AO 91 (Rev. 11/11) Criminal Complaint      AUSAs Barry Jonas (312) 886-8027 and Raj Laud (414) 469-6306

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



**ᴅFILED**

APR 11 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JOSEPH D. JONES and
EDWARD SCHIMENTI

**CASE NUMBER:**
**UNDER SEAL**

**17CR 236**

MAGISTRATE JUDGE WEISMAN

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From at least on or about February 24, 2017, until at least on or about April 7, 2017, in the Northern District of Illinois, Eastern Division, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, 2339B(a)(1) | conspiring and attempting to provide material support and resources, namely, personnel and equipment, to a foreign terrorist organization, namely, the Islamic State of Iraq and al Sham, knowing that the organization was a designated terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

_____
CASSANDRA B. CARNRIGHT
Special Agent, Federal Bureau of Investigation
(FBI)

Sworn to before me and signed in my presence.

Date: April 11, 2017

_____
*Judge's signature*

City and state: Chicago, Illinois

M. David Weisman, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT    )
    )
NORTHERN DISTRICT OF ILLINOIS    )

### AFFIDAVIT

I, Cassandra B. Carnright, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately March 2016.

2.    As part of my duties as an FBI Special Agent, I investigate criminal violations relating to international terrorism, including providing and conspiring, and attempting to provide, material support or resources to foreign terrorist organizations, in violation of Title 18, United States Code, Section 2339B(a)(1). As a result of my training and experience, to include information provided by other federal agents with applicable knowledge, I am familiar with the tactics, methods, and techniques used by terrorist networks and their members. In addition, I have participated in the execution of multiple federal search warrants.

3.    This affidavit is made in support of a criminal complaint alleging that JOSEPH D. JONES, a/k/a "Yusuf Abdulhaqq," and EDWARD SCHIMENTI, a/k/a "Abdul Wali," have violated Title 18, United States Code, Section 2339B(a)(1).

4.    This affidavit is also submitted in support of an application for a warrant to search a single family home located at [redacted] in Zion, Illinois (**Subject Premises**).

5.    This affidavit is also submitted in support of a warrant to search the following electronic devices:

a. A black Samsung cellular phone, assigned telephone number (773) 699-XXXX and used by JONES (**Subject Phone 1**).

b. A black LG cellular phone, assigned telephone number (224) 430-XXXX and used by SCHIMENTI (**Subject Phone 2**).

c. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of securing search warrants and for a criminal complaint charging JONES and SCHIMENTI with conspiring and attempting to provide material support and resources, namely, personnel and equipment, to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham (ISIS), knowing that the organization was a designated terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint, and that evidence of this offense will be found at or within the places and items to be searched.

6. At various points in the Affidavit, I offer my interpretations of certain communications in brackets and otherwise. These interpretations, which include translations of certain words and phrases in the Arabic language, are based on my knowledge of the investigation to date and review of prior communications, the contents and context of the communications, prior and subsequent communications,

2

conversations with other law enforcement officers and agents, conversations with one or more Arabic translators employed by the FBI, and my experience and familiarity with terrorist organizations generally. Some of these summaries do not include references to all the topics covered during the course of the communications. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. Finally, quotations from written communications are as they appear in their original form, including any grammatical or spelling errors. Although transcribers have attempted to transcribe the communications accurately, to the extent that quotations from these communications are included, these are preliminary, not final, transcriptions.

## OVERVIEW

7.     As described in more detail below, JONES and SCHIMENTI have conspired and attempted to provide material support and resources, namely, personnel and cellular telephones, to a designated foreign terrorist organization, namely, ISIS. Specifically, JONES and SCHIMENTI each provided cellular telephones to an individual whom, unbeknownst to JONES and SCHIMENTI, was an FBI Confidential Human Source (the CHS).[1] JONES and SCHIMENTI provided these cellular telephones to the CHS with the belief and understanding that they would be transported by the CHS to ISIS-controlled territory and provided to ISIS for use in assembling improvised explosive devices (IEDs) to conduct violent attacks.

---

[1] To date, the CHS has been paid approximately $14,855 by the FBI. All of the payments, with the exception of approximately $500, were used to cover investigation related expense.

8.     In addition, JONES and SCHIMENTI worked together to prepare and support the CHS's purported travel overseas to fight on the behalf of ISIS. Specifically, SCHIMENTI expressed support for the CHS's plans to travel to fight on behalf of ISIS, helped the CHS improve his physical fitness so he would be prepared to fight with ISIS, counseled the CHS to be cautious to avoid detection by law enforcement, and introduced the CHS to JONES, for the purpose of JONES introducing the CHS to a purported ISIS facilitator who would assist the CHS with joining ISIS. JONES, in turn introduced the CHS to an individual whom JONES believed operated an ISIS facilitation network capable of delivering the CHS to ISIS-controlled territory in Syria.

### The Islamic State of Iraq and al-Sham

9.     On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

10.     On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the FTO listing: The Islamic State of

Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

11.     Based on my training and experience: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, have been traveling to Syria and Iraq to join ISIS and commonly enter Syria by crossing the border from Turkey; (b) Abu Bakr al-Baghdadi is the current leader of ISIS and is frequently referred to as "Khalifa" or "Khalifa Abu Bakr al-Baghdadi"; (c) the terms "dowlah," "dawlah," "dowla," and "dawla" are Arabic terms that mean country or state and are commonly used to refer to ISIS, which is also known as "the State;" and (d) ISIS maintains a flag with a black background and white letters, written in Arabic on the top, translated to "There is no God but Allah." In the middle of the flag is a white circle containing black lettering translated to, "Mohammed is the Messenger of Allah".

**JOSEPH D. JONES**

12.     According to State of Illinois identification records, JONES is a 35-year-old, who resides at [redacted] in Zion, Illinois (**Subject Premises**). Based on surveillance, law enforcement agents familiar with the physical appearance of JONES have observed him at the **Subject Premises** on numerous occasions. More specifically, agents have observed JONES present at the **Subject Premises** on or

5

about June 16, 2016, December 13, 2016, and March 26, 2017. Additionally, following a meeting between an FBI undercover employee (UC1) and JONES, UC1 dropped JONES off at the **Subject Premises**. Similarly, the CHS observed JONES at the **Subject Premises** on or about February 24, 2017 and March 26, 2017.

**EDWARD SCHIMENTI**

13.     According to Illinois driver's license records, SCHIMENTI is a 35-year-old who resides in Zion, Illinois.

## PROBABLE CAUSE IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

14.     As set forth in more detail below, law enforcement is conducting an investigation of JONES and SCHIMENTI's conspiracy to provide material support and resources to ISIS. In approximately September 2015, JONES was introduced to an FBI undercover employee, UC1, who informed JONES that he was preparing to travel to the Middle East to join ISIS with the assistance of a purported ISIS facilitator. JONES later introduced UC1 to SCHIMENTI. JONES and SCHIMENTI expressed support for UC1's plans to travel to ISIS-controlled territory in the Middle East and fight on behalf of ISIS.

15.     UC1 later introduced JONES and SCHIMENTI to another FBI undercover employee (UC2), who could purportedly facilitate travel to ISIS-controlled territory. In or about May 2016, JONES and SCHIMENTI believed that UC1 traveled to Syria with the help of UC2. Afterwards, UC2 informed JONES that UC1 had successfully joined ISIS. Later, JONES introduced another FBI undercover employee

6

(UC4), whom JONES had met online, to UC2 to facilitate UC4's travel to Syria to fight on behalf of ISIS. In or around January 2017, JONES and SCHIMENTI believed that UC4 traveled to Syria to fight on behalf of ISIS.

16.    In approximately November 2016, SCHIMENTI met the CHS, who purportedly was from Iraq and had a brother who was an ISIS member. SCHIMENTI explained to the CHS that SCHIMENTI was a supporter of ISIS who believed in violent jihad. After the CHS expressed a desire to return to the ISIS-controlled territory in the Middle East to fight on behalf of ISIS, SCHIMENTI introduced the CHS to JONES, who was in contact with UC2, who had a purported ISIS facilitation network. JONES then introduced the CHS to UC2 to facilitate the CHS's travel to fight on behalf of ISIS. JONES and SCHIMENTI also provided the CHS with cellular telephones with the understanding that the phones would be used as detonators for overseas IED attacks by ISIS.

**JONES's Online Activity**

17.    Based in part on emails received by an online FBI undercover employee (UC3), whom JONES believed was an ISIS supporter located in the Chicagoland area, as well as other information as set forth in this Affidavit, the email account "Only1Not3@gmail.com" appears to belong to JONES. For example, on or about April 22, 2016, JONES, using Communication Platform 1, told UC3 that he (JONES) was going to send an email containing a picture. During this conversation, JONES informed UC3 that JONES was in one of the photos, an individual who goes by "Abdul Wali" was in the other picture (as set forth below, Abdul Wali is an alias used by

7

SCHIMENTI), and that the picture was taken "close to home." The next day, UC3 received an email from Only1Not3@gmail.com, containing a picture of an individual holding what appears to be the flag used by ISIS. In the background of the picture, below, is a sign that states "Welcome to Illinois" with additional words that are partially blocked but appear to be "Beach State Park."[2] From my training and experience, and based upon information provided to me by other federal agents, it appears that the flag in the picture is the ISIS flag. JONES requested UC3 share this picture to the UC3's Google+ account with the caption "Support from dar ul kuffar [the land of infidels]!" The following is a screen capture of these images:




---

[2] Illinois Beach State Park is located in Zion, Illinois.

18.    JONES has been identified as the former user of a Facebook account with the user name "Yusuf Abdulahad."[3] An open source search for social media accounts using the name "Yusuf Abdulahad" resulted in the identification of a Google+ account with the user name "Yusuf Abdulahad."[4] I have compared the publicly available photograph of the person who appears to be the user of Google+ account Yusuf Abdulahad as it appeared in or about April 2015, to JONES's State of Illinois identification card photograph and they appear to depict the same person. I have also showed the publically available photo from Google+ account Yusuf Abdulahad to the CHS, who has met JONES on multiple occasions, and the CHS has identified the photo as JONES.

19.    Numerous statements in support of ISIS and violent jihad have been posted using Google+ account Yusuf Abdulahad. Because, as described above, JONES appears to be the user of this account, and because JONES later discussed his support for violent jihad when he met in person with the UCs and CHS as set forth beginning in paragraph 34 of this affidavit, I believe that JONES authored these posts. For

---

[3] The user of this account publicly posted his location as Chicago, Illinois and his date of birth as February 27. According to State of Illinois identification card records, JONES's month and day of birth are February 27. In addition, the Facebook profile photo for this account contained an image that appears to be the same individual depicted on JONES's state identification card.

[4] Based on my training and experience, I know that Google+ is an online social medium on which users can post personal information and commentary, photographs, videos, and other information. Google+ permits users to invite and/or request other users to their "circles," thereby allowing other users to, among other things, share information and updates. To establish a "circle" relationship on Google+, a user seeking to friend another user typically sends a request to join that user's "circle," which can be accepted, rejected, or ignored by the other user.

example, in or about March and April 2015, JONES posted on Google+ account Yusuf
Abdulahad the following statements.

- "Relying on man made system will only continue our slaughter at the
  hands of the filthy disbelievers claiming to protect us."

- "They lie so much the media said 2 weeks ago the city was taken from
  Islamic State...May Allah curse the wicked and aid the mujahideen
  [mujahideen refers to individuals engaged in jihad]."

- "Brother there is no such thing as a moderate Muslim. That is the name
  Kaffirs [non-believers] give to weak minded material loving sellouts.
  The intention of these people is to put kafir in a ruling position instead
  of Allah."

- "So I was searching eBay for a black islamic flag...nothing but filthy shia
  and iranian flags pop up."

20.     Also using Google+ account Yusuf Abdulahad, JONES authored
publically-available posts arguing against other Google+ users who did not share
JONES's support for violent extremism. For example, in a May 2015 exchange with
another Google+ user, JONES stated, "No one else gives a dam about ruling by Islam
no one else is fighting against oppression of the believers so please do not disrespect
the mujahedeen [jihadi fighters] of Iraq Syria West Africa or any in the world."

21.     Similarly, on or about April 16, 2015, JONES posted an article,
"Interview with an Islamic State Correspondent," using Google+ account Yusuf

10

Abdulahad. The article promoted ISIS and claimed that ISIS has been successful in its military operations because of its "intelligence forces", implementation of snipers, and use of IEDs.

22.     Similarly, on or about May 13, 2015, using Google+ account Yusuf Abdulahad, JONES posted an essay, "Jihad: The Forgotten Obligation." The essay includes statements such as, "Jihad is the best deed and the best grade of jihad is Shahadah [martyrdom] which the Shaheed [martyr] has achieved." The essay also states that "It is clear from this Hadith that the person who does Jihad in Allah's path is more superior than other Muslims," and "Allah's love and blessing is with those who demonstrate their commitment by sacrificing their lives and wealth for Allah." Further, the essay indicates that, "Muslims should remain experienced in the war tactics and weapons of war. They should keep all sorts of arms and weapons ready in order to benefit from the reward and subsequently would not feel shamed and inadequate when it is required."

23.     On or about May 20, 2015, using Google+ account Yusuf Abdulahad, JONES posted a document, "A Brief Guide to the Islamic State [2015]". The document appears to be, in essence, a 46-page traveler's guide to the Islamic State that includes information on food, weather, transportation, technology, people, and education in ISIS's self-proclaimed caliphate. The Guide notes that U.S. airstrikes kill multiple civilians in the Islamic State and argues that the lives of Iraqis and Syrians are now better off because of the Islamic State. The Guide concludes, "When we descend on

the streets of London, Paris, and Washington the taste will be far bitterer, because not only will we spill your blood, but we will also demolish your statues, erase your history, and, most painfully, convert your children who will then go on to champion our name and curse of their forefathers." The following is a screen capture of this posting:





12

24.     On or about July 12, 2015, JONES, using Google+ account Yusuf Abdulahad, shared publicly an audio message by ISIS's Al-Furquan Media.[5] The message was entitled, "A message to the Mujahideen and to the Muslim Ummah [nation] by Abu Bakr al-Baghdadi." In this 19 minutes and 47 seconds audio message, Abu Bakr al-Baghdadi, the leader of ISIS, called upon Muslims to act against global oppression and to emigrate to the newly-declared caliphate. The following is a screen capture of this posting:



25.     In addition to publicly posting his support of ISIS, JONES made private posts supporting ISIS. For example, on or about October 22, 2015, JONES shared privately a video originally shared by Google+ Community which translates to, "the Glare of the Caliphate."[6] The video is titled "Some of the Deadly Stabbing Ways: Do not Forget to Poison the Knife." The video is one minute and 12 seconds long. It was originally produced by "Ajnad Foundation For Media Production," one of ISIS's media

---

[5] As explained in paragraph 10 above, Al-Furquan Establishment for Media Production is a designated alias of ISIS.
[6] This posting was observed by UC3, who had friended JONES online, and therefore received JONES's non-public posts.

foundations. Pictured below is a screen shot from the video which features two masked individuals who appear to illustrate some deadly stabbing methods, including stabbing the heart, the neck, the abdomen, and the legs. The following is a screen capture of this posting:



26.     According to subpoenaed telephone records, phone number (773) 699-XXXX (**Subject Phone 1**) is subscribed to JONES by a variation of his name, with the **Subject Premises** listed as the address for the account.

**SCHIMENTI's Online Activity**

27.     SCHIMENTI has been identified as the former user of a Google+ account with the user name "Ed Schimenti." Specifically, according to subpoenaed subscriber information, telephone number (224) 430-XXXX (**Subject Phone 2**) is associated with the Google+ account Ed Schimenti. Based on information provided by a credit agency, **Subject Phone 2** is assigned to SCHIMENTI. In addition, as described

below, SCHIMENTI identified **Subject Phone 2** as his phone during a meeting with UC1 and UC2.

28.     Numerous statements in support of ISIS and violent jihad have been posted using Google+ account Ed Schimenti. Because, as described above, SCHIMENTI appears to be the user of this account, and because SCHIMENTI later discussed his support for violent jihad when he met in person with the UCs and CHS as set forth beginning in paragraph 34 of this affidavit, I believe that these posted were authored by SCHIMENTI. For example, on the publicly available portion of Google+ account Ed Schimenti, on or about April 3, 2015, SCHIMENTI authored a post stating, "Kuffar [unbelievers], we are coming to slay you." The following is a screen capture of this posting:



29.     Further, on the publicly available portion of Google+ account Ed Schimenti, on or about April 23, 2015, SCHIMENTI commented, "Islamic State will control your country, matter of fact, Islam will dominate the world!!" The following is a screen capture of this posting:

15



+1    ➥

Hide comments  ∧

**Ed Schimenti**  April 11, 2015
Islamic State will control your country, matter of fact, Islam will dominate the world!!

    30.    Further, the publicly available portion of Google+ account Ed Schimenti, on or about May 10, 2015, displayed the ISIS flag and depicted an individual associated with the designated foreign terrorist organization Boko Haram claiming credit for attacks on Lagos and Abuja, Nigeria. In a posting, SCHIMENTI stated, "May Allah reward this fierce mujahideen who uses his life, body, and earthly might to make Allah's Law govern all, may Allah reward him for striking fear in the hearts of the taghut and the disbelievers in general." SCHIMENTI continued his comments regarding this Boko Haram post by saying, "May Allah reward this brother who has left his family and life to fight for establishment of the Islamic State...I love him...what can the kuffar do.? They have noone..." The following is a screen capture of this posting:

16



**Ed Schmenti**

May Allah reward this fierce mujahideen who uses his life, body and earthly might to make Allah's Law govern all, may Allah reward him for striking fear in the hearts of the taghut and the disbelievers in general, Alaaaahu Akbaaaar!



Boko Haram chief claims Lagos & Abuja attacks, moc...

+1

**Ed Schmenti** commented on a video on YouTube.

May Allah reward this brother who has left his family and life to fight for establishment of Islamic State and makes it clear that victory comes only thru Allah azzawajall, I love him, Alhamdulillah, what can the kuffar do ? They have noone, we have Allah and truly the Party of Allah is the victorious Party!



Boko Haram chief claims Lagos & Abuja attacks, moc...

31.     Further, based on the publicly available portion of Google+ account Ed Schimenti, on or about June 7, 2015, SCHIMENTI posted a photograph of a masked individual holding a knife with the ISIS flag in the background, and the caption of this photo stated, "IF YOU CAN'T MAKE HIJRAH [travel to fight jihad] THEN SLAUGHTER THE PAGANS NEXT TO YOU." The following is a screen capture of this posting:

17



32.   SCHIMENTI has been identified as the former user of a Facebook

account with the vanity name "Ed Schimenti." I compared the photograph posted on

the Facebook account Ed Schimenti, photo below, to a photograph of SCHIMENTI

contained in Illinois driver's license records and they appear to be the same person.

In addition, the CHS, who has met SCHIMENTI on several occasions, identified the

photograph posted through the Facebook account Ed Schimenti as SCHIMENTI. The

following is a screen capture of this posting:

18



33.     SCHIMENTI has posted numerous statements in support of ISIS and violent jihad using the Facebook account Ed Schimenti. For example, on the publicly available portion of the Facebook account Ed Schimenti, in or about December 2014, SCHIMENTI posted, "I like 2 spread Islam. It's where I found my honor/worth. I love my brothers/sisters fighting 2 expand territory of Islamic State/all Muslims. 2 the CIA on Facebook, Muslims are a lil smarter. Just had convo's w/2spies playing good cop/bad cop asking about my allegiance…6/29/2014!"   The following is a screen capture of this posting:



**Ed Schimenti**
Yesterday at 3:23pm · Edited ·

I like 2 spread Islam.It's where I found my honor/worth.I love my brothers/sisters fighting 2 expand territory of Islamic State/all Muslims.2 the CIA on Facebook, Muslims are a lil smarter.Just had convo's w/2 spies playing good cop/bad cop asking about my allegiance....6/29/14!

Like · Comment · Share

19

### JONES's and SCHIMENTI's Meetings with UCs 1 and 2

34.     On or about September 1, 2015, an FBI undercover employee (UC1) introduced himself/herself to JONES at the Zion Police Department in Zion, Illinois.[7] As part of a ruse, UC1 posed as a recently detained individual brought into the police department for questioning after a traffic stop. During this meeting, UC1 and JONES exchanged their contact information and agreed to communicate through Communication Platform 2.

35.     On or about September 2, 2015, UC1 and JONES began to communicate through Communication Platform 2. For example, on or about September 4, 2015, UC1 asked JONES, "Do you have any good videos or articles i can read to strengthen up my deen [faith]?" In reply JONES stated, "Yes brother I will send you some inshallah [God willing]. Do you have Gmail?" UC1 provided UC1's email address so that JONES could send the videos or articles, and UC1 asked what email address JONES was going to use to send this email. JONES replied, "Only1not3@gmail.com."

36.     On or about October 6, 2015, using Communication Platform 2, UC1 informed JONES about how associates of UC1 used Communication Platform 1 to communicate with each other. Using Communication Platform 2, UC1 provided his/her username for Communication Platform 1. On or about October 7, 2015, JONES provided UC1 his username on Communication Platform 1 and added UC1 as a contact on Communication Platform 1.

---

[7] JONES had not been charged with any crime. Instead, JONES was at the police station to be interviewed regarding the murder of one of his friends.

37.     On or about October 8, 2015, UC1 and JONES began communicating on Communication Platform 1. During this conversation, JONES asked UC1, "Are there any other brothers on here that I could build and learn with?" UC1 responded that another individual (UC2), was also using Communication Platform 1, and that UC1 would attempt to put UC2 in contact with JONES on Communication Platform 1. UC1 described UC2 as a "knowledgeable brother and very trustworthy." JONES responded, "Don't forget about me."

38.     On or about October 19, 2015, using Communication Platform 1, JONES asked UC1, "Do you watch videos published by the Islamic State?" UC1 responded, "Akhee [Brother], I have seen some videos but I don't know how to get a hold of more...have any that you can email me?" JONES responded, "I have plenty of videos. From Syria Iraq and west Africa." UC1 asked JONES to send those videos. JONES asked for UC1's email address, and stated, "They are expanding the Islamic state [ISIS] and humiliated those who oppose."

39.     On or about October 20, 2015, at approximately 7:44 a.m., JONES used Only1Not3@gmail.com to send two ISIS videos to UC1. Both videos appeared to portray ISIS fighters conducting acts of violence, such as executions by beheadings and shooting restrained individuals in the head.

40.     Later on or about October 20, 2015, using Communication Platform 1, UC1 and JONES discussed the videos. UC1 asked JONES, "Were those brothers soldiers from the Islamic State trying to establish the caliphate in Africa?" JONES

21

replied, "yes they are from the Islamic state and those brothers have given bayah [an oath or allegiance] to the Khilafah [leader of ISIS]." Furthermore, JONES stated, "I will send more. Have you saw the Flames of war video?" UC1 asked JONES, "have you ever thought about going over to the caliphate [ISIS]?" JONES replied, "Every night and day. U?" UC1 responded, "Same here." JONES told UC1, "The more I see the expansion of the Islamic state the stronger my faith grows. I always pray for them to continue expanding and for us here in this part of the world's top get a better understanding of the truth." JONES concluded the discussion by saying, "I will send a video that shows brothers from all over the world speaking about living in the land of Khilafah even their children. All races and colors living together SubhanAllah [greatness of God]."

41.     On or about October 24, 2015, using Communication Platform 1, UC1 informed JONES that UC2 and UC1 had plans to travel through Chicago, Illinois, on approximately October 30, 2015. During this conversation, UC1 asked JONES if he wanted to meet up with UC1 and UC2. JONES responded, "yes that would be great. I live and work in the same town of zion Illinois that you saw met me in. Let me know. Alhumdulillah [praise be to God] I will try my best to make myself available just give me the heads up."

42.     On or about October 30, 2015, UC1 and UC2 met with JONES at a location in Waukegan, Illinois, which was suggested by JONES. During this meeting, which was audio recorded, JONES introduced UC2 and UC1 to SCHIMENTI, who

22

introduced himself as Abdul Wali. After this portion of the meeting, JONES, SCHIMENTI, UC1, and UC2 traveled to a local restaurant. While at the restaurant, SCHIMENTI provided his phone number as **Subject Phone 2**. SCHIMENTI confided in UC1 and UC2 that he watched Anwar Awlaki materials[8] and supported ISIS.

43.    On or about November 13, 2015, using Communication Platform 1, JONES sent UC1 a link to an online news article containing an ISIS video. The headline of the news article was, "ISIS Beheads 4 Peshmerga Fighters." The article described the video as "a new video purportedly released by the Islamic State, [in which] three Kurdish soldiers are forced to watch a fellow Peshmerga get beheaded before being beheaded." JONES instructed UC1 to, "Watch the video til the end had English at the end addressing Obama." The portion toward the end of the video contains spoken English and shows the Peshmerga soldiers being beheaded.

44.    During this same discussion on or about November 13, 2015, UC1 asked JONES, "Have you been watching the news going on right now in Paris?" UC1 was referring to what news outlets described as the Paris Massacre, in which at least 128 people were killed by gunfire and blasts according to French officials. JONES responded, "Yes I just saw it on TV at work as I was going to make magrib [Islamic prayers]. Can you say imam [faith] booster!" During this conversation, UC1 informed

---

[8] Anwar al-Awlaki is a deceased member of Al-Qaeda in the Arabian Peninsula. Al-Awlaki has encouraged violent attacks against the West.

23

JONES that UC1 was going to contact UC2 to determine, "what more I can do to prepare myself for this war."

45.    Between on or about November 23, 2015 and November 24, 2015, using Communication Platform 1, UC1 stated to JONES, "Assalmalaikum [peace be upon you] Akhee [brother] I saw on the news today that armed kuffars [non-believers] are watching masjids. Be careful and watch yourself. Havent from you in a while everything ok?" JONES responded, "Yes evertyhing is OK. Jazakallah khairn for your concern. Mashallah brother I really need knowledge. I am so ready to go." Based on my training and experience, and information provided to me by other federal agents, I believe JONES meant he wanted to travel overseas to join ISIS.

46.    On or about November 25, 2015, using Communication Platform 1, JONES asked UC1, if he has ever taken a course of jihad. UC1 and JONES then had a discussion regarding the meaning of jihad. JONES then asked UC1 if UC1 thought that ISIS had something to do with what happened in France. UC1 stated, "From what I've seen and read I do believe the brothers did it on the behalf of the dawla [Islamic State]...and as far as the jihad, [UC2] is finding some training for me to attend." JONES then asked, "What type of training? Do you think the prophet pbuh [peace be upon him] approves of the attack? I'm not condemning it. I just want to understand it." UC1 answered, "I've asked [UC2] to find training for me that would get me prepared to travel to the dawla [ISIS], survival training." JONES asked UC1 where the location would be for this training. UC1 answered by saying, "I've asked

24

[UC2] for training away from where i live and somewhere where the conditions are similar to the dawla [ISIS]." JONES then asked UC1, "I wonder why the brothers didn't attack military or police base."

47. On or about December 19, 2015, using Communication Platform 1, UC1 informed JONES that UC1 had participated in a training camp. JONES asked UC1 what this training entailed. UC1 told JONES the training involved weapons, self-defense, and survival training with rifles and pistols. UC1 also told JONES that "another student" was able to take pictures of UC1 conducting this training and that UC1 would share those pictures with JONES the next time they were together.

48. On or about December 22, 2015, using Communication Platform 1, UC1 informed JONES that UC1 and UC2 would be traveling through northern Illinois on or about December 29, 2015. JONES replied, "I will be waiting for your call or text."

49. On or about about December 29, 2015, UC1 and UC2 met with JONES and SCHIMENTI in Waukegan, Illinois. During this meeting, JONES confirmed that he had given bay'ah. According to FBI linguists and translators, "bay'ah" is an Arabic word meaning an oath or allegiance to a leader or a group. Based on the context of this statement, as well as JONES's rhetoric and open source postings, I believe this is a reference to pledging bay'ah to ISIS.

50. JONES asked if UC1 or UC2 listened to a recent speech by Abu Bakr Al-Baghdadi (the leader of ISIS). UC1 showed JONES pictures from the firearms/survival training that he purportedly attended. In response, JONES stated

25

he wanted to attend the same training. Furthermore, JONES voiced concern about attending the training due to his prior felony convictions. In addition, JONES suggested a place to shoot firearms in Lombard, Illinois.

51.     During the same meeting, JONES stated to UC1 and UC2 that SCHIMENTI wanted to talk about jihad with everybody, but SCHIMENTI should be smart and not put everyone else in jeopardy by discussing jihad so openly. JONES further stated that SCHIMENTI brought the feds into their life.[9] This meeting ended when SCHIMENTI abruptly left the meeting. He then returned to get JONES, who then left with SCHIMENTI (they had driven to the meeting together).

52.     On or about February 6, 2016, using Communication Platform 1, UC1 asked JONES if he could provide any more videos to UC1. JONES stated, "New videos all the time a brother just told me about 1." UC1 stated, "I'm not sure if you have got my messages from last week since you got your new phone. I wanted to ask you to keep me in your dua [prayers], because [UC2] informed me by the permission of Allah the window of my dreams may have been opened."

53.     On or about February 7, 2016, the conversation between JONES and UC1 continued from the previous day. During this conversation, JONES provided a link to a news outlet article with a video embedded that appears to show a child

---

[9] On or about December 12 and 16, 2015, SCHIMENTI and JONES, respectively, were each interviewed regarding a purported terrorist plot overseas after SCHIMENTI was identified in the media as a participant in the plot. Based on the investigation to date, it does not appear that JONES and SCHIMENTI were involved in this alleged plot.

soldier beheading a man. JONES stated when he provided the hyperlink that, "This is one of the new ones."

54.     At approximately 14 minutes into this video, a man in an orange jumpsuit has his hands bound behind his back. The man is being escorted by a boy with a knife. The man in the orange jumpsuit is placed on his knees, and the boy with the knife stands behind the kneeling individual. A male voice is then heard speaking in English. The ISIS flag can be seen in the upper right corner of the video. The boy with the knife then puts the man in the orange jumpsuit in the prone position, grabs his hair to lift up his head, and decapitates the man in the orange jumpsuit while his hands are still bound behind his back. The boy with the knife then puts the decapitated head on the back of the male in the orange jumpsuit.

55.     On or about February 8, 2016, the conversation between JONES and UC1 continued from the previous day. During this conversation, UC1 stated, "You know what else I'm looking for is the ISIS Islamic state flag....if i find one you want me to get you one?" JONES responded, "Yes alhumdulillah [praise be to God]. I am waiting on a brother from the iqra store to let me know if he has a flag. It's not the isis flag but black with shahada on it. Or white." JONES continued, "I thought of making one or paying someone to make it." UC1 stated, "I will find some my way and if i do i will get you one akhee. I got you." JONES responded, "I will do the same for you." Towards the end of this conversation UC1 stated, "I can't wait to leave!" JONES responded, "May Allah make it easy for you." Based on the context of the

conversation, I believe that JONES was referring to "Allah" making UC1's travel to ISIS-controlled territory "easy."

56. On or about February 15, 2016, using Communication Platform 1, JONES provided UC1 a link to a news article with a video embedded that appeared to show ISIS executing alleged spies by burning them alive, drowning them in cages, and strapping explosives around their neck and detonating those explosives.

57. The first segment of the video shows men in red jumpsuits speaking to the camera in Arabic. At approximately two minutes into the video, four men can be seen with their hands bound behind their back, and are escorted by individuals wearing camouflage clothing, face masks, and pistols secured in shoulder holsters. The individuals in the red jumpsuits are placed in a four-door vehicle with their hands secured to handles in the vehicle. An individual is then seen aiming what appears to be a rocket propelled grenade (RPG) at the vehicle. This individual fires the RPG at the vehicle, and the vehicle catches fire. Audible screams can be heard while the vehicle is burning.

58. The second segment of the video shows men in red jumpsuits speaking to the camera in Arabic. At approximately three minutes and 25 seconds into the video, five men are seen with their hands bound behind their back. The men are escorted by an individual wearing camouflage clothing, a face mask, and a pistol secured in a shoulder holster. The individuals in the red jumpsuits are then placed in a cage. The individual wearing camouflage clothing attaches a lock to the cage's

door. The cage is then lifted, by what appeared to be a crane, and fully submerged in a swimming pool filled with water. When this cage is fully submerged in the water, muffled screams can be heard. The cage is then lifted while the ISIS flag is seen in the upper right corner of the video. When the cage emerges from the water all five individuals appear to have drowned, and some have foam coming out of their mouths.

59.     The third segment of the video shows men in red jumpsuits speaking to the camera is Arabic. At approximately six minutes and five seconds, seven men are seen with their hands bound behind their back. The prisoners are escorted by an individual wearing camouflage clothing, a face mask, and a pistol secured in a shoulder holster. The men in the red jumpsuits are placed on their knees, and the individual wearing camouflage clothing is seen wrapping what appears to be detonation cord around the necks of the prisoners. The video then shows all seven of the men in the video frame, after which an explosion occurs in slow motion, and the bodies are seen to be dismembered by this explosion. The video ends with another individual in a red jumpsuit who appeared to observed this execution.

60.     On or about February 21, 2016, using Communication Platform 1, UC1 notified JONES that UC1 had obtained an ISIS flag for JONES, and that UC1 would be in JONES' area the week of March 7, 2016. On or about March 10, 2016, using Communication Platform 1, UC1 and JONES discussed the logistics of meeting each other on March 11, 2016. JONES requested that UC1 pick him up from his residence, and JONES provided his address, the **Subject Premises**.

29

61.     On or about March 11, 2016, UC1 met with JONES in Zion, Illinois outside of the **Subject Premises**. JONES and UC1 then went to coffee shop. During this meeting, UC1 advised JONES that UC1 would be leaving to join "Dawla Islamiya [ISIS]" in April or May 2016 to join "Al-Baghdadi." Furthermore, during this meeting UC1 provided an ISIS flag to JONES.[10] Following this meeting, JONES requested that UC1 erase JONES's address (the **Subject Premises**) from UC1's Communication Platform 1. UC1 responded, "i ain't leaving just yet!" JONES responded, "Doesn't make a difference brother. Understand me please." UC1 then stated, "I will delete this thread and start a new one?" JONES responded, "Love you for the sake of Allah..."

62.     On or about April 21, 2016, using Communication Platform 1, UC1 informed JONES that UC1 and UC2 had made arrangements to depart from O'Hare International Airport on May 20, 2016, to begin UC1's journey to join ISIS.

63.     On or about May 12, 2016, using Communication Platform 1, UC1 informed JONES that UC1's and UC2's plans had been confirmed to depart from Chicago O'Hare International Airport on May 20, 2016. JONES stated, "You are truly a motivation and I love you for the sake of Allah..." JONES then asked if UC2 was traveling with UC1. UC1 responded that UC2 was traveling with UC1, but UC2 was

---

[10] As set forth in more detail in paragraph 18, JONES later shared online a photograph of himself and what appears to be the same ISIS flag in front of a sign at Illinois Beach State Park.

not making the full journey, and that UC2 intended to return to the United States before UC1 entered into ISIS controlled territory.

64. On or about May 19, 2016, using Communication Platform 1, JONES stated to UC1, "Travel well brother! In Shaa Allah! [God willing] Jazakallah khairn [May God reward you with goodness]. Thank you from the bottom of my heart! Love you for the sake of Allah..."

65. On or about June 16, 2016, using Communication Platform 1, UC2 told JONES, "i have some Islamic goods from close to the land of truth for you and our brother . . . that i need to give to you." JONES responded, "Allahu Akbar! What a blessing! How are you doing ahki [brother]? How was the trip? How was [UC1]?" UC2 stated that UC1 was doing well, and trying to understand how it works overseas. UC2 informed JONES that UC2 was staying the night in the Chicagoland area and wanted to meet with JONES later that day because there were photographs to show JONES of UC1's and UC2's journey. JONES agreed to meet with UC2 during the evening on or about June 16, 2016. UC2 agreed to pick up JONES from his residence (the **Subject Premises**).

66. On or about June 16, 2016, UC2 met with JONES in Zion, Illinois, outside of the **Subject Premises**. UC2 and JONES obtained food to go from a restaurant and then traveled to another location in Waukegan. Afterwards, UC2 dropped JONES back off at the **Subject Premises**. While sitting in UC2's car, UC2 explained the details of UC2's purported ISIS facilitation network. UC2 explained

the ISIS facilitation network involved Individual A, who assisted in getting individuals from the United States to Syria. UC2 explained that once the traveling individual arrived in a country bordering Syria, this ISIS facilitation network would safely transport the traveling individual across the border into Syria. Finally, once in Syria, the traveling individual will enter ISIS-held territory to begin their training to become a fighter for ISIS. During this meeting, UC2 showed pictures of UC1, UC2, and another (Individual A) purportedly traveling from North America to the Middle East, along with a portion of UC1's video explaining UC1's motivations for wanting join ISIS and fight to defend ISIS. UC2 told JONES that UC1 made the video while in the Middle East before crossing the border into Syria.

67.     On or about June 17, 2016, using Communication Platform 1, JONES initiated a conversation with UC2. During this conversation, JONES inquired if UC2 was home safely. UC2 responded in the affirmative.

**JONES and UC4**

68.     On or about October 26, 2015, using Communication Platform 3, JONES initiated contact online with FBI undercover employee UC4. During the ensuing conversation, JONES and UC4 agreed to communicate through Communication Platform 1.[11]

---

[11] Later on or about March 3, 2016, using Communication Platform 3, UC4 informed JONES that his previous username on Communication Platform 1 had been locked out, therefore UC4 would have to create a new username on Communication Platform 1. Subsequent communications on this platform between JONES and UC4 used the new username.

69.     As referenced above, on or about April 22, 2016, using Communication Platform 1, JONES sent UC4 a photo of a masked man holding the banner of ISIS, in front of a partially obscured monument which appears to display the text WELCOME TO ILLINOIS BEACH STATE PARK. The photograph appears to depict the same ISIS flag that was provided to JONES by UC1 on or about March 11, 2016.

70.     The photograph JONES provided to UC4 is as follow:



71.     On or about April 25, 2016, UC4 asked for JONES's permission to share the picture, via social media, that JONES previously provided. JONES stated that he did not mind UC4 sharing it, just not on Facebook. JONES continued by saying, "Share it with those who you trust or with the Ansar in private groups. It will boost the iman [faith] of the righteous mujahedeen [fighters] and Ansar over the world. In Shaa Allah [God willing]. Kuffar [non-believers] might report."

72.     From approximately August 2016 through January 2017, JONES continued to communicate with UC4, whose identity was later assumed by an FBI undercover agent in order to facilitate an in-person meeting.[12] During their communications, UC4 indicated to JONES that UC4 would like to travel to join ISIS. JONES then introduced UC4 to UC2 in order to facilitate UC4's travel to ISIS-controlled territory. In or about January 2017, UC4 informed JONES that he was traveling to Syria soon.

**SCHIMENTI, JONES and the CHS**

73.     On or about December 21, 2016, an in-person conversation occurred between SCHIMENTI and the CHS, who was employed at the same place as SCHIMENTI. During this conversation,[13] according to the CHS, the CHS asked SCHIMENTI if he had heard about the attacks in Berlin. Specifically, an attack on or about December 19, 2016, during which a truck was driven into the Christmas market next to Kaiser Wilhem Memorial Church at Breitscheidplatz in Berlin, killing 12 people and injuring 56. Following the attack, ISIS stated that the attacker answered its call to target the citizens of states that are fighting against it. SCHIMENTI responded by discussing the mujahideen [fighters], the kufar [non-believers], and stated that jihad was "doing God's work."

---

[12] Because JONES believed the online individual was the same person JONES met in person, the persona will be referred to as UC4.

[13] The conversations between the CHS and SCHIMENTI that occurred at their place of employment were not recorded.

74. On or about December 31, 2016, the CHS and SCHIMENTI met in Bridgeview, Illinois. During this meeting, which was audio recorded, SCHIMENTI and the CHS discussed the CHS's brother. SCHIMENTI asked the CHS if the CHS's brother's friends were "from the Dawla [ISIS]." After the CHS responded in the affirmative, SCHIMENTI stated "Hamdullah [praise be to God]." SCHIMENTI further stated that people call him a "Dawla [ISIS] fanboy." SCHIMENTI admitted he was "a fan of the mujahideen [fighters]." SCHIMENTI continued, "I don't do the jihad…[recording unintelligible]… but I know what's Haqq [truth] and I know what they're doing is on the …[recording unintelligible]." The CHS told SCHIMENTI that the CHS's brother was going to love him. SCHIMENTI responded, "… I'd love to meet him, man." SCHIMENTI stated he used to think ISIS was extremist because the news only tells you negative events. During this meeting, the CHS observed an image of the ISIS flag on SCHIMENTI's cell phone (**Subject Phone 2**).

75. On or about January 8, 2017, the CHS and SCHIMENTI had a conversation while waiting outside their place of employment. During this conversation, SCHIMENTI invited the CHS into his car to talk and watch videos on SCHIMENTI's phone (**Subject Phone 2**). According to the CHS, the videos were about Islam, and referenced people that believe in jihad. SCHIMENTI discussed his dislike of "Ahmadiyya," which is the belief in fulfilling the Islamic prophecy through peace, and how he supports Muslims overseas, but does not support people who do

not support jihad. SCHIMENTI stated he has neighbors in Zion that he does not like because they do not support jihad.

76. On or about February 6, 2017, while at their place of employment, the CHS and SCHIMENTI had a conversation. During this conversation, the CHS stated the CHS's brother was going to Syria, the CHS explained that the CHS cannot live "like this" anymore, and that the CHS wants to "go back," but is scared, and cannot stay in the United States any more. SCHIMENTI hugged the CHS twice. SCHIMENTI told the CHS that if the CHS wanted to leave, no one would care, but the CHS might not be able to come back to the United States. SCHIMENTI also told the CHS, "sometimes people here go back." After the CHS stated, "I don't know what to do," SCHIMENTI replied not to do anything until the CHS talked to him first, and to let him know before the CHS did anything. SCHIMENTI reassured the CHS "not to worry" and that "[we] can figure something out." SCHIMENTI stated that he and the CHS should talk in person, "face to face," and cautioned him not to send "anything" via text messaging. SCHIMENTI hugged the CHS again and said [he] would "figure something out."

77. On or about February 8, 2017, the CHS met with SCHIMENTI in North Chicago, Illinois. During this meeting, SCHIMENTI told the CHS that SCHIMENTI's brother [JONES] met a long bearded brother [UC1] at a police station. SCHIMENTI further told the CHS of a brother named [UC2] and how [UC2] "supposedly" was able to facilitate travel to Dawla [ISIS]. SCHIMENTI stated that

36

because he used to be a criminal, he can see when things are a bit "fishy." Regarding [UC1] and [UC2], SCHIMENTI stated, "I don't believe them, not for one minute." SCHIMENTI stated one of "his brothers" [JONES] had the "Dawla" [ISIS] flag in his basement and that he received it from [UC1] and [UC2]. The CHS told SCHIMENTI that the CHS's brother was currently fighting for ISIS, and the CHS wanted to travel to join their brother. SCHIMENTI advised the CHS if he attempted to leave to join ISIS "it's a federal offense." SCHIMENTI also cited an example of a "brother" who attempted to join ISIS and, as a result, is currently in federal prison. SCHIMENTI asked the CHS to provide the CHS's brother's social media contact information and told the CHS that he watches Dawla [ISIS] videos every night.

78. On or about February 17, 2017, the CHS met with SCHIMENTI in Waukegan, Illinois. During this meeting, which was audio recorded, the CHS relayed a purported conversation that the CHS had with the CHS's brother that the CHS needed his passport, money, a backpack, a compass, cell phones, and that he needs to exercise for when the CHS attempts to travel overseas to join ISIS. The CHS told SCHIMENTI that the CHS's brother has been discussing drones bombing ISIS fighters. The CHS relayed information to SCHIMENTI that the ISIS fighters were tracked by the drones because the phones they were buying in Syria were compromised. The CHS further stated the CHS's brother purportedly wanted the CHS to obtain phones in the United States, and bring the phones to ISIS members overseas when the CHS travels to Syria.

37

79. SCHIMENTI acknowledged the CHS's statement by stating there was a phone store next door to the restaurant they were eating at during this conversation. SCHIMENTI suggested that if the CHS wanted to, they could go talk to store representatives about obtaining cell phones. SCHIMENTI further added, "They [phone store people] are Muslim." SCHIMENTI also stated Anwar Awlaqi was bombed by drones because they were able to track him. During this conversation, the CHS also informed SCHIMENTI that the CHS was definitely leaving to join ISIS. SCHIMENTI again admonished the CHS if the CHS attempts to travel to ISIS the CHS may go to prison. Then SCHIMENTI stated, "there is a way," and that his brother [JONES] believed he has already helped "two people get to the Dawla [ISIS]" via this ISIS facilitation network. SCHIMENTI claimed he did not trust that ISIS facilitation network, but stated to the CHS, "I want this for you." Before leaving the restaurant, SCHIMENTI again asked the CHS if the CHS wanted to talk to the "phone people." The CHS declined this offer. SCHIMENTI confided in the CHS that he has pledged bay'ah [allegiance, in context, to ISIS] before, and discussed the indoctrination "classes" that people have to go through when they arrive in Dawla [ISIS].

80. On or about February 24, 2017, the CHS met with SCHIMENTI and JONES in Zion, Illinois. The meeting took place at a gym at approximately 7:30 a.m. During this meeting, which was audio recorded, SCHIMENTI and the CHS engaged in physical training exercises. During the training, SCHIMENTI told the CHS that

he watches "Dawla [ISIS] training videos" and observed how fighters worked out hard, including "jumping through fire." The CHS responded that was the type of training the CHS's brother wants the CHS to go through and the CHS added, "Cause we going to fight, and not going to show the girls [our muscles]." SCHIMENTI responded, "Right, right, right…it's about that strength and that endurance." SCHIMENTI stated he previously told his brother [JONES], "Man you know I'm all big, fat…[recording unintelligible]…but inshallah [God willing] the brothers will just have me be the one to cut the neck," and added "You gotta be able to hand-to-hand." SCHIMENTI continued, "So this all goes in with that though, believe you me." SCHIMENTI stated he used to share pictures of ISIS fighters training on Facebook. SCHIMENTI also added, "To all you kuffar [non-believers] army, look at how we train." SCHIMENTI told the CHS that the gym at their place of employment opens at 5:30 a.m. every morning, and that he would meet the CHS at the gym whenever the CHS wanted to work out.

81.    During this training session, SCHIMENTI also told the CHS he was angry with a person at their job because that individual was a homosexual. SCHIMENTI stated if "Sharia [Islamic Law] comes here, we are putting you [homosexuals] on top of Sears Tower and we drop you." SCHIMENTI stated his brother Yusuf [JONES] was coming to the gym. At this point, the CHS asked if Yusuf was the person who, "Take the guys to the Dawla." SCHIMENTI responded, "Yeah yeah yeah…not him but he, he knows the guy [UC2]."

39

82. Later, JONES arrived at the gym and introduced himself to the CHS. JONES stated he wanted to hang out with SCHIMENTI and the CHS after they leave the gym, and also let them know he was bringing his daughter with him. After JONES departed the gym, SCHIMENTI stated JONES came to the gym because he wanted to meet the CHS. SCHIMENTI stated to CHS, "I tell both of you about each other."

83. At approximately 10:30 a.m., SCHIMENTI and the CHS exited the gym, entered SCHIMENTI's vehicle and drove to SCHIMENTI's residence. Upon arriving at SCHIMENTI's residence, the CHS stated that the CHS wanted to wait outside because the CHS wanted to smoke a cigarette. After telling SCHIMENTI multiple times that the CHS would wait outside, SCHIMENTI said, "Brother, no. I want to show you a video anyways." At this point, the CHS agreed to enter SCHIMENTI's residence. Once both were inside, SCHIMENTI showed the CHS an ISIS video of Turkish soldiers being burned alive. SCHIMENTI stated, "I don't know what they're saying but I love it." While the CHS and SCHIMENTI were watching this video, JONES arrived at SCHIMENTI's residence, and briefly talked about how SCHIMENTI was showing off at the gym. JONES then asked the CHS if the CHS was from a particular city in the Middle East, and if the CHS's family was still there. JONES stated he received a lot of updates regarding the city in the Middle East via Communication Platform 4. JONES then asked if the CHS spoke Turkish. The CHS translated the ISIS video for SCHIMENTI and JONES into English.

84.     After watching ISIS videos, SCHIMENTI and JONES agreed to drive to a restaurant. While at the restaurant, JONES continued to ask the CHS questions, including if the CHS was from the east or west part of the particular city in the Middle East, and how much money the CHS paid for rent. SCHIMENTI told the CHS that he makes "dua [prayer]" for the CHS's family and the CHS's brother because the CHS's brother (whom SCHIMENTI had been told was an ISIS fighter) is "of the best." SCHIMENTI added that he asked Allah to "get behind the mujahideen's [fighter's] arrows, whether its Kalashnikov [a type of assault rifle], you know, whatever it is, you know, the knife...Allah you strike the kuffar..."

85.     After leaving the restaurant, SCHIMENTI and the CHS followed JONES to the **Subject Premises**. JONES parked his vehicle at his house and JONES and his daughter entered SCHIMENTI's vehicle to travel to a location in Waukegan, Illinois.

86.     While driving, JONES told SCHIMENTI that when SCHIMENTI leaves,[14] he should not take his phone to the airport. JONES told the CHS that SCHIMENTI had a lot of Dawla [Islamic State] videos on his phone and they may check his phone because of his beard and the mark on his head. JONES told the CHS that "the Feds" came to his house so he may already be on a list.

87.     Later, SCHIMENTI, JONES, and the CHS drove in SCHIMENTI's vehicle back to Zion. During the drive, JONES told the CHS, "We only listen to what

---

[14] SCHIMENTI had previously stated that he intended to travel to Pakistan to meet a woman whom he intended to marry in the United States.

41

the Dawla [ISIS] put out." JONES further stated he was watching the CHS's face light up when they were all watching the ISIS video in SCHIMENTI's house. JONES stated that it made him, "So happy." JONES stated that when he introduced UC2 to UC4, UC2 stated that UC4 needed to study and understand Islam. JONES also recalled when UC2 told him about how UC1 was in an ISIS school and had to learn the deen [faith] before UC1 could go fight. In addition, JONES mentioned an Al-Nusra [the designated foreign terrorist organization Jabat Al-Nusra] brother who gave bay'ah to ISIS, and the Al- Nusra brother stated ISIS would not let you fight for them until you know your deen. Towards the end of this meeting, JONES asked the CHS when the CHS was going to be off work so they could all get together again.

88.     On or about March 4, 2017, the CHS met with SCHIMENTI at a gym in Zion, Illinois, and the meeting was audio recorded. During the physical fitness training, the CHS told SCHIMENTI that the CHS did not want to train to have a lot of muscles. SCHIMENTI told the CHS that weights support the cardio, and that cardio supports the weights. SCHIMENTI continued, "All of this, make you, make you good, you know in, in the battlefield." SCHIMENTI added, "No. I'm serious." After the CHS told SCHIMENTI that ISIS will train him once he goes over to join them, SCHIMENTI responded, "they gonna train you," and added that it would be good for the CHS to be "ready for this" as well.

89.     After leaving the gym, SCHIMENTI and the CHS drove to a parking lot near a cellular telephone store. SCHIMENTI told the CHS that the phone store is

42

"right here" and stated they could go to the phone store first if the CHS wanted to. The CHS asked SCHIMENTI if he wanted to eat first, and SCHIMENTI responded, "Yeah, we can go and eat first." The CHS asked if the phone store SCHIMENTI pointed out was the one with the "Muslim guy" whom SCHIMENTI previously mentioned. SCHIMENTI responded in the affirmative. While eating lunch, the CHS told SCHIMENTI he loved the lifestyle SCHIMENTI lived. The CHS mentioned that SCHIMENTI wakes up, works out, and eats. SCHIMENTI responded, "I hope that I am not too comfortable." SCHIMENTI added that the life the CHS's brother (the purported ISIS fighter) is living is, "Much better." After telling SCHIMENTI that the CHS planned to travel from Chicago to Germany to Turkey [to join ISIS], SCHIMENTI asked, "Not Jordan?" SCHIMENTI further stated that Turkey was "Against the Dawla [ISIS]." SCHIMENTI claimed another person asked him why he does not travel to join ISIS. SCHIMENTI stated he does not know if his faith was, "ready for a Federal case." After the CHS told SCHIMENTI he was getting ready to get some phones, SCHIMENTI responded, "I'm just proud of you brother." The CHS told SCHIMENTI that the CHS thought the ISIS fighters overseas, including his purported brother, would use some of the cell phones for "bombs" and attach them to "C4" (a type of explosive). SCHIMENTI agreed.

90.     While at the cellular telephone store, in Zion, Illinois, the CHS purchased 11 cellular phones, some broken and some operable. After the CHS told SCHIMENTI not to provide any financial assistance, SCHIMENTI purchased a

phone charger for the CHS. SCHIMENTI justified the purchase by saying, "I know what these are going for." While driving back to the CHS's car at the gym, SCHIMENTI stated "always I am thinking one day insha'allah [God willing]" of the Naval graduation that takes place on "Buckley." Based on my training and experience, I know that Naval Station Great Lakes, which trains Navy recruits, is located on Buckley Street in North Chicago, Illinois.

91.     SCHIMENTI further stated the Navy has graduations there every Friday and there are "Many people...always thinking akhi, so pray I get the faith." Based on my training and experience, I believe that SCHIMENTI was referring to gathering the courage to launch some sort of attack at Naval Station Great Lakes.

92.     On or about March 11, 2017, the CHS met with SCHIMENTI and JONES at the CHS's apartment in Chicago, Illinois. At one point during the meeting, which was audio recorded, SCHIMENTI, JONES, and the CHS drove to a restaurant. On the way to the restaurant, JONES asked the CHS, "When you trying to get out of here?" The CHS responded, "Soon." SCHIMENTI told the CHS that he "called the guy," which in context I believe to be a reference to person who worked at the cellular telephone store in Zion, Illinois. SCHIMENTI further stated, "Inshallah [God-willing], I'll just go up there and I'll just get them to you." SCHIMENTI further cautioned the CHS to look through them [cell phones] and make sure the phones are not cracked.

93.     At the restaurant, SCHIMENTI told JONES that the CHS's brother had not texted the CHS in a while because the CHS's brother was busy defending the Ummah [the Muslim community]. JONES responded, "Alhumdulliah [praise be to God]." JONES then explained, in detail to the CHS, about how the ISIS facilitation network purportedly operated by UC2 worked. The CHS asked JONES if he [JONES] could talk to [UC2] about him [the CHS]. JONES responded, "I'll ask [UC2]." JONES further stated UC2 will "come here [Zion]" to meet with the CHS.

94.     Later, at the CHS's apartment, JONES talked about people going through a six week class for those who want to go overseas and join ISIS. The CHS also explained to JONES and SCHIMENTI that the fighters needed phones. Furthermore, JONES told SCHIMENTI and the CHS not to take their phones to the airport because the government may seize their phones. Later that evening, after watching ISIS videos at the CHS's apartment, JONES and SCHIMENTI decided to leave. Before leaving, JONES told the CHS he would let the CHS know when UC2 contacted him (JONES). SCHIMENTI, again, stated he would "talk to the dude at [telephone] store."

95.     JONES, during the meeting on or about March 11, 2017, with SCHIMENTI and the CHS described above, used Communication Platform 1 to tell UC2, "Brother there is another brother who is ready." UC2 responded, "AllahuAkhbar [God is great]. May Allah (SWT) be pleased with your efforts and reward you with the highest level of Jannah [paradise]. How long have you known this brother and

45

hiw did you meet. InshaAllah when is he looking to make a move." JONES explained

that the CHS was ready to go and was looking to get to ISIS-controlled territory with

the help of UC2's facilitation network. Specifically, JONES stated, "[the CHS] is

ready to move quick ahki. This brother is from [specific city and country redacted]

and [the CHS] is planning to go already. I have known [the CHS] a few months. I met

him through our brother who you met [SCHIMENTI] with me and [UC1]. They

[SCHIMENTI and the CHS] work together. [The CHS] is on the haqq and is in contact

with [the CHS's] family. [The CHS] is planning to try to go 1 way with a lot of

obstacles and is wondering if you were in tune with one's in the place you visited

when our 1st bro left that can assist in his journey on a smoother journey with less

obstacles. [The CHS] knows the terrain and has already supplied himself with

equipment suggested by his blood brother there." UC2 stated, "InshaAllah i'll reach

out to the [Individual A] and give [Individual A] the good news. I know everythung is

still good to go. No matter how Shaytan [Devil] tries he can never disrupt anything

that Allah (SWT) has blessed."

96.    On or about March 13, 2017, using Communication Platform 2,

SCHIMENTI provided a phone number used by JONES to the CHS. Around the same

time but after getting the phone number from SCHIMENTI, the CHS initiated

contacted with JONES on Communication Platform 2. JONES responded back with

his username on Communication Platform 1, and requested the CHS to add JONES

as a contact on Communication Platform 1.

97.     On or about March 14, 2017, using Communication Platform 1, JONES initiated a conversation with the CHS. During this conversation, JONES stated that UC2 had spoken with Individual A, and they are pleased to know there are brothers on the Haqq [truth]. JONES admonished the CHS not to use names on Communication Platform 1. JONES informed the CHS that JONES would provide the CHS's username on Communication Platform 1 to UC2, and that UC2 would use Communication Platform 1 to establish contact with the CHS. Later on the same day, JONES asked the CHS if UC2 had made contact with him yet. The CHS responded that UC2 had not made contact so far. JONES replied, "Ok don't worry [UC2] will."

98.     Also on or about March 14, 2017, using Communication Platform 1, JONES initiated a conversation with UC2. JONES stated, "Assalamalaikum [peace be upon you]. [The CHS] is ready ahki [brother]." JONES then provided the CHS's username on Communication Platform 1 to UC2. JONES stated, "[The CHS] is expecting you to contact." UC2 responded, "InshaAllah I will hit [the CHS] soon."

99.     That same day, the CHS met with SCHIMENTI in Highland Park, Illinois. During the meeting, which was audio recorded, SCHIMENTI stated that he was very suspicious of UC2, and had a "real funny feeling" about UC2. SCHIMENTI added that he did not trust UC2. SCHIMENTI further stated that he wanted to talk to the CHS before the CHS met with UC2. SCHIMENTI stated that he did not bring it up in conversation in front of JONES during dinner with the CHS and JONES on

47

March 11, 2017, because SCHIMENTI did not want JONES to think he was "trying to prevent you [the CHS] from going to do what you're going to do."

100. During the meeting, SCHIMENTI stated, "I know I'm still being observed." SCHIMENTI also stated he knows the FBI does not just give back property and walk away. SCHIMENTI stated, "There's something in law called entrapment" and they [FBI] know ways to do this within the law. SCHIMENTI further stated, "It's a federal offense to say, make it be known, and tell anybody I've given bay'ah [pledged allegiance] to Abu Bakr Al-Baghdadi [the leader of ISIS]." SCHIMENTI explained the reason it was a federal offense was because Al-Baghdadi gave a fatwa advocating violence against kuffar [non-believers] in the lands they [non-believers] reside in. SCHIMENTI further stated UC2 was trying to "entrap" him by asking SCHIMENTI if he wanted to "rock it out [conduct an attack against the homeland]." In addition, SCHIMENTI stated Yusuf [JONES] would be upset with SCHIMENTI for talking bad about UC2. SCHIMENTI stated, "I did send you the number [JONES' phone number]," and further stated he was not going to block the CHS from the opportunity to travel. Regarding the CHS traveling to join ISIS through [UC2], SCHIMENTI stated, "It could be true." SCHIMENTI continued, "Everything could be fine." SCHIMENTI added that he could be "overthinking" everything.

101. On or about March 15, 2017, using Communication Platform 1, the CHS informed JONES that UC2 had made contact with the CHS via Communication

Platform 1. JONES responded, "May Allah reward you good for your intentions and purify them for his sake."

102.   On or about March 17, 2017, using Communication Platform 1, UC2 notified JONES, "I reached out to our brother." JONES responded, "Alhumdulillah rabbil alamin. Jazakallah khair. Where you able to assist [the CHS]?" UC2 responded, "InshaAllah already in motion. AllahuAkhbar." JONES stated, "May Allah reward you good."

103.   On or about March 17, 2017, the CHS met with SCHIMENTI at a restaurant in Zion, Illinois, and then, after they ate, they went to a cellular telephone store. During this meeting, which was audio recorded, the CHS told SCHIMENTI that the CHS was in communication with UC2 via Communication Platform 1, and that the CHS may ask questions of UC2 if they meet in person. SCHIMENTI asked the CHS if the CHS asked UC2 questions on Communication Platform 1. The CHS told SCHIMENTI that the CHS would ask UC2 questions once they meet in person.

104.   During this meeting, SCHIMENTI and the CHS went to the cellular telephone store. While at the store, SCHIMENTI negotiated with the sales person for a cheaper price on the phone the CHS was interested in. SCHIMENTI and the CHS made plans to meet again on March 18, 2017.

105.   On or about March 17, 2017, using Communication Platform 1, JONES initiated a conversation with the CHS. JONES inquired what time the CHS was expected to be in Zion, Illinois, on March 18, 2017. The CHS provided an estimated

time frame for the CHS's arrival. JONES responded, "Ok I have a few phones for you."

106.   On or about March 18, 2017, the CHS met with SCHIMENTI and JONES in Zion, Illinois, which was audio recorded. Before entering the cellular telephone store, SCHIMENTI stated, "I called here earlier." SCHIMENTI further stated he thought the sales person in the store is "the Muslim." After the CHS asked SCHIMENTI if Yusuf [JONES] had phones, SCHIMENTI responded in the affirmative. SCHIMENTI further asked the CHS if he wanted him to make a phone call to Yusuf [for the phones]. SCHIMENTI called JONES and stated he was "up here at the … [cellular telephone]… store." SCHIMENTI further told JONES that the CHS needed to ask JONES a question before the CHS buys the "used ones [phones]." While handing his phone to the CHS, SCHIMENTI stated that JONES told them to "come by [his house]." While on the phone with JONES, the CHS asked JONES if he had working or non-working phones. Shortly afterwards, the CHS ended the conversation with JONES. After the CHS purchased phones from the store, SCHIMENTI asked the CHS if the CHS wanted to head over to Yusuf's [JONES' residence]. SCHIMENTI added, "He [JONES] has some also." SCHIMENTI then asked, "You wanna uh follow me over there?"

107.   SCHIMENTI and the CHS then traveled to JONES's residence (the **Subject Premises**). While at JONES's residence, JONES told the CHS there was a new video by Abu Bakr Al-Baghdadi [the leader of ISIS] that he received from

50

Communication Platform 4. JONES asked the CHS to translate the video for him due to the lack of subtitles.

108. During this meeting, JONES provided the CHS with two cell phones. After receiving the phones, the CHS asked JONES if he was sure he wanted to provide the phones. JONES responded in the affirmative. JONES stated the phones were just "laying around the house anyway akhi [brother]." JONES added, "Maybe I can get more." The CHS told JONES and SCHIMENTI that the CHS was going to send phones to the CHS's aunt.[15] JONES said if he gets more [phones], he would give them to the CHS. After the CHS told JONES that the CHS would pay money for the phones that JONES provided, JONES stated he did not want any money but claimed he needed "something for the hereafter."

109. During the meeting, the CHS told JONES and SCHIMENTI that the CHS watched on YouTube what the brothers [ISIS fighters] do with the phones. As the CHS paused to remember a specific word in English, SCHIMENTI interrupted and asked, "Detonator?" the CHS confirmed the word "detonator" was the word that the CHS was attempting to remember. JONES further stated if the CHS provides the CHS aunt's address, JONES would continue to provide phones to the CHS after CHS leaves the United States and joins ISIS. The CHS told JONES that the CHS had sent packages to his aunt, and his aunt can send those packages to Istanbul, Turkey. The CHS told JONES that rom Istanbul, there is a brother who can take it [to Syria]. As

---

[15] As set forth in the paragraph below, the CHS later explained that his aunt was purportedly a member of a network that could send items to ISIS-controlled territory in Syria.

the CHS prepared to leave JONES' residence, JONES thanked the CHS for translating the Abu Bakr Al-Baghdadi video for him.

110. On or about March 21, 2017, UC2 informed JONES that UC2 intended to meet the CHS the weekend of March 24 and asked if JONES was going to be available for this meeting. JONES stated he was available that Sunday or Saturday evening. JONES asked which day was best for UC2. UC2 confirmed Sunday would be the day JONES will introduce the CHS to UC2. UC2 asked if the meeting should occur in the same location (referring to the meeting on or about December 13, 2016). JONES responded, "Sure akhi that will be OK. Maybe we can grab some food this time in Shaa Allah." On or about March 25, 2017, UC2 provided the approximate time of the meeting on March 26, 2017. JONES responded, "Ok [UC2], I'll be on point. I will have [the CHS] come up here here. In Shaa Allah."

111. On or about March 26, 2017, the CHS met with JONES in Zion, Illinois, with the intention of going to meet UC2 in Gurnee, Illinois. This meeting was audio recorded. The CHS picked up JONES from the **Subject Premises** and JONES directed the CHS to the area where he arranged to meet with UC2. After the CHS picked up JONES from the **Subject Premises**, JONES stated that he told SCHIMENTI to come to the meeting with UC2. JONES further stated they [JONES and the CHS] would possibly meet with SCHIMENTI after they meet with UC2.

112. During the drive, JONES explained to the CHS how he first met UC2 through UC1. According to JONES, after the "Feds" raided SCHIMENTI's house,

SCHIMENTI became nervous at a hotel meeting with [UC1] and [UC2] and began to think they were Feds. JONES stated if they [UC1 and UC2] were Feds, they could have taken them [JONES and SCHIMENTI] to jail already. JONES also stated that he knew "another brother named [UC4]." JONES continued, "I helped [UC4] leave [to join ISIS] too." JONES told the CHS that UC2 never asked JONES to find more people or showed JONES anything to be nervous about.

113. Also while waiting in the CHS's vehicle for UC2 to arrive at the meeting location, JONES asked the CHS if the CHS had talked with the CHS's brother [the purported ISIS fighter] lately. The CHS responded that the CHS's brother sent the CHS a video that the CHS could access via Communication Platform 5. The CHS then showed a video of a Humvee being hit by an IED. The CHS explained that ISIS fighters are attaching phones to explosives to blow up vehicles.

114. JONES then asked the CHS to provide JONES with the CHS's aunt's address. The CHS responded that the CHS would. JONES also asked the CHS for the CHS's social media account, so they [the CHS and JONES] can communicate when the CHS arrives in Syria. JONES further asked if the CHS's brother knew that the CHS was coming to join him.

115. UC2 then entered the CHS's vehicle. After initial greetings and introductions, UC2 asked JONES if he took care of "everything [preparation for travel]." JONES responded, "Yeah. I let him know everything." UC2 asked background questions of the CHS, and then provided a list of items needed for travel.

53

JONES, UC2, and the CHS exited the vehicle and walked into a restaurant to eat lunch. After lunch, UC2 departed the area, and the CHS and JONES drove back to the **Subject Premises**.

116. After making a phone call to SCHIMENTI, JONES told the CHS that SCHIMENTI was at the same location in Gurnee, Illinois, where JONES and the CHS had just met UC2. JONES stated that SCHIMENTI was on his way to the **Subject Premises**. JONES and the CHS returned to the **Subject Premises**. Later that day, SCHIMENTI arrived at the **Subject Premises**.

117. After arriving at the **Subject Premises**, the CHS joked about putting the ISIS flag on top of the **Subject Premises.** SCHIMENTI stated he would like to see the flag "on top of the White House." The CHS told SCHIMENTI that the CHS met with UC2, and that the CHS thought UC2 was a good brother. The CHS further stated that the CHS was going to leave [to travel to Syria] before SCHIMENTI leaves [to travel to Pakistan].

118. During this meeting at the **Subject Premises**, JONES provided an additional cell phone to the CHS. JONES stated he hoped it kill many "kuffar [non-believers]." SCHIMENTI also said, "Many." The CHS stated that the CHS sent the other phones the CHS had acquired to the CHS's aunt, and the CHS hoped to send more to the CHS's aunt later. JONES told the CHS to provide the CHS's aunt's address before the CHS leaves so JONES could keep sending as many phones as he could. The CHS said when the CHS makes it to Syria, the CHS will make a video and

54

upload it for JONES and SCHIMENTI to view. SCHIMENTI stated if he sees the

CHS "cutting the kuffar neck," SCHIMENTI will be "so happy that day."

119.   JONES recommended they all take a picture in front of the ISIS flag so

that the CHS's brother could have it. All three took a picture in front of the flag. The

CHS then departed the **Subject Premises**. The following is the picture with the

CHS's face pixelated.



120.   The CHS has witnessed JONES use a black Samsung phone on multiple

occasions (**Subject Phone 2**). During the meeting on or about March 26, 2017, as

well as the meetings on or about March 11 and March 18, 2017, JONES showed the

CHS ISIS videos on **Subject Phone 2**. These videos consisted of a speech by Al-

Baghdadi (the leader of ISIS), information on how to decapitate individuals, and Turkish soldiers being burned.

121.    On or about March 29, 2017, the CHS met with SCHIMENTI at the CHS's residence in Chicago, Illinois, which meeting was audio recorded. While driving to a restaurant, SCHIMENTI claimed he called three places looking for phones to give to the CHS. SCHIMENTI gave the CHS six phones in a bag. The CHS asked SCHIMENTI how much he paid [for the phones]. SCHIMENTI responded, "Five dollars." When the CHS told SCHIMENTI that the CHS would pay SCHIMENTI back, SCHIMENTI declined the offer and stated, "I know where they're going." The CHS stated that the CHS hoped each one would kill 20 people. SCHIMENTI responded, "Many kuffar."

122.    While at the CHS's residence, the CHS showed SCHIMENTI a video clip of a Humvee being blown up by an IED. The CHS explained that the phones JONES and SCHIMENTI provided were being used for this purpose. In the video clip, as the Humvee approaches the IED, SCHIMENTI stated, "Landmine." After the IED goes off in the video clip, SCHIMENTI stated, "Yes. Yes." SCHIMENTI further stated that people do not understand that "we" have people who have expertise in paving roads and operating guns. SCHIMENTI stated that Allah gives understanding to whom he pleases. SCHIMENTI stated, without this understanding, SCHIMENTI would not know the "Dawla [ISIS] sister" and SCHIMENTI would not know the brother "who had the bomb in his shoe [Richard Reid]." SCHIMENTI stated he [Richard Reid] was

a "good brother." SCHIMENTI pulled up a picture of Richard Reid for the CHS. SCHIMENTI also stated that Richard Reid was upon "Haqq [truth]" and SCHIMENTI could show the CHS letters from Reid.

123. While still at the CHS's residence, during prayers, SCHIMENTI prayed that Allah "continue to expand your State…protect all the mujahedeen…continue to humiliate the kuffars."

124. The CHS told SCHIMENTI that he needed to go shopping for a few items in preparation for his travel. SCHIMENTI offered to drive the CHS to the store. The CHS told SCHIMENTI that UC2 suggested the CHS could buy things from the list he received from UC2. SCHIMENTI asked the CHS when the CHS was going to go visit his aunt (i.e. the person who would facilitate the shipment of overseas items). SCHIMENTI added that he may go buy a compass and bring it to the CHS. While shopping, after the CHS expressed excitement for his trip and that he would send SCHIMENTI videos, SCHIMENTI stated, "I want to see blood flowing, whatever way." A short time later, SCHIMENTI said, "You can Google my name and I put it in English so the Kuffar can see, Islamic State here to stay!"

125. On or about April 7, 2017, SCHIMENTI and JONES ate dinner with the CHS. During the meal, JONES told the CHS that he felt ashamed that he was not traveling as well. SCHIMENTI told the CHS to "drench that land with they, they blood." Afterward, SCHIMENTI and JONES drove the CHS to O'Hare International

Airport in Chicago with the understanding that the CHS would be traveling from Chicago to Syria to join and fight with ISIS.

## SEARCH OF SUBJECT PHONES 1 AND 2

126. Based upon my training and experience, I know that cellular phones may contain relevant evidence of the conspiracy to provide material support or resources to a foreign terrorist organization, including text messages and other methods of communication, made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the conspiracy to provide material support to a foreign terrorist organization. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the conspiracy to provide material support or resources to a foreign terrorist organization. Moreover, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses. Furthermore, videos located in the memory of the **Subject Phones** may contain evidence of conspirators' knowledge, willfulness and intent with regard to conspiracy to provide material support or resource to a foreign terrorist organization.

127. In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

128. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone

59

may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

### SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

129. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

     b.     Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

130.   In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

131.   In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

132. Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachments A-1, A-2 and A-3, so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

133. The review of electronically stored information and electronic storage media removed from the premises described in Attachments A-1, A-2 and A-3 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a. examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B-1, B-2 and B-3;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B-1, B-2 and B-3 (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal

activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

        c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachments B-1, B-2 and B-3;

        d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachments B-1, B-2 and B-3.

134. The government will return any electronic storage media removed from the premises described in Attachments A-1, within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.[16]

135. I respectfully submit that the facts set forth above establish probable cause to believe that JOSEPH D. JONES, a/k/a "Yusuf Abdulhaqq," and EDWARD SCHIMENTI, a/k/a "Abdul Wali," have violated Title 18, United States Code, Section 2339B(a)(1), as charged in the criminal complaint.

---

[16] As set forth in this affidavit, there is probable cause to believe that **Subject Phone 1** and **Subject Phone 2** are instrumentalities of the offense of conspiring, and attempting to provide, material support or resources to foreign terrorist organizations, in violation of Title 18, United States Code, Section 2339B(a)(1), the government anticipates that **Subject Phone 1** and **Subject Phone 2** will be seized rather than returned to the defendants.

136. Based on the above information, I respectfully submit that there is probable cause to believe that JOSEPH D. JONES and EDWARD SCHIMENTI have conspired and attempted to provide material support or resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1), and that evidence relating to this criminal conduct, as further described in Attachments B-1, B-2 and B-3, will be found in the **Subject Premises** and **Subject Phones**, as further described in Attachments A-1, A-2 and A-3.

64

137.   I therefore respectfully request that this Court issue a search warrant for the single family home located at 2120 Carmel Boulevard in Zion, Illinois, more particularly described in Attachment A-1, and the Subject Phones more particularly described in Attachments A-2 and A-3, authorizing the seizure of the items described in Attachments B-1, B-2 and B-3, respectively, pursuant to the protocol described in the addendum to Attachments B-1, B-2 and B-3.

FURTHER AFFIANT SAYETH NOT.

Cassandra B. Carnright
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 11th day of April, 2017

Honorable M. David Weisman
United States Magistrate Judge