UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 17 CR 236 |
| v. | Hon. Andrea R. Wood |
| JOSEPH D. JONES and EDWARD SCHIMENTI | |

**MOTION OF THE UNITED STATES TO ADMIT EVIDENCE
PURSUANT TO FED. R. EVID. 801(d)(2)(E)**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, moves this Court to admit certain statements against defendants JOSEPH D. JONES and EDWARD SCHIMENTI pursuant to Fed. R. Evid. 104(a), 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.    INTRODUCTION

This submission begins by providing an overview of the conspiracy to provide material support to a foreign terrorist organization that will be established at trial. It then discusses the law governing the admissibility of coconspirator statements under Rule 801(d)(2)(e). Next, it discusses the law governing alternative bases for admissibility of certain statements, as nearly all, if not all, of the statements proffered here are admissible under Rules 801(d)(2)(A). The submission then outlines some of the evidence establishing the scheme in this case. Finally, it summarizes the evidence supporting the admission of coconspirators' statements. Based on the following, the government seeks admission of statements pursuant to Rule 801(d)(2)(E) and

requests a pretrial ruling of admissibility from the Court, in accord with *United States v. Santiago*, 582 F.2d 1128, 1130–31 (7th Cir. 1978), and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

In this submission, the government has not detailed each and every proposed coconspirator statement of each witness or document, but rather a representative sample of statements from witnesses or documents. Further, by presenting statements attributed to particular witnesses, the government is not committed to introducing each statement at trial. Of course, the government is committed to establishing the *Bourjaily v. United States*, 483 U.S. 171, 176–81 (1987) predicates at trial, and the ultimate admissibility of coconspirator statements is government by the trial evidence.

## II.  OVERVIEW OF THE CHARGED CONSPIRACY

The superseding indictment charges defendants JONES and SCHIMENTI with one count of conspiring to provide and attempt to provide material support and resources—namely, personnel and cellular telephones—to the Islamic State of Iraq and al Sham ("ISIS"), a designated foreign terrorist organization, between February and April 2017, in violation of 18 U.S.C. § 2339B(a)(1).[1] Specifically, defendants each provided cell phones for the purpose of making improvised explosive devices to an

---

[1] In addition, the superseding indictment charges SCHIMENTI with making false statements involving international terrorism to the FBI, in violation of 18 U.S.C. § 1001(a)(2).

individual who, unbeknownst to defendants, was a confidential human source for the FBI (the CHS). Moreover, defendants worked together to prepare and support the CHS's purported travel overseas to fight on behalf of ISIS.

As detailed in the complaint, and as the evidence will prove at trial, in approximately November 2016, SCHIMENTI met the CHS, who purportedly was from Iraq and had a brother who was an ISIS member. SCHIMENTI explained to the CHS that SCHIMENTI was a supporter of ISIS who believed in violent jihad. After the CHS expressed a desire to return to the ISIS-controlled territory in the Middle East to fight on behalf of ISIS, SCHIMENTI introduced the CHS to JONES.

JONES and SCHIMENTI worked together to prepare and support the CHS's purported travel overseas to fight on the behalf of ISIS. Specifically, SCHIMENTI expressed support for the CHS's plans to travel to fight on behalf of ISIS, helped the CHS improve his physical fitness so he would be prepared to fight with ISIS, counseled the CHS to be cautious to avoid detection by law enforcement, and introduced the CHS to JONES, for the purpose of JONES introducing the CHS to a purported ISIS facilitator who would assist the CHS with joining ISIS. JONES, in turn introduced the CHS to an individual whom JONES believed operated an ISIS facilitation network capable of delivering the CHS to ISIS-controlled territory in Syria.

JONES and SCHIMENTI also provided cell phones to the CHS with the belief and understanding that they would be transported by the CHS to ISIS-controlled

territory and provided to ISIS for use in assembling improvised explosive devices (IEDs) to conduct violent attacks.

## III.  GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[2] Statements are admissible as non-hearsay under Rule 801(d)(2)(E) notwithstanding the lack of any formal conspiracy charge, as long as the requirements of the rule are met. *See, e.g.*, *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010); *United States v. Moon*, 512 F.3d 359, 363 (7th Cir. 2008).

### A.  Existence of and Membership in the Conspiracy

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the trial judge must preliminarily determine whether statements by a coconspirator of the

---

[2] No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant. Such statements are not testimonial, and therefore are not subject to the Confrontation Clause. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823–24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448–49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

defendant will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134–35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176–81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or

statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398–99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398–99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754–55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[3]

---

[3] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565–66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497–98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867–69 (7th Cir. 1985) (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548–50 (7th Cir. 1979). The government need only establish the existence of a conspiracy for an illegal purpose (or for a legal purpose using illegal means) and participation in the conspiracy by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549–50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant

knows, has met, or has agreed with every coconspirator or schemer. *Longstreet,* 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604–05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context, or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B. The "In Furtherance of" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the

conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937–38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630, at *2–3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

9

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[4]

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073–74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341*,* 1343–44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

---

[4] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008); and

- "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. Appx. 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## IV. ALTERNATIVE BASES FOR ADMISSIBILITY OF STATEMENTS

Many of the statements described herein and sought to be admitted against defendants are independently admissible and do not require a Rule 801(d)(2)(E) analysis, even though they were made over the course of the scheme. A defendant's own statements, for example, are admissible against him pursuant to Rule

801(d)(2)(A), without reference to the coconspirator statement rule. Further, verbal declarations that are not "assertions" subject to verification are not considered hearsay under Rule 801(a).

## A.    Defendants' Own Statements

A defendant's own admissions are admissible against him and are not hearsay pursuant to Rule 801(d)(2)(A), without reliance on the coconspirator-statement rule.[5] *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993); *see also Godinez*, 110 F.3d at 455. Moreover, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See Potts*, 840 F.2d at 371–72; *United States v. Alexander*, 741 F.2d 962, 966 (7th Cir. 1984), *overruled on other grounds*; *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir. 1985).

## B.    Non-Hearsay Statements

The coconspirator statement rule is also not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification; an example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of

---

[5] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

12

verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). More importantly, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[6] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929–30; *see, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565–66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867–69.[7] For example, SCHIMENTI urged the CHS to talk in person, rather than communicating by text message, and told the CHS that traveling abroad to join ISIS was illegal. Such admonitions are not hearsay statements.

## V. THE EVIDENCE REGARDING THE EXISTENCE OF THE CONSPIRACY AND THE COCONSPIRATORS' PARTICIPATION IN THE CONSPIRACY

At trial, the government's evidence will establish that, beginning no later than in or around February 2017, and continuing until at least on or about April 7, 2017,

---

[6] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[7] Of course, in many cases, statements by an alleged coconspirator will include a combination of declarations offered for the truth of the matters asserted and declarations offered for other non-hearsay purposes.

defendants JONES and SCHIMENTI conspired with each other to provide and attempt to provide material support and resources to ISIS. As set forth below, the evidence that proves the existence of this conspiracy is substantial. The government's evidence at trial will include, among other things, testimony by the CHS, undercover agents, and other agents, recordings of communications involving JONES, SCHIMENTI, and the CHS, and the cell phones provided by JONES and SCHIMENTI to the CHS.

Below, the government summarizes some of the evidence that it will present regarding the existence of the charged conspiracy. As shown below, the government will present sufficient evidence to establish the existence of a conspiracy between JONES and SCHIMENTI to provide material support and resources—including equipment in the form of cell phones and personnel in the form of training the CHS and preparing the CHS for travel—to ISIS. Such evidence clearly meets the preponderance of the evidence standard applicable at this stage of the proceeding.[8]

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met in or around November 2016 and worked at the same place of employment. Prior to February 2017, SCHIMENTI and the CHS met on multiple occasions, during which SCHIMENTI and the CHS discussed, among other things,

---

[8] The government is not detailing all of its evidence that would go to show the existence of the conspiracy or the defendant's and other declarants' participation in it. Rather, this proffer highlights for the Court some of the government's evidence in order to establish, by a preponderance of the evidence, the existence of the conspiracy and the roles of the coconspirators. Thus, this proffer does not list all of the government's witnesses, nor does it provide all of the evidence that will be presented by those witnesses who are named.

an ISIS attack in Berlin[9] and the CHS's brother who was purportedly a member of ISIS.

The government anticipates that the CHS will testify that SCHIMENTI and the CHS then met multiple times in or around February 2017. The CHS told SCHIMENTI that the CHS's brother was going to Syria and expressed the CHS's desire to go abroad to join ISIS. SCHIMENTI told the CHS that they would figure something out and that they should talk in person, not by text message. SCHIMENTI later told the CHS about JONES and someone JONES met who supposedly could facilitate travel to ISIS-controlled territory (*i.e.*, UC2). When the CHS mentioned that his brother wanted him to obtain phones in the United States and bring them to ISIS members overseas, SCHIMENTI told him that there was a nearby phone store and suggested that they could talk with the store's Muslim owners. SCHIMENTI warned the CHS multiple times that leaving to join ISIS may be illegal. SCHIMENTI confided in the CHS that he had pledged bay'ah (*i.e.*, allegiance to ISIS).

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met on or about February 24, 2017, at a gym. During this meeting, SCHIMENTI and the CHS engaged in physical training exercises. SCHIMENTI told the CHS that he watches ISIS training videos and observed how fighters worked out

---

[9] On or about December 19, 2016, a truck was driven into the Christmas market next to Kaiser Wilhem Memorial Church at Breitscheidplatz in Berlin, killing 12 people and injuring 56. Following the attack, ISIS stated that the attacker answered its call to target the citizens of states that are fighting against it.

hard, including "jumping through fire." SCHIMENTI also told the CHS that "inshallah [God willing] the brothers will just have me be the one to cut the neck." SCHIMENTI told the CHS that the gym at their place of employment opens at 5:30 a.m. every morning and that he would meet the CHS at the gym whenever the CHS wanted to work out. SCHIMENTI told the CHS that JONES, the one who knew UC2, would be joining them at the gym. JONES subsequently joined SCHIMENTI and the CHS at the gym and introduced himself to the CHS. SCHIMENTI told the CHS that JONES came to the gym because he wanted to meet the CHS.

The government anticipates that the CHS will testify that SCHIMENTI and the CHS left the gym for SCHIMENTI's residence. SCHIMENTI showed the CHS an ISIS video of Turkish soldiers being burned alive. SCHIMENTI stated, "I don't know what they're saying but I love it." After JONES arrived, he asked if the CHS spoke Turkish. The CHS then translated the ISIS video for SCHIMENTI and JONES. Later, at a restaurant, SCHIMENTI told the CHS that he makes "dua [prayer]" for the CHS's family and the CHS's brother because the CHS's brother (the purported ISIS fighter) is "of the best." SCHIMENTI added that he asked Allah to "get behind the mujahideen's [fighter's] arrows, whether it's Kalashnikov [a type of assault rifle], you know, whatever it is, you know, the knife . . . Allah you strike the kuffar [nonbeliever] . . ." Later, while driving, JONES told SCHIMENTI that, when

16

SCHIMENTI leaves,[10] he should not take his phone to the airport because of the ISIS videos on his phone. JONES told the CHS, "We only listen to what the Dawla [ISIS] put out." JONES also stated that, according to an Al-Nusra [the designated foreign terrorist organization Jabat Al-Nusra] brother who gave bay'ah to ISIS, ISIS would not let you fight for them until you know your deen. JONES suggested that they could get together again.

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met on or about March 4, 2017, at a gym. The CHS engaged in physical fitness training. SCHIMENTI and the CHS further discussed physical training for ISIS and training that ISIS would provide.

The government anticipates that the CHS will testify that SCHIMENTI and the CHS then drove to a parking lot near a cell phone store. SCHIMENTI told the CHS that the phone store is "right here" and stated they could go to the phone store first if the CHS wanted. The CHS and SCHIMENTI agreed to eat first. At lunch, SCHIMENTI stated that the life the CHS's brother (the purported ISIS fighter) is "much better" than his lifestyle. SCHIMENTI and the CHS discussed the CHS's planned route to join ISIS. SCHIMENTI claimed another person asked him why he does not travel to join ISIS, to which SCHIMENTI said he did not know if his faith was "ready for a federal case." After the CHS told SCHIMENTI he was getting ready

---

[10] SCHIMENTI had previously stated that he intended to travel to Pakistan to meet a woman whom he intended to marry in the United States.

to get some phones, SCHIMENTI responded, "I'm just proud of you, brother." The CHS told SCHIMENTI that the CHS thought the ISIS fighters overseas, including his purported brother, would use some of the cell phones for "bombs" and attach them to "C4" (a type of explosive). SCHIMENTI agreed.

The government anticipates that the CHS will testify that SCHIMENTI and the CHS then went to the cell phone store. The CHS purchased 11 cellular phones, some broken and some operable. After the CHS told SCHIMENTI not to provide any financial assistance, SCHIMENTI purchased a phone charger for the CHS and stated, "I know what these are going for." Later, while driving, SCHIMENTI stated that "always I am thinking one day insha'allah [God willing]" of the Naval graduation that takes place on "Buckley" (*i.e.*, Naval Station Great Lakes) and that, at the graduations, there are "many people . . . always thinking akhi [brother], so pray I get the faith."

The government anticipates that the CHS will testify that SCHIMENTI, JONES, and the CHS met at the CHS's apartment and then drove to a restaurant on or about March 11, 2017. On the way to the restaurant, JONES asked the CHS, "When you trying to get out of here?" The CHS responded, "Soon." SCHIMENTI told the CHS that he called "the guy" (*i.e.*, someone working at the cell phone store) and that "Inshallah [God-willing], I'll just go up there and I'll just get them to you." SCHIMENTI asked the CHS to check the cell phones to ensure they are not cracked. At the restaurant, JONES explained to the CHS how the ISIS facilitation network

purportedly operated by UC2 worked. The CHS asked if JONES could talk to UC2 about the CHS. JONES told the CHS he would ask and that UC2 would come meet with the CHS.

The government anticipates that the CHS will testify that SCHIMENTI, JONES, and the CHS later returned to the CHS's apartment. JONES mentioned a six-week class for those who want to go overseas and join ISIS. The CHS explained to JONES and SCHIMENTI that the fighters needed phones. JONES told SCHIMENTI and the CHS not to take their phones to the airport because the government may seize their phones. Before leaving the CHS's apartment, JONES told the CHS that he would let the CHS know when UC2 contacted JONES. SCHIMENTI again stated he would "talk to the dude at [the cell phone] store."

The government anticipates that UC2 will testify that, on or about March 11, 2017, JONES told UC2 through online communications, "Brother there is another brother who is ready." JONES explained to UC2 that the CHS was ready to go and was looking to get to ISIS-controlled territory with the help of UC2's facilitation network. On or about March 14, 2017, JONES told UC2 that the CHS was ready and was expecting UC2 to contact the CHS, and provided the CHS's username to UC2. UC2 responded, "InshaAllah I will hit [the CHS] soon." The same day, through online communications, JONES asked the CHS if UC2 had made contact with the CHS yet. The CHS responded that UC had not made contact so far. JONES replied, "Ok don't worry [UC2] will."

19

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met on or about March 14, 2017. During this meeting, SCHIMENTI stated, "It's a federal offense to say, make it be known, and tell anybody I've given bay'ah [pledged allegiance] to Abu Bakr Al-Baghdadi [the leader of ISIS]." SCHIMENTI explained the reason it was a federal offense was because Al-Baghdadi gave a fatwa advocating violence against kuffar [non-believers] in the lands they [non-believers] reside in.

The government anticipates that the CHS will testify that, on or about March 15, 2017, through online communications, the CHS informed JONES that UC2 had made contact with the CHS. JONES responded, "May Allah reward you good for your intentions and purify them for his sake."

The government anticipates that UC2 will testify that, on or about March 17, 2017, through online communications, UC2 notified JONES, "I reached out to our brother." JONES responded, "Alhumdulillah rabbil alamin. Jazakallah khair. Where you able to assist [the CHS]?" UC2 responded, "InshaAllah already in motion. AllahuAkhbar." JONES stated, "May Allah reward you good."

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met at a restaurant and then went to a cell phone store on or about March 17, 2017. At the restaurant, the CHS told SCHIMENTI that the CHS was in communication with UC2 and that the CHS may ask questions of UC2 if they meet in person. At the cell phone store, SCHIMENTI negotiated with the salesperson for

a cheaper price on the phone the CHS was interested in. SCHIMENTI and the CHS made plans to meet again on March 18, 2017.

The government anticipates that the CHS will testify that, on or about March 17, 2017, through online communications, JONES asked when the CHS would be in Zion on March 18, 2017. The CHS provided an estimated timeframe for his arrival. JONES responded, "Ok I have a few phones for you."

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met at the cell phone store on or about March 18, 2017. Before entering the store, SCHIMENTI stated, "I called here earlier." After the CHS asked SCHIMENTI if JONES had phones, SCHIMENTI responded in the affirmative and then asked the CHS if he wanted SCHIMENTI to make a phone call to JONES for the phones. SCHIMENTI called JONES and told him SCHIMENTI was at the store. SCHIMENTI said that JONES told them to "come by [his house]" and that JONES "has some [phones] also."

The government anticipates that the CHS will testify that SCHIMENTI, JONES, and the CHS met at JONES's residence on or about March 18, 2017. JONES told the CHS that he received a new video by Abu Bakr Al-Baghdadi [the leader of ISIS] and asked the CHS to translate the video for him. JONES provided the CHS with two cell phones. The CHS asked JONES if he was sure he wanted to provide the phones. JONES responded in the affirmative and said the phones were just "laying around the house anyway akhi [brother]." JONES added, "Maybe I can get

more." The CHS told JONES and SCHIMENTI that the CHS was going to send phones to the CHS's aunt. JONES said if he gets more [phones], he would give them to the CHS. After the CHS told JONES that the CHS would pay money for the phones that JONES provided, JONES stated he did not want any money but claimed he needed "something for the hereafter."

The CHS told JONES and SCHIMENTI that the CHS watched on YouTube what the brothers [ISIS fighters] do with the phones. As the CHS paused to remember a specific word in English, SCHIMENTI interrupted and asked, "Detonator?" the CHS confirmed the word "detonator" was the word that the CHS was attempting to remember. JONES further stated if the CHS provides the CHS aunt's address, JONES would continue to provide phones to the CHS after CHS leaves the United States and joins ISIS. The CHS told JONES that the CHS had sent packages to his aunt and that his aunt can send those packages to Istanbul, Turkey. The CHS told JONES that, from Istanbul, there is a brother who can take it [to Syria]. As the CHS prepared to leave JONES's residence, JONES thanked the CHS for translating the Abu Bakr Al-Baghdadi video for him.

The government anticipates that UC2 will testify that, between on or about March 21 and 25, 2017, JONES and UC2 engaged in various online communications about UC2 meeting with the CHS.

The government anticipates that the CHS will testify that JONES and the CHS drove to meet with UC2 on or about March 26, 2017. During the drive, JONES

22

explained to the CHS how he initially met UC2, how SCHIMENTI was nervous that UC2 was a "Fed," and how UC2 never asked JONES to find more people or showed JONES anything to be nervous about. The CHS showed JONES a video of a Humvee being hit by an IED and explained that ISIS fighters are attaching phones to explosives to blow up vehicles. JONES then asked the CHS for the address of the CHS's aunt (the person purportedly facilitating the shipment of overseas items) and for the CHS's social media account they could communicate when the CHS arrived in Syria. JONES also asked whether the CHS's brother (the purported ISIS fighter) knew that the CHS was coming to join him.

The government anticipates that the CHS and UC2 will testify that JONES, the CHS, and UC2 met in CHS's vehicle on or about March 26, 2017. UC2 asked JONES if he took care of "everything [preparation for travel]." JONES responded, "Yeah. I let him know everything." UC2 asked background questions of the CHS and provided a list of items needed for travel.

The government anticipates that the CHS will testify that SCHIMENTI, JONES, and the CHS met in JONES's residence on or about March 26, 2017. The CHS joked about putting the ISIS flag on top of JONES's residence. SCHIMENTI stated he would like to see the flag "on top of the White House." The CHS told SCHIMENTI that the CHS met with UC2, and that the CHS thought UC2 was a good brother. The CHS further stated that the CHS was going to leave [to travel to Syria] before SCHIMENTI leaves [to travel to Pakistan].

23

During this meeting, JONES provided an additional cell phone to the CHS. JONES stated he hoped it kill many "kuffar [non-believers]." SCHIMENTI also said, "Many." The CHS stated that the CHS sent the other phones the CHS had acquired to the CHS's aunt (the person purportedly facilitating the shipment of overseas items) and hoped to send more to her later. JONES told the CHS to provide her address before the CHS leaves so JONES could keep sending as many phones as he could. The CHS said when the CHS makes it to Syria, the CHS will make a video and upload it for JONES and SCHIMENTI to view. SCHIMENTI stated if he sees the CHS "cutting the kuffar neck," SCHIMENTI will be "so happy that day." JONES recommended they all take a picture in front of the ISIS flag so that the CHS's brother (the purported ISIS fighter) could have it. All three took a picture in front of the flag.

The government anticipates that the CHS will testify that SCHIMENTI and the CHS met at the CHS's residence, among other places, on or about March 29, 2017. While driving, SCHIMENTI stated that he called three places looking for phones to give to the CHS. SCHIMENTI gave the CHS six phones in a bag. The CHS asked SCHIMENTI how much he paid [for the phones]. SCHIMENTI responded, "Five dollars." When the CHS told SCHIMENTI that the CHS would pay SCHIMENTI back, SCHIMENTI declined the offer and stated, "I know where they're going." The CHS stated that the CHS hoped each one would kill 20 people. SCHIMENTI responded, "Many kuffar [non-believers]."

While at the CHS's residence, the CHS showed SCHIMENTI a video clip of a Humvee being blown up by an IED. The CHS explained that the phones JONES and SCHIMENTI provided were being used for this purpose. In the video clip, as the Humvee approaches the IED, SCHIMENTI stated, "Landmine." After the IED goes off in the video clip, SCHIMENTI stated, "Yes. Yes." SCHIMENTI further stated that people do not understand that "we" have people who have expertise in paving roads and operating guns. SCHIMENTI stated that Allah gives understanding to whom he pleases. SCHIMENTI stated, without this understanding, SCHIMENTI would not know the "Dawla [ISIS] sister" and SCHIMENTI would not know the brother "who had the bomb in his shoe [Richard Reid]." SCHIMENTI stated he [Richard Reid] was a "good brother." SCHIMENTI pulled up a picture of Richard Reid for the CHS. SCHIMENTI also stated that Reid was upon "Haqq [truth]" and SCHIMENTI could show the CHS letters from Reid. During prayers, SCHIMENTI prayed that Allah "continue to expand your State . . . protect all the mujahedeen . . . continue to humiliate the kuffars."

The CHS told SCHIMENTI that he needed to go shopping for a few items in preparation for his travel. SCHIMENTI offered to drive the CHS to the store. The CHS told SCHIMENTI that UC2 suggested the CHS could buy things from the list he received from UC2. SCHIMENTI asked the CHS when the CHS was going to go visit his aunt (the person purportedly facilitating the shipment of overseas items). SCHIMENTI added that he may go buy a compass and bring it to the CHS.

While shopping, after the CHS expressed excitement for his trip and that he would send SCHIMENTI videos, SCHIMENTI stated, "I want to see blood flowing, whatever way." A short time later, SCHIMENTI said, "You can Google my name and I put it in English so the Kuffar [non-believer] can see, Islamic State here to stay!"

The government anticipates that the CHS will testify that SCHIMENTI, JONES, and the CHS met for dinner on or about April 7, 2017. During the meal, JONES told the CHS that he felt ashamed that he was not traveling as well. SCHIMENTI told the CHS to "drench that land with they, they blood." Afterward, SCHIMENTI and JONES drove the CHS to O'Hare International Airport in Chicago with the understanding that the CHS would be traveling from Chicago to Syria to join and fight with ISIS.

## VI.   COCONSPIRATOR STATEMENTS

The statements between the coconspirators, JONES and SCHIMENTI, made in furtherance of the conspiracy that the government intends to offer at trial fall into several categories, all concerning subjects that were integral to the conspiracy to provide material support and resources to ISIS.[11] As demonstrated above, the statements between the coconspirators made in furtherance of the conspiracy include conversations, as recorded or recounted by the CHS or undercover agents, about:

---

[11] As stated above, the government is not detailing each and every proposed coconspirator statement of each witness or document.

26

- ISIS, ISIS videos, ISIS travelers, training provided by ISIS, and ISIS-controlled territory;

- Mujahideen (fighters), jihad, and opposition to kuffar (non-believers);

- The CHS's brother's supposed fighting for ISIS;

- The CHS's potential travel to ISIS-controlled territory to join ISIS, including necessary preparations for travel, physical training, and route to ISIS-controlled territory;

- A contact who supposedly could facilitate travel to ISIS-controlled territory (*i.e.*, UC2) and his ISIS facilitation network;

- JONES's ISIS flag;

- Use of cell phones as components of IEDs;

- JONES and SCHIMENTI purchasing or otherwise acquiring cell phones for the CHS to provide to ISIS fighters;

- JONES and SCHIMENTI pledging bay'ah (*i.e.*, allegiance to ISIS); and

- Naval Station Great Lakes.

## VII.    CONCLUSION

The United States respectfully requests that this Court find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

Dated: April 29, 2019                                     Respectfully submitted,

                                                          JOHN R. LAUSCH, JR.
                                                          United States Attorney

                                          By:      /s/ G. David Rojas
                                                   BARRY JONAS
                                                   RAJNATH LAUD
                                                   G. DAVID ROJAS
                                                   Assistant U.S. Attorneys
                                                   219 South Dearborn St., Rm. 500
                                                   Chicago, Illinois 60604
                                                   (312) 353-5300

28