**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17 CR 236 |
| | ) | Hon. Judge Andrea R. Wood |
| EDWARD SCHIMENTI, | ) | |
| | ) | |
| Defendant. | ) | |

**EDWARD SCHIMENTI'S CONSOLIDATED POST-TRIAL MOTIONS**

**TABLE OF CASES**

**Page**

**Cases**

*Alford v. United States*, 282 U.S. 687 (1931) ........................................................... 12-14

*Batson v. Kentucky*, 476 U.S. 79 (1986) ................................................................... 7-10

*Brady v. Maryland*, 373 U.S. 83 (1963) ...................................................................... 14

*Christoffel v. United States*, 338 U.S. 84 (1949) ......................................................... 24

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ........................................................... 15

*Fields v. City of Chicago*, 2015 U.S. Dist. LEXIS 189573 (N.D. Ill. 2015) ................... 6

*Giglio v. United States*, 405 U.S. 150 (1972) ............................................................... 14

*Hernandez v. New York*, 500 U.S. 352 (1991) ............................................................... 8

*Johnson v. California*, 545 U.S. 162 (2005) ................................................................... 8

*Martin v. Texas*, 200 U.S. 316 (1906) ........................................................................... 7

*Neal v. Delaware*, 103 U.S. 370 (1881) ......................................................................... 7

*Norris v. Alabama*, 294 U.S. 587 (1935) ....................................................................... 7

*Shaw v. Illinois*, 394 U.S. 214 (1969) .................................................................... 13, 21

*Siegfriedt v. Fair*, 982 F.2d 14 (1st Cir. 1992) ....................................................... 16-17

*Smith v. Illinois*, 390 U.S. 129 (1968) ..................................................................... 12-14

*Strauder v. West Virginia*, 100 U.S. 303 (1880) ........................................................... 7

*United States v. Abu Marzook*, 03-cr-978 (N.D. Ill. 2006) ..................................... 17, 19

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) ........................................................ 6

*United States v. Brumley*, 217 F.3d 905, 909 (7th Cir. 2000) ......................................... 2

*United States v. Carter*, 111 F.3d 509 (7th Cir. 1997) ................................................... 8

*United States v. Condon*, 170 F.3d 687 (7th Cir. 1999) ................................................ 21

*United States v. Daoud*, 12-cr-723 (N.D. Ill. 2012)............................................17-18, 20

*United States v. Dumeisi*, 03-cr-664 (N.D. Ill. 2004) ...............................................19-20

*United States v. Hagler*, 700 F.3d 1091 (7th Cir. 2012)................................................ 2

*United States v. Hunter*, 932 F.3d 610 (7th Cir. 2019)................................................7-8

*United States v. Mohamud*, 3:10-cr-475 (Dist. Or. 2010)............................................. 20

*United States v. Mortensen*, 322 U.S. 369 (1944) ...................................................... 24

*United States v. Moya*, 721 F.2d 606 (7th Cir. 1983) ................................................... 24

*United States v. Navarro*, 737 F.2d 625 (7th Cir. 1984)................................................ 14

*United States v. O'Malley*, 833 F.3d 810 (7th Cir. 2016).............................................. 2

*United States v. Osmakac*, 8:12-cr-45 (M.D. Fla. 2012) ............................................. 20

*United States v. Palermo*, 410 F.2d 468 (7th Cir. 1969) ....................................12-13, 15

*United States v. Pearson*, 113 F.2d 758 (7th Cir. 1997)............................................23-24

*United States v. Pope*, 739 F.2d 289 (7th Cir. 1984) ................................................... 24

*United States v. Reyes*, 542 F.3d 588 (7th Cir. 2008)................................................... 2

*United States v. Roman*, 728 F.2d 846 (7th Cir. 1984)................................................. 24

*United States v. Santos*, 201 F.3d 953 (7th Cir. 2000).................................................. 25

*United States v. Stephens*, 421 F.3d 503 (7th Cir. 2005).............................................. 8

*United States v. Taylor*, 509 F.3d 839 (7th Ci. 2007).................................................. 10

*United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) ...........................................12, 16

*Whitus v. Georgia*, 385 U.S. 545 (1967)..................................................................... 8

**Statutes**

18 U.S.C. § 3500........................................................................................................ 14

18 U.S.C. § 201(c)(2).................................................................................................. 21

**Other Sources**

Fed. R. Crim. P. 29 ...................................................................................................... 23

Fed. R. Crim. P. 33 ........................................................................................................ 2

Now comes the Defendant, **Edward Schimenti**, by and through his undersigned attorneys, and respectfully submits to this honorable Court his Consolidated Post-Trial Motions pursuant to Federal Rules of Criminal Procedure 29 and 33. Through these consolidated Motions, Mr. Schimenti respectfully requests a judgment of acquittal, or in the alternative, a new trial. In support thereof, Mr. Schimenti states as follows.

## I. BACKGROUND

The court is familiar with the procedural and factual history of this case. As such, Mr. Schimenti will not engage in a lengthy recitation of facts elicited at trial. Rather, Mr. Schimenti will cite to facts relevant to each individual argument.

## II. ARGUMENT

### a. A New Trial Must be Granted Based on Newly Discovered Evidence

On October 23, 2019, two days before Defendants' post-trial motions were due, the government informed defense counsel that after the conclusion of the trial the FBI made a $50,000 payment to Muhamed, the lone CHS in this case. Were this information available to defense counsel before trial, Defendants could have argued that the testimony of Muhamed should be disregarded in its entirety. Given his significance as a witness, this would have cut at the heart of the government's case. Considering the critical role that Muhamed played in the underlying events and as a witness at trial, it is reasonably probable that evidence tending to show that his testimony against Defendants would have resulted in a $50,000 payment would have produced a different result at trial.

To obtain a new trial based on newly discovered evidence, a party must show that the evidence (1) was discovered after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4)

would probably lead to acquittal in the event of a new trial. Fed. R. Crim. P. 33; *see also United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016); *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012); *United States v. Reyes*, 542 F.3d 588, 595 (7th Cir. 2008); *United States v. Brumley*, 217 F.3d 905, 909 (7th Cir. 2000). Regarding the first and second prongs, there can be no question that the $50,000 payment as well as the circumstances surrounding it were discovered after trial and could not have been discovered sooner had due diligence been exercised.

For the third prong, although the new evidence might be considered as impeachment, it hardly can be considered "*merely* impeaching." At the very least, the evidence directly contradicts the government's narrative throughout trial that Muhamed acted as a CHS out of zeal for his new homeland. At trial, both he and his handler, FBI Special Agent Carnright, testified that he was voluntarily cooperating with the FBI, that he only received reimbursement for specific expenses, that he never requested payment for his work, and that he was never promised anything beyond reimbursement of expenses. In particular, Agent Carnright stressed that Muhamed was "voluntarily assisting the FBI" (Tr. at 252), was "a very patriotic individual, very law-enforcement friendly, and [had] a very positive work experience with the [Department of Defense] overseas" (Tr. at 405). During his testimony, Muhamed also stressed the voluntary nature of his work for the FBI, his support for law enforcement generally, and his family's previous work for law enforcement. (Tr. at 1223-1225, 1426, 1436, 1439-40, 1501, 1503).

Both Agent Carnright and Muhamed minimized the nature of any benefits he had received in return for his work for the FBI. Carnright testified that any payments to Muhamed were reimbursement for expenses, for a "junker" of a car, and for his relocation after Defendants were arrested and charged. Tr. at 410-412, 412. According to both, Muhamed received no more

than approximately $16,000 for these incidental costs. Tr. at 412. Muhamed stressed that he was not receiving a salary from the FBI (Tr. at 1504) and that this compensation covered "money only for fuel, car . . . not fancy car, just cheap car— for parking, for moving out from my old apartment after the case." Tr. at 1226. On direct, Muhamed could not have been more categorical in his denial of any material compensation:

> Q: Did you ask the FBI for anything in exchange for your cooperation with them?
> MUHAMED: No.
> Q: Did they offer you anything in exchange for your cooperation with them?
> MUHAMED: No.
> Q: Did you expect to get anything?
> MUHAMED: No.

Tr. at 1225:7-14.

During closing argument, the government drove this point home: "The FBI didn't promise him anything. He didn't ask anything from them. In fact, the only thing he got from them was reimbursement of funds that he had to spend for the investigation." Tr. at 2737:12-15. Similarly, during the jury instruction conference, while arguing against the Defendants' proposed "caution and great care" instruction, the government argued "Typically when the caution and great care instruction is given it's because it's very obvious the person has got a plea deal or something like that. [...] I think in light of the very minimal benefit, if any, and the dispute as to whether there is a benefit or not, this particular witness does not warrant an instruction so strong as the caution and great care instruction." Tr. at 2272:23 to 2273:9. The Court was persuaded by the government's argument and declined to give the instruction, finding that "a special cautionary statement, I do think, is reserved for those situations where there is a concrete benefit,

such as a plea, cooperation credit, or something else that very clearly or at least as has been presented is evidence of a benefit. It does not strike me as necessary here." Tr. at 2451:20-24.

It turns out that there was a significant benefit planned. In her affidavit, Agent Carnright testified that "prior to trial" there was a "conversation about the possibility of paying Muhamed" with members of the United States Attorney's Office. Dkt. 135, ¶4. In response, the U.S. Attorney's Office advised her to "wait until after the resolution of the case" to pay Muhamed. *Id.* Carnright stressed, however, that her "intention to pay Muhamed was notional until officially requested and concurred upon by FBI Management" on June 26, 2019. *Id.* This is nonsense.

At trial, Carnright testified that "all the money provided to Muhamed was to afford for any costs incurred to him throughout the course of the investigation." Tr. at 411. Put another way, she "didn't want to put him in the hole for the work that we asked him to do." *Id.* During the trial, the government led us to believe that the sum total of those expenses came to about $16,000. Now, Carnright claims that this number was $50,000 off. At hearing, Carnright even admitted that, at the very least, if that $50,000 had been made prior to trial, a defense attorney would have been entitled to that information and would be allowed to cross-examine the cooperator on that information. Hearing Tr. at 31:17-21. Without question, a $50,000 payment to Muhamed is material.

But the $50,000 payment was not the only post-trial revelation. At hearing, Carnright's testimony cast her entire relationship with Muhamed in a completely different light. At hearing, Carnright testified that throughout their relationship, Muhamed would discuss his financial concerns, often at her request. Hearing Tr. at 38:19-23. In her affidavit, Carnright claims that the $3,000 advance on June 28, 2019, was "specific to Muhamed's financial need at the time." Dkt. 235, ¶6. At hearing, Carnright explained that the situation was more dire: "He had no money. He

had lost the job that he currently had during trial. And because we were going to pay him but it would take a substantial amount of time more to get the full amount, I requested we advance him some of the money to cover his rent and food expenses." Hearing Tr. at 43. It is significant that Muhamed's financial situation was so precarious that losing his job at some point during trial resulted in his having no money less than a week after it concluded. Even more, according to Carnright, she was monitoring his finances so closely that she knew how important it would be to provide him with the $3,000 just over a week after the trial concluded.

Yet, at hearing, Carnright insisted that at no point did she indicate to Muhamed that she intended to make any payment—let alone $50,000—to him until she provided this advance on June 28, 2019. Nor, she claims, did Muhamed ever request further payment. This is the hill the government refuses to abandon. For if Muhamed expected payment—or even understood that he might receive additional payment as a result of his testimony—then the jury might not have believed the testimony of Muhamed and Carnright at trial. Or, Messrs. Jones and Schimenti might have received the great caution and care jury instruction they requested. At the hearing, Carnright stressed that she never promised Muhamed additional funds and that the first time Muhamed learned that he would be receiving an extra payment for his work in this case was on the day that she paid him, June 28, 2019.

These claims defy common sense. If Carnright is to be believed on this point, during the investigation, Muhamed went for long periods without salary, and when he did have a salary, Carnright did not know what it was. At some point before the close of that investigation, Carnright discussed the prospect of paying Muhamed additional money with AUSA Jonas, who instructed her to wait until after trial. During trial Muhamed lost his job. Somehow, without his alerting Carnright to his financial condition, or requesting that he be compensated further at all,

Carnright discovered that his need was so great that she not only expedited a request for $50,000 *within six days* of the jury's verdict on June 20, but she also had the foresight to bring $3,000 in cash to her meeting with Muhamed on June 28, the first time she told him the good news that he would be receiving an additional $50,000. He then refused the money at first, only to eventually acquiesce to the lump sum of $50,000. The timing and logistics of Carnright's explanation are incredible and arguably had a direct connection to Muhamed's testimony against the Defendants in the present case.[1]

Armed with this evidence, defense counsel could have argued that Muhamed's testimony regarding his conversations with Defendants should be disregarded in its entirety. As the only CHS to testify, Muhamed's testimony was essential to the government's case as well as its rebuttal against Defendants' entrapment defense. Muhamed described his efforts to comply with Carnright's instructions to avoid injecting certain topics into conversations with Defendants, presumably to avoid the appearance of government inducement. Many of these conversations were not recorded, and so both his and Carnright's credibility on these issues were crucial to the entrapment issue. The December 2 hearing was not the first time that Carnright was called back to testify regarding the late disclosure of evidence that raised questions regarding the extent and scope of the government's efforts behind the scenes in this case. At trial, she was recalled due to the government's late disclosure of evidence relevant to the entrapment issue.

This newly discovered evidence is of such a substantial nature that it requires a new trial. Mr. Schimenti requests that this Court grant his request on this basis.

---

[1] Even later-occurring events may give an insight into the character of the relationship between the prosecutorial team and their witnesses. *See*, *e.g.*, *United States v. Boyd*, 55 F.3d 239, 245 (7th Cir. 1995); *Fields v. City of Chicago*, 2015 U.S. Dist. LEXIS 189573, *29-31 (N.D. Ill. Apr. 6, 2015).

### i. Batson Issue/ jury selection

Long before its seminal decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court decided that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which the members of his race have been purposefully excluded." *Id*. at 85, citing *Strauder v. West Virginia*, 100 U.S. 303 (1880). Although the equal protection clause and our jurisprudence does not guarantee a defendant a "petit jury composed in whole or in part of persons of his own race," *Batson*, 476 U.S. at 85, the defendant "does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Id*. at 85-86, citing *Martin v. Texas*, 200 U.S. 316, 321 (1906). The *Batson* Court recognized that the Equal Protection Clause secures against the prosecution excluding members of the defendant's race from the "jury venire on account or race … or on the false assumption that members of his race as a group are not qualified to serve as jurors." 476 U.S. at 86, citing *Norris v. Alabama*, 294 U.S. 587, 599 (1935); *Neal v. Delaware*, 103 U.S. 370, 397 (1881). "The very idea of a jury is a body … composed of peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), quoting *Strauder v. West Virginia*, 100 U.S. 303 (1880).

*Batson* held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *United States v. Hunter*, 932 F.3d 610, 617 (7th Cir. 2019), quoting *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). There are three steps in the process of a *Batson* challenge. At the outset, the defendant challenging a peremptory strike on the basis of race must make a *prima facie* showing that the

prosecution's motive was discriminatory. *Hunter*, 932 F.3d at 617; *Batson*, 476 U.S. at 93-94.

At the *prima facie* stage, however, the burden is low and need not be by a preponderance of the evidence. *United States v. Stephens*, 421 F.3d 503, 512 (7th Cir. 2005), citing *Johnson v. California*, 545 U.S. 162, 170 ("a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred,").

Once a *prima facie* case is made, the government must then offer a nonracial reason for its use of a peremptory strike. *Id*. Finally, the district court must then decide if the defendant established "purposeful discrimination." *Id*. If the prosecution has "offered a race-neutral explanation for the peremptory challenge, the test is compressed down to the ultimate question of intentional discrimination; the preliminary questions of a *prima facie* case becomes moot." *United States v. Carter*, 111 F.3d 509, 512, n.1 (7th Cir. 1997), citing *Hernandez v. New York*, 500 U.S. 352, 359 (1991). Through the first two steps, the trial court is presented with evidence which allow it, at the third step, "to determine the persuasiveness of the defendant's constitutional claim." *Stephens*, 421 F.3d at 512. The defendant ultimately carries the burden of persuasion to prove the existence of purposeful discrimination. *Johnson*, 545 U.S. at 170-71, quoting *Batson*, *supra*; *Whitus v. Georgia*, 385 U.S. 545, 550 (1967). In this case, the government's use of a peremptory challenge related to venire person number 2, Mr. Anthony Brown, was discriminatory in nature.

On the morning of May 28, 2019, the parties began the process of picking a jury from the venire. At that time, Juror number 2, Anthony Brown, was briefly interviewed by the Court. (Tr. at 32). Mr. Brown studied philosophy in college and, at the time of trial, was a finance and accounting supervisor at UPS. *Id*. Other than a grandmother that retired from the IRS and a

former associate who worked for the FBI, Mr. Brown had no connections to government. *Id*. at 33. Despite that, he would not offer any different weight to the testimony of law enforcement. Overall, Mr. Brown offered nothing of note, but in an effort to be fully transparent with the Court, disclosed that he had heard an episode of the NPR podcast, This American Life. (Tr. at 34-35). Mr. Brown explained that the particular episode dealt with a "counter-terrorism investigation…." *Id*. at 35. Mr. Brown further explained: "[s]o I'm trying to identify this as my own potential bias. And even if that, you know, I imagine that sort of process, which I may find distasteful, is exceedingly rare, but it also may be outside the bounds of the law. So I want to be transparent about that and I want to identify it as a potential bias for myself." *Id*.

Upon further questioning by the Court, Mr. Brown disclosed that he heard the episode of This American Life some years prior and that he could be fair and impartial despite having heard the NPR program. (Tr. at 35-36). At sidebar, the parties discussed an objection for cause related to Juror number 15, and the government explained related to juror number 15, "I think this falls in the category of, you know, it's not wrong – I mean, jurors are going to come in with preexisting notions on either side. For example, Juror No. 2, Mr. Brown, came in with a preexisting concern about the government entrapping people in terrorism cases and had a pretty detailed recollection of an episode of This American Life that he had listened to about that." (Tr. at 249). The parties then seemed to agree that all present had heard the same episode of this American Life. The parties then moved on without further discussion of Mr. Brown, and he was not dismissed for cause. Importantly for this discussion, Mr. Brown is African-American.

After sifting through the venire and addressing any strikes for cause, the government exercised a peremptory strike against Mr. Brown. At that time, Mr. Jones objected based on *Batson*, and Mr. Schimenti joined in that objection. Mr. Jones is African-American, and Mr.

Schimenti is mixed race, and approximately one-quarter African-American. (Tr. at 685). The government responded, citing its concern over Mr. Brown disclosing that he had listened to the This American Life episode discussed above. *Id*. at 685. The Court recognized that "several people, including counsel and myself, … had heard on the radio." *Id*. All other African-American members of the venire had previously been struck. Brief arguments were heard on May 30, and further argument carried over to the following day.[2]

Ultimately, this Court recognized that there were other members of the venire who expressed distaste for methods of surveillance used by the government and government overreach who were, nonetheless, retained by the government. (Tr. at 707-08). The government argued that Mr. Brown was unique among those other potential jurors because his concerns "went to the heart of the case…." *Id*. at 708. At hearing, Jones and Schimenti argued the similarities of the instant matter with *United States v. Taylor*, 509 f.3d 839 (7th Cir. 2007), noting that one way in which to address the discriminatory nature of the strike is to look at two similar potential jurors, one white and one African-American. *Id*. at 723. The government maintained its argument that Mr. Brown's concern over the targeting of Muslims was the basis for the strike. *Id*. at 736-37. The Court found that the *Batson* challenge was not frivolous, but did not conclude any intentional effort to exclude African-American jurors. *Id*. at 748-49. This was in error when the Court compares similar jurors of different ethnicities stricken or not stricken by the government. It is based on this error, in part, that Mr. Schimenti requests a new trial.

---

[2] Jones and Schimenti also argued the *Batson* challenge related to juror number 42, another African-American member of the venire. Mr. Schimenti does not waive that argument here; however, for brevity, is focusing on the issues related specifically to juror number 2.

### ii. This Court impermissibly infringed on the right to confront witnesses by granting the CIPA Motion and protective order

On February 28, 2019, the government filed a combination of motions with the aim of this Court entering a protective order and limiting the Defendants' ability to cross-examine certain government witnesses. Dkt. Nos. 104, 105. Over defense counsels' objections (Dkt. No. 115), this Court granted the government's Motion for a Protective Order Pertaining to the Trial Testimony of Undercover Employees, Online Covert Employees, and Confidential Human Sources (the "Motion") without limitation. (Dkt. No. 121). The proposed limitations on cross examination and the right to confront witnesses had the feared effects at trial. This was in error. As such, Mr. Schimenti requests that this Court grant his motion for a new trial as discussed below.

In its Motion, the government offered that there would be three categories of witnesses testifying at trial for whom it sought protection. The government did offer testimony from those three categories of witnesses at trial: undercover employees ("UCE"), online covert employees ("OCE") from the Federal Bureau of Investigation, and confidential human sources (CHS") (collectively the "Witnesses"). Upon an initial review of the Motion, it appeared the government was only requesting that this Court should (1) not require the disclosure of a Witnesses' true identity, and should (2) allow Witnesses to testify outside the view of the public. The government's request was, however, devastatingly overbroad.

The government sought and this Court granted twelve distinct types of protection for the Witnesses. Most of those protections fell within the two categories described above, with an important exception for two. The two requests at issue[3] are as follows:

---

[3] Jones and Schimenti objected to all requests which the government sought in its Motion (Dkt. No. 104) – all of which were granted over that objection. Mr. Schimenti maintains and preserves

4. The defense shall be prohibited from asking any questions about the witnesses' participation in past or pending investigations or undercover operations;

5. The defense shall be prohibited from asking any questions regarding any FBI undercover program.

Dkt. No. 104, p. 6; granted by Order, Dkt. No. 121. By granting the governments requested limitations above, this Court allowed the government to stifle the counsels' ability to fully cross examine the witnesses and develop arguments related to their offered defense of entrapment.

### 1. The Government failed to identify specific threats would which justify limiting cross-examination on issues of identity

Courts have long held that cross examination should not be limited without sufficient justification; otherwise, reversal is the appropriate remedy. Specific to the instant situation, the Court in *Alford v. United States*, 282 U.S. 687 (1931) and *Smith v. Illinois*, 390 U.S. 129 (1968) held that reversal is necessary where the district judge refused to allow threshold questions about a witnesses' address and employment. *See United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969). "The purpose of the inquiry is to make known to the jury the setting in which to judge the character, veracity or bias of the witness. *** Since there is no requirement of materiality, it is not necessary to show the possibility of the witness being in custody in order to make such an inquiry." *Palermo*, 410 F.2d at 472, quoting *United States v. Varelli*, 407 F.2d 735, 749 (7th Cir. 1969).

The court in *Palermo* acknowledged, however, that the decision whether to disclose a witness's place of employment or address could not be made in a vacuum, citing the difficulty

---

his objections herein. For purposes of brevity in the instant motion, however, Mr. Schimenti focuses his arguments on only two of the requests which were granted, without waiving any objection or argument related to all limitations sought and granted in the government's Motion.

that the government may have in securing witnesses to testify. 410 F.2d at 472. Citing *Smith*, the Supreme Court stated:

> "[i]n *Alford v. United States* … the Court recognized that questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination. I would tend to place in the same category those inquiries which tend to endanger the personal safety of a witness."

To that end, where there is a threat to the life of a witness, the defendant does not have an absolute right to the name, address, and employment of the witness. *Palermo*, 410 F.2d at 472, citing *Varelli*, 407 F.2d 735. While there may not be an absolute right to such information, it was the government's burden of proving to this Court that such a threat to the life of a witness existed. Importantly, "the threat to the witness must be actual and not the result of conjecture." *Id.*, citing *Shaw v. Illinois*, 394 U.S. 214 (1969).

The government's position that defense counsel – including security cleared defense counsel – could not know the true identities of the witnesses for the purpose of defense counsel conducting their own investigation. The government's apparent rationale was based upon the circular logic of security agencies - that even security cleared counsel do not have a "need to know." Aside from the self-serving absurdity of this reasoning, this logic allowed for the witnesses to testify without using their true names in court – which is arguably acceptable.[4] What is wholesale unacceptable is that this logic prevented defense counsel with security clearance from investigating the Witnesses and adequately cross-examining them. The effect of the government's request and this Court's grant of it is constitutionally impermissible. The significance of this limit on preparation for trial and cross-examination cannot be understated.

---

[4] Defendants maintain their objection on this issue because the government never provided anything beyond mere conjecture as to threats facing the Witnesses, in contravention to precedent.

In *Smith*, the Court underscored the importance of defense counsel's ability to investigate and cross-examine government witnesses. There, the Court reversed a defendant's conviction after the trial court precluded him from learning the true name of the State's witness. 390 U.S. at 131. In so holding, the Court expressed what may seem obvious but is worth repeating:

> Yet when credibility of a witness is in issue, the very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.

*Id*., (internal quotation marks omitted); *Alford*, 282 U.S. 687; *United States v. Navarro*, 737 F.2d 625, 633 (7th Cir. 1984) ("*Alford* and *Smith*, thus make it clear that a defendant is presumptively entitled to cross-examine a key government witness as to his address and place of employment,"). Moreover, allowing the Witnesses to use their respective pseudonyms at trial did not diminish the government's obligations under *Brady v. Maryland*, *Giglio v. United States*, and the Jencks Act, 18 U.S.C. § 3500.[5] The government was thus able to proceed to trial without providing security-cleared defense counsel with the Witnesses' true identities or any detailed background information. The government clearly recognized the importance of this information, however, when it offered to conduct the Defendant's investigation of the Witnesses for the Defendants. This was not an acceptable alternative to the Defendant's asserted rights to the information sought.

---

[5] The government argued in its Motion that "[i]t is [the OCE, UCE, or CHS's] interactions with the defendants – not their personal identity – that makes their testimony relevant at trial." Motion, p. 10 (Dkt. No. 104). Although this Court ordered that the government provide the Defendants with a list of training courses taken by the Witnesses (Dkt. No. 121), there were still numerous potentially relevant matters other than the Witnesses specific training courses, if any, and their interactions with the Defendants which were relevant and should have been the subject of investigation at the least, and cross-examination. These issues include, but are not limited to, matters related to the Defendants' defense of entrapment.

In support of the Motion, the government cited to *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), arguing the proposition that "[t]he Confrontation Clause does not require that a jury hear a witness's true name…." Motion, p. 7 (Dkt. No. 104). But that excerpt does not represent the holding in *Van Arsdall*.

In *Van Arsdall*, the defendant was on trial for murder and the state called many witnesses, including Robert Fleetwood. Defense counsel sought to impeach Fleetwood during cross-examination by questioning him about the dismissal of an unrelated case after Fleetwood agreed to speak with the prosecutor in the *Van Arsdall* matter. 475 U.S. at 676. The state objected to this line of questioning and the court sustained the objection pursuant to Delaware Rule of Evidence 403. *Id.* The court also prohibited defense counsel from examining Fleetwood about police questioning on an unrelated murder. *Id.* At no point did the court address whether the issue of witnesses testifying using pseudonyms or their names otherwise being withheld.

The *Van Arsdall* Court did hold that judges retain wide latitude in limiting cross-examination, but specifically on the issue of whether it was proper to limit cross-examination into a witness's motivation for testifying and potential bias. 475 U.S. at 678-79. The Court held that such limitation was proper, vacated the conviction of the defendant, and remanded to the Delaware Supreme Court for further action. The *Van Arsdall* Court never approached the idea that the "Confrontation Clause does not require that a jury hear a witness's true name." Similarly, other cases cited by the government entirely missed the mark of supporting its position.

In *United States v. Palermo*, *supra*, the Seventh Circuit held that "[u]nder almost all circumstances, the true name of the witness must be disclosed." 401 F.2d at 472, citing *Smith, supra*. "A witness's prior address must also be disclosed if the witness does not intend to return

to this location." *Id.*, citing *Varelli*. Most importantly, however, is the *Palermo* court's holding that, "[i]f the trial judge concludes that the defendant does not have a right to the exact address of the witness and his place of employment, the defendant is entitled to ask other relevant questions which may aid the jury in weighing the witness' credibility." *Id.* In this case, the Court granted the government's Motion in its entirety, prohibiting the Defendants from questioning the Witnesses about their true name, place of employment, and further limiting cross-examination in other ways, discussed *infra*.

In yet another inapposite case cited by the government and is forth *Siegfriedt v. Fair*, 982 F.2d 14 (1st Cir. 1992). In *Siegfriedt*, the defendant was charged with arson and, at a preliminary hearing on the matter, witness Christopher Martel testified under oath and was subject to cross-examination. 982 F.2d at 16. By the time the matter proceeded to trial, Mr. Martel could not be located and, it was eventually discovered, had testified under an assumed identity – but not at the direction of any party. At trial, the court allowed the prior testimony to be admitted after a finding that Martel was unavailable and had previously been subjected to cross-examination. *Id.* The court also allowed the defendant to call Martel's brother and another witness to testify about Martel's reputation for veracity. *Id.* The defendant was convicted and later filed a *habeas* petition, the appeal of which resulted in the *Siegfriedt* opinion.

In his petition, Siegfriedt claimed that because Martel testified under an adopted name, the opportunity for cross-examination was inadequate as a matter of law. *Siegfriedt*, 982 F.2d at 17. In support the petitioner cited *Smith* – a position which the First Circuit Court of Appeals rejected. The court observed that "[t]he long and short of it is that the *Smith* standard has a core purpose: to prevent a criminal conviction based on the testimony of a witness who remains 'a

mere shadow' in the defendant's mind." *Siegfriedt*, 982 F.2d at 17.  Ultimately the court drew

the following distinction regarding the defendant's argument:

> In *Smith*, unlike here, the witness adopted a pseudonym for the sole purpose of testifying.  In *Smith*, unlike here, the defendant did not know the witness's true identity before the jury returned its verdict.  In *Smith*, unlike here, the witness's anonymity was the direct result of government contrivance.  We find these distinctions more than sufficient to propel this case out of *Smith's* precedential orbit.

*Id*. at 18.  Not only do the cases which the government cited and on which this Court relied *not*

support its proposed limitations on identifying witnesses and subjecting them to cross-

examination, but these cases support the idea that use of pseudonyms and limiting examination

on background issues would be reversible error.  Indeed, the government was allowed to have

the witnesses testify with assumed names, with no questions on cross-examination related to

their respective backgrounds, training, or undercover work – which is relevant to the issue of

entrapment.  The inability to fully cross examine became even more relevant when combined

with fact of the $50,000 windfall payment to Muhamed, as discussed below.

Here, there was no showing of an actual threat rather than the result of conjecture.

Instead, the accepted premise was that the witnesses necessarily faced some kind of threat based

on their line of work.  While the witnesses may in fact face generalized threats based on their

chosen employment, such an assertion was not enough to sustain the government's burden of

demonstrating an actual threat.  Despite that failure, the Motion was granted and the Witnesses

were allowed to testify with significant restrictions to cross-examination, to the Jones and

Schimenti's detriments.  The prejudice is crystalized by comparison to *United States v. Abu

Marzook, et al.*, and *United States v. Daoud*.

In *United States v. Abu Marzook*, the court allowed certain protections for witnesses,

including the use of pseudonyms and light disguises to protect the identities of Israeli Security

Agency ("ISA") witnesses. Case No. 03-cr-978 (N.D. Ill 2006) (Dkt. No. 652). The court's decision was based on the fact that, as members of the ISA, the witnesses' true identities were protected by the laws of Israel and were deemed classified by Executive Order 12958, related to national security. In other words, the government did not need to demonstrate a specific threat to the ISA witnesses in order to satisfy the law; the request could be granted by other means.

In *Daoud*, the government sought similar protections for witnesses as were granted in this case. 12-cr-723 (N.D. Ill 2012). In the governments Motion for Protective Order in *Daoud*, the government identified the fact that "one month after the defendant's arrest, while in custody, the defendant solicited the murder of the undercover employee in retaliation for his involvement in the investigation and to prevent him from testifying against the defendant…." *Id*. at Dkt. No. 123, p. 3. Thus, the government identified a specific threat to a witness which was "actual and not a result of conjecture." In this case, no such threats were identified.

There were never allegations against the Defendants that they were violent in nature. Neither Messrs. Jones or Schimenti were accused of making threats to individuals associated with their investigation, acts of violence, or anything approaching it. Instead, they were alleged and proven to have provided material support to ISIS by giving cell phones to Muhamed. Nothing in this case came near the threats or dangers of other comparative cases which warranted the granting of the government's Motion. The resulting of the granting of the government's Motion was that the Witnesses were allowed to testify using pseudonyms and with a closed courtroom for their protection, but the Defendants were then further limited in their cross-examination – essentially allowing the government to have it both ways while gutting the Defendants' Sixth Amendment rights to confrontation.

**2. This Court's granting of the government's Motion related to the FBI's undercover program and other, relevant lines of questioning offered no protection to the Witnesses; it simply limited cross-examination in an impermissible manner**

Through its Order (Dkt. No. 121), this Court granted the government's request that the Defendants be prohibited from "asking any questions about the witnesses' participation in past or pending investigations or undercover operations" and "asking any questions regarding any FBI undercover program." Motion, p. 6 (Dkt. No. 104). Neither the government in its Motion nor this Court in its Order granting that Motion have cited any statute or case law which allows for such limitation on cross examination. This lack of citation to any law supporting the government's request is due to the fact that this request was unlike any granted by other courts.. In so many words, this Court was at the spearhead of ever-expanding and increasing requests by the government for limitations on cross-examination across the country, and has allowed the government to continue on that path unchecked. Even the cases cited by the government in its Motion fail to support such an expansive limitation on cross-examination.

In *Abu Marzook*, the government moved for a protective order requesting: (1) that ISA witnesses not be required to disclose their true (and classified by Israel law) identities; (2) that ISA witnesses be allowed to testify outside the view of the public; (3) that the ISA witnesses be allowed to testify in light disguise; and (4) that the ISA witnesses should have access to a secure, non-public courtroom entrance and exit. Case No. 03-cr-978 (N.D. Ill. 2006) (Dkt. No. 587). Then district judge granted the above four requests. Dkt. No. 652. Nowhere in the government's request in *Abu Marzook* or the court's order was there any limitation on the topics of cross-examination.

In *United States v. Dumeisi*, No. 03-cr-664 (N.D. Ill. 2004), the government moved for a protective order requesting that: (1) the witness be allowed to conceal his true identity, place of

employment, and address; and (2) the witness be allowed to testify behind a screen or in a light disguise without courtroom sketch artistry.[6]  Dkt. No. 75.  The court granted the government's very limited requests, but specified that the witness "may be questioned about his previous responsibilities and potentially exculpatory matters" which the defendant had raised.  Dkt. No. 83.  Not only did the government not request limitations on cross-examination (other than issues of true identity), but the court specifically granted the defendant the ability to explore these issues on cross-examination.

Similarly, in *United States v. Daoud*, the government sought via protective order protections nearly identical to those at issue here.  Case No. 12-cr-723 (Dkt. No. 123). The major distinction between the *Daoud* motion and the government's Motion here is the government did not seek the limitations in Requests 4 and 5 here.  The only restriction on cross-examination which the government sought in *Daoud* is that the defense be prohibited "from asking any questions seeking personal information from the undercover employee."  Dkt. No. 123, p. 4.  The court in *Daoud* granted the government's requested relief.  Dkt. No. 155, p. 3.  Other cases cited by the government reached the same result.  *See United States v. Mohamud*, No. 3:10-cr-475 (Dist. Or. 2010) (Dkt. No. 341) (granting protective order as sought by the government, with no limitation on cross-examination except that "[t]he defense is prohibited from asking any questions seeking personal identifying information from the UCEs,"); *United States v. Osmakac*, No. 8:12-cr-45 (M.D. Fla. 2012) (Dkt. Nos. 140, 217) (the government sought a protective order nearly identical to that in *Daoud* and *Mohamud*, and did not seek to limit cross-examination

---

[6] By comparison to the instant case, in *Dumeisi*, the government had previously disclosed to defense counsel the true identity of the witness who sought the protection, thus allowing the defense to gather impeaching and otherwise exculpatory information.  Dkt. No. 75, p. 1 ("This witness, whose name has been disclosed to defense counsel under the terms of the Protective Order entered by this Court on September 23, 2003 ….").

except for prohibiting "questions seeking personal identifying information, such as name and address, from the UCE," with the court granting the relief).

Precedent allows for limitations on cross-examination as to such introductory matters as employment and address of witnesses only where there is a "threat to the life of a witness," (*Palermo, supra*) but with the caution that "the threat to the witness must be actual and not the result of conjecture." *Id.*, citing *Shaw v. Illinois*. Here, however, this Court granted the government's requested limitations on cross-examination. These requests have far less support from statutes and precedent, but have far greater effect on the rights of the Defendants. This is especially true when the limitations at issue go right to the heart of the entrapment defense which was relied on at trial. The Defendants respectfully submit that granting the government's requested limitations on cross-examination was in error and seek a new trial on that basis.

### 3. The limitation on cross-examination coupled with the government's decision not to disclose the $50,000 payment until after trial, prevent Mr. Schimenti from exploring information about Muhamed's expectations of payment

There has been ample discussion above about the limitations placed on cross-examination through the protective order in this case. The limitations prevented defense counsel from exploring the background of Muhamed, other than learning that his family worked at a vague police academy with the United States Army. (Tr. at 1436-37). Defense counsel was unable to explore whether Muhamed was compensated by the United States government for his work while in Iraq. That issue is of the utmost importance when considering the payment of $50,000 to Muhamed shortly after his work on this case (testimony) was complete.[7]

---

[7] It is worth noting that, had defense counsel paid a witness after trial, they likely would have been subject to prosecution under 18 U.S.C. § 201(c)(2). The court in *United States v. Condon* did not evaluate whether "whoever" in § 201(c)(2) applied to federal prosecutors or agents as it would any other person. 170 F.3d 687 (7th Cir. 1999). The court did not need to answer this

The issue of Muhamed's expectations of compensation are now at the center of the inquiry. Did Muhamed expect any payment to be delivered? Based on Muhamed's previous work with the United States, did he understand that the U.S. compensates undercover operators for their work both internationally and domestically? Is this why Mohamed showed up to the FBI building with a resume in hand, prior to his work on this case? The likely answer to all of these questions is "yes." Unfortunately, Mr. Schimenti was unable to explore Muhamed's past and his expectations in any meaningful way.

It is also likely that Muhamed's experience in this case led him to believe that he would receive compensation after his testimony was complete. Although the government put on evidence at trial that the $16,000 paid to Muhamed during this case was simply reimbursement for out-of-pocket expenses, we now know based on the December 2, 2019 hearing that $8,600 of these funds was not a reimbursement. Instead, it was up front, lump sum payment for Muhamed to relocate. This $8,600 included a security deposit, three months' rent, and a per diem for 30 days. Indeed, Agent Carnright testified that it was similar to when the FBI pays for an employee to relocate. So, knowing that the FBI would take care of him financially based on his experience in this case, and likely his experience with the United States government in the past, it is logical to think he expected compensation for his work and testimony here. But, through the government's well-timed payment to Muhamed and Mr. Schimenti's inability to cross-examine Muhamed on his past, Mr. Schimenti was entirely prevented from putting on a full defense

question, because the promises of reduced sentences or immunity at issue in that case was not a thing of value, so the statute simply did not apply. The court explained that "if is unnecessary to consider a possibility that some other courts have embraced: that 'whoever' in § 201 does not included federal prosecutors. "That approach, if taken seriously, would permit prosecutors to pay cash for favorable testimony, a practice that lacks the statutory and historical support of immunity and sentence reduction." 170 F.3d at 689.

which explored the motives of Muhamed – violating his constitutional rights. Mr. Schimenti should be granted a new trial on this basis.

### b. Motion for Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure 29, the Defendants move this Court to set aside the jury verdict in this case and enter a Judgment of Acquittal. The Defendants properly argued a Motion for Judgment of Acquittal at trial and now renew that Motion.

At trial, the Government's evidence was insufficient to sustain a verdict of guilty and Rule 29 provides this Court with the appropriate avenue for relief. Federal Rule of Criminal Procedure 29(a) states as follows:

> (a) Before Submission to the Jury
> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

*Id*. The Rule allows this Court to reserve ruling, (Rule 29(b)), and also allows for this Court to grant a Motion for Judgment of Acquittal after discharge of the jury. *See* Rule 29(c). The latter situation applies here.

A sufficiency of the evidence challenge requires this Court to determine if the evidence could support the conviction when viewed in the light most favorable to the Government. *United States v. Pearson*, 113 F.2d 758, 761 (7th Cir. 1997). The same standard announced in *Pearson* applies to Mr. Jones' and Mr. Schimenti's request for a Judgment of Acquittal:

> A motion for acquittal may not be granted if, viewing the evidence in the light most favorable to the prosecution, there is relevant evidence from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [citation omitted]. When applying this standard, a judge must, of course, keep in mind that it is the [finder of fact] which has the exclusive authority to assess the witnesses' credibility, resolve evidentiary conflicts and draw reasonable inferences from the evidence presented.

*United States v. Pope*, 739 F.2d 289, 291 (7th Cir. 1984); *citing United States v. Roman*, 728 F.2d 846, 857 (7th Cir. 1984). Mr. Jones and Schimenti maintain that the evidence adduced at trial, taken in the light most favorable to the prosecution, failed to prove their guilt beyond a reasonable doubt. *See United States v. Moya*, 721 F.2d 606, 610 (7th Cir. 1983). A guilty verdict can only be sustained if there was sufficient, credible and probative evidence which proved beyond a reasonable doubt that the Defendants were guilty of each element of the crimes charged. *United States v. Mortensen*, 322 U.S. 369 (1944). Failure to prove an essential element entitles the defendant to an acquittal. *Christoffel v. United States*, 338 U.S. 84 (1949). In this case, the Government failed to prove with credible and probative evidence that the Defendants were guilty of material support of terrorism, that they were not entrapped by agents of the government, and for Mr. Schimenti, that he provided materially false information to the government.

Mr. Schimenti generally adopts the arguments of co-defendant Jones in his post-trial motions on this issue. Specifically, Mr. Schimenti adopts Jones' arguments that the government failed to prove that Jones and Schimenti were predisposed to commit the crime charged. Mr. Schimenti's lack of predisposition was demonstrated at trial in several circumstances, as follows:

- During a December 29, 2015, meeting between Jones, Schimenti, and two undercover FBI agents, the undercover agents urged Mr. Schimenti to pledge Bay'ah, and further asked him to "rock it out." (Tr. at 330-332). According to undercover agent Bilal, "rock it out" meant to take action for Allah, with a jihadi context. *Id*. at 1170-71.

- After Bilal asked Schimenti to "rock it out," Schimenti left the meeting. Tr. at 489.

- Schimenti stated that he "doesn't do jihad" and never bought an ISIS flag. Tr. at 509.

- Mr. Schimenti declined confidential source Milton's advances, and never solicited support from him. Tr. at 512, 513.

The government also failed to prove that Mr. Schimenti was not induced to act by the cadre of undercover agents, confidential human sources, and online covert employees. Some specific examples of the evidence at trial is as follows:

- Government agents instructed Muhamed on how to introduce various topics to Mr. Schimenti. Tr. at 421.

- Undercover agent Bilal initiated conversation with Mr. Schimenti by saying he was "ready to explode" for the sake of Allah, in the specific context of jihad. Tr. at 1163, 64-65.

- Undercover agent Bilal's goal was to bring more deception into the case by continue to sell his story. Tr. at 1169.

- Muhamed came up with list of supplies for travel with the goal of having Mr. Schimenti assist in shopping. Tr. at 1477.

- Agents told Muhamed to suggest to Schimenti all manner of support, and even offered a code that they could use. Tr. at 1486, 1487.

The above examples are a non-exhaustive list used to illustrate that the failings of the government in overcoming its burden related to entrapment. Here, the government agents and actors were persistent in their efforts to get Mr. Schimenti to act. Mr. Schimenti adopts any further legal arguments of co-defendant Jones on this issue, and incorporates them herein.

## III. ADDITIONAL ISSUES

a. Collectively, the cumulative effect of the trial errors acted to deprive Mr. Schimenti of his constitutional right to a fair trial. As the Seventh Circuit has noted, even considerable evidence against a defendant does not inoculate against such cumulative error. *United States v. Santos*, 201 F.3d 953, 965 (7th Cir. 2000). At the very least, these compounded errors prevented Mr. Schimenti from completely presenting his theory of defense to the jury and so deprived him of his constitutional right to a meaningful opportunity to present a complete defense.

**b.** Mr. Schimenti incorporates herein by reference and expressly asserts and preserves all written pleadings, motions to suppress, motions for severance, and all oral motions, objections, requests, and arguments made before, during, and after trial by Defendant Jones.

## IV.    CONCLUSION

Wherefore, Mr. Schimenti respectfully request that this Court grant his request for judgment of acquittal pursuant to Fed. R. Crim. P. 29, or in the alternative, a new trial pursuant to Fed. R. Crim. P. 33.

Respectfully submitted this 6th day of January, 2020.


/s/Joshua B. Adams
Joshua B. Adams
Counsel for Ed Schimenti

/s/Stephen F. Hall
Stephen F. Hall
Counsel for Ed Schimenti


Joshua B. Adams                          Stephen F. Hall
**Law Offices of Joshua B. Adams, P.C.**   **Law Office of Stephen F. Hall**
53 West Jackson Blvd., Suite 1615        53 West Jackson Blvd., Suite 1424
Chicago, Illinois 60604                  Chicago, Illinois 60604
312.533.9173                             312.858.4400