**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17 CR 236-2 |
| | ) | Hon. Judge Andrea R. Wood |
| EDWARD SCHIMENTI, | ) | |
| | ) | |
| Defendant. | ) | |

**EDWARD SCHIMENTI'S COMBINED OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

Joshua B. Adams,
**Law Offices of Joshua B. Adams, P.C.**
53 West Jackson Blvd., Suite 1615
Chicago, Illinois 60604
312.566.9173/ josh@adamsdefenselaw.com

Stephen F. Hall
**Law Office of Stephen F. Hall**
53 West Jackson Blvd., Suite 1424
Chicago, Illinois 60604
312.858.4400/ stephen@sfhall.com

## TABLE OF CONTENTS

I.     BACKGROUND ........................................................................................ 1

II.    OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT .................... 2

    a.  Mr. Schimenti objects to the 2-point enhancement ........................................... 2
         under § 2M5.3(b)(1)(E)

    b.  Mr. Schimenti objects to the 12-point enhancement ........................................ 3
         under § 3A1.4

         i.  There is no proven basis to apply the ................................................... 3
             "Terrorism Enhancement"

         ii.  The automatic increase to Criminal History ........................................ 5
             Category VI should not be applied here

    c.  Mr. Schimenti Objects to the Adjusted and Total Offense Levels ................... 5

    d.  Mr. Schimenti Objects to the Discretionary Conditions .................................. 5

III.   DOWNWARD DEPARTURE .......................................................................... 7

    a.  Mr. Schimenti should receive a downward departure ...................................... 7
         from Criminal History Category VI

    b.  Mr. Schimenti should be granted a downward departure based ...................... 13
         on the Imperfect Entrapment Doctrine and U.S.S.G. § 5K2.12

    c.  Mr. Schimenti should receive a downward departure based on...................... 17
         the investigators' sentencing manipulation

IV.   SENTENCING MEMORANDUM ...................................................................... 19

    a.  The Nature and Circumstances of the Offense ............................................... 20

    b.  The History and Characteristics of Mr. Schimenti .......................................... 22

    c.  The Kinds of Sentences Available and the Sentencing Range ........................ 24
         Calculated under the Sentencing Guidelines

    d.  Pertinent Policy Statements Set Forth Pursuant to the Guidelines ................. 25

         i.  Age ................................................................................................. 26

    e.  The Need to Avoid Unwarranted Sentencing Disparities ............................... 27

V.    CONCLUSION............................................................................................ 30

# **TABLE OF AUTHORITIES**

**Cases**

*Koon v. United States*, 518 U.S. 81 (1996) .................................................................. 17

*Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51 (1937) ........................................... 18

*United States v. Akl*, Case No. 3:10 CR 251 (N.D. OH) ................................................ 28

*United States v. al-Jayab*, Case No. 16 CR 181 (N.D. IL) ............................................ 29

*United States v. Augustin*, Case No. 06 CR 20373 (S.D. FL) ....................................... 28

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) ................................................... 18

*United States v. Bala*, 236 F.3d 87 (2d Cir. 2000) .................................................. 13, 14

*United States v. Beith*, 407 F.3d 881 (7th Cir. 2005) ...................................................... 3

*United States v. Booker*, 543 U.S. 220 (2005) ........................................................*passim*

*United States v. Brown*, 732 F.3d 781 (7th Cir. 2013) ..................................................... 7

*United States v. Bullion*, 466 F.3d 574 (7th Cir. 2006) ................................................. 26

*United States v. Chandia*, 395 Fed. App'x 53 (No. 08-4529, 4th Cir. 2010) ................. 4

*United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) ................................................. 4

*United States v. Ciszkowkis*, 492 F.3d 1264 (11th Cir. 2007) ...................................... 17

*United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005) ........................................ 13

*United States v. Daoud*, Case No. 12 CR 723 (N.D. IL) ............................................... 28

*United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993) ...................................... 14

*United States v. Giles*, 768 F.Supp. 101 (S.D.N.Y. 1991) ............................................ 13

*United States v. Harris*, 41 F.3d 1121 (7th Cir. 1994) ................................................... 2

*United States v. Hassan*, Case No. 10 CR 187 (D. Minn.) ............................................ 28

*United States v. Hester*, No. 17 CR 64 (W.D. MO, 2020) ............................................ 26

*United States v. Johnson*, 685 F.3d 660 (7th Cir. 2012) ................................................ 26

*United States v. Lewis*, 162 F.App'x 647 (7th Cir. 2006) ............................................. 14

*United States v. Martinez-Villegas*, 993 F.Supp. 766 (C.D. Cal. 1998) ................. 14-15

*United States v. Maxfield*, 812 F.3d 1127 (7th Cir. 2016) ............................................. 7

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995) ..................................... 13, 15

*United States v. Osborne*, 935 F.2d 32 (4th Cir. 1991) ............................................ 13-14

*United States v. Parr*, 545 F.3d 491 (7th Cir. 2008) ........................................................ 4

*United States v. Prado*, 743 F.3d 248 (7th Cir. 2014) ................................................... 27

*United States v. Rizzo*, 121 F.3d 794 (1st Cir. 1997) .................................................... 17

*United States v. Senn*, 129 F.3d 886 (7th Cir. 1997) ...................................................... 3

*United States v. Sokoya*, 2007 WL 4198244 (N.D. IL 2007) ....................................... 14

*United States v. Staufer*, 38 F.3d 1103 (9th Cir. 1999) ................................................ 13

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ..................................................... 4

*United States v. Taylor*, 696 F.3d 628 (6th Cir. 2012) .................................................. 13

*United States v. Tobias-Rodriguez*, Case No. 10 CR 20094 (S.D. FL) ........................ 28

*United States v. Turner*, 569 F.3d 637 (7th Cir. 2009) ................................................. 17

*United States v. Vizcarra*, 668 F.3 516 (7th Cir. 2012) .................................................. 2

*United States v. Way*, 103 F.App'x 716 (4th Cir. 2004) ............................................... 14

*United States v. Warsame*, Case No. 04 CR 29 (D. Minn.) ........................................... 28

*Williams v. New York*, 337 U.S. 241 (1949) ................................................................ 20

**Statutes**

18 U.S.C. § 2332b(g)(5) ............................................................ 4

18 U.S.C. § 3553(a) ....................................................... *passim*

18 U.S.C. § 3561 ...................................................................... 25

18 U.S.C. § 3564(b) ................................................................. 25

18 U.S.C. § 3582 ...................................................................... 19

18 U.S.C. § 3661 ...................................................................... 19

28 U.S.C. § 994(d) ............................................................... 25-26

**Other Authorities**

USA PATRIOT Act, Pub. L. No. 107-56 ...................................... 8

U.S.S.G. Appendix C, amendment 637 (2002) ........................... 8

U.S.S.G. § 2M5.3(a) ............................................................... 27

U.S.S.G. § 2M5.3(b)(1)(E) ................................................... 2,3, 5

U.S.S.G. § 3A1.4 ................................................................... 3-4

U.S.S.G. § 4A1.3 ................................................................... 5, 7

U.S.S.G. § 5B1.1 .................................................................... 25

U.S.S.G. § 5K2.12 ............................................................... 13-14

United States Sentencing Commission, *A Comparison of the Federal* ...................... 26
    *Sentencing Guidelines Criminal History Category and the U.S. Parole*
    *Commission Salient Factor Score* (January 2005)

United States Sentencing Commission, *Measuring Recidivism: The Criminal* .......... 26
    *History Computation of Federal Sentencing Guidelines*, (May 2004)

Violent Crime Control and Law Enforcement Act of 1994, .......................... 8
    Pub. L. No. 103-322, § 120004

**Rules**

Rule 32(c) of the Federal Rules of Criminal Procedure .................................................... 1

**Articles and Other Sources**

Bureau of Justice Statistics Special Report, *Recidivism of Prisoners Released* ............ 11
    *from 30 States in 2005: Patters from 2004 to 2010* (April 2014)

Federal Bureau of Investigation, *Crime in the United States:* ..................................... 26
    *Arrests by Age, 2010*

George D. Brown, *Notes on a Terrorism Trial – Preventative Prosecution,* ............... 10
    *"Material Support" and the Role of the Judge After United States*
    *v. Mehanna*, 4 Harv. Nat'l Sec. J. 1 (2012)

James P. McLoughlin, Jr., *Deconstructing United States Sentencing* ......................... 8, 9
    *Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial*
    *Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51 (2010)

Carol Rosenberg, *John Walker Lindh, Known as the "American Taliban,"* ................ 11
    *Is Set to Leave Federal Prison This Week*, The New York Times
    (May 21, 2019)

National Institute for Justice*, National Statistics on Recidivism* (Feb. 2008) .............. 11

NCTC Current, *US Homegrown Violent Extremist Recidivism Likely*, .................. 10-12
    January 24, 2017

Now comes the Defendant, Edward Schimenti**,** through his attorneys, Joshua B. Adams and Stephen F. Hall, and respectfully submits to this Honorable Court his Objections to the Presentence Investigation Report ("PSI") and Sentencing Memorandum, pursuant to Federal Rule of Criminal Procedure 32(c), *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, as well as the factors enumerated in 18 U.S.C. § 3553(a). Mr. Schimenti respectfully requests this honorable court set his total offense level 28 with a Criminal History III and impose a below-Guidelines sentence of 60 months' imprisonment. As explained below, Mr. Schimenti, submits that a sentence of 60 months' imprisonment is not greater than necessary to accomplish the goals of sentencing. In support thereof, Mr. Schimenti states as follows:

## I.      BACKGROUND

As a preliminary matter, Mr. Schimenti disagrees with the jury's verdict as expressed in his post-trial motions. He pled not guilty and put his fate in the hands of the jury. He does not now challenge the basis of their verdict, vis-à-vis the evidence presented at trial. Rather, he argues the evidence introduced at trial as well as his personal history and characteristics mandate a below guideline sentence.

This Honorable Court presided over Mr. Schimenti's trial. As such, counsel will not engage in a lengthy recitation of the facts. Mr. Schimenti will highlight that for two years before the government introduced Muhammed to Mr. Schimenti, Edward took no action, no affirmative steps to assist ISIS. It was only in November 2016 - after the government's surveillance of Ed's social media content and a year-long undercover operation - that Edward agreed to obtain cellphones for ISIS.

Additionally, the advisory guideline calculations and enhancements applied to Mr. Schimenti effectively double the base offense level 26 to the total offense level 42. The PSI

suggests enhancements for offense conduct already contemplated in the base offense level of 26, and automatically enhances Mr. Schimenti's Criminal History Level to a category VI simply because of the statute the government chose to charge him under. This is despite having a criminal history score of only five points. The enhancements suggested in this case are based on the government's conduct and planning of this undercover scheme. For example, the FBI chose to use phones as the object of material support and cleverly devised Muhammed's backstory. Ed did not seek them out. As a result, Mr. Schimenti objects to the enhancements contained in the PSI as explained below.

Mr. Schimenti only acted when the government placed the opportunity before him and then consistently manipulated him over an extended period until he took the bait. He respectfully requests a sentence of 60 months' imprisonment. Such a sentence recognizes Mr. Schimenti's personal history and characteristics, the nature and circumstances of the offense and his own conduct and promotes deterrence while avoiding sentencing disparities among similarly situated individuals.

## II.      OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

### a. Mr. Schimenti objects to the 2-point enhancement under §2M5.3(b)(1)(E)

The PSI adds two points because Mr. Schimenti "provided cellular phones . . . with the belief that the CHS would transport them to ISIS-controlled territory." PSI., ¶23. Moreover, the PSI states that "the instant offense involved the provision of funds or other material support or resources . . ." *Id.*  Application of this two-point enhancement is double counting.

Although "[d]ouble counting is generally permissible unless the Guidelines say otherwise or there is a compelling basis for implying a prohibition," (*United States v. Vizcarra*, 668 F.3d 516, 520 (7th Cir. 2012) quoting *United States v. Harris,* 41 F.3d 1121, 1123 (7th Cir.1994)), the

Seventh Circuit "also said that impermissible double counting occurs 'if the offense itself *necessarily* involves the same conduct as the enhancement.'" *United States v. Beith,* 407 F.3d 881, 889 (7th Cir.2005) (quoting *United States v. Senn,* 129 F.3d 886, 897 (7th Cir.1997)). This is what happened in Mr. Schimenti's case.

The conspiracy to provide material support statute under which the government charged Mr. Schimenti, specifically enumerates cell phones as an item that can be used to provide material support. At trial, the case agent stated that the FBI chose cell phones because it was the "easiest" item to obtain. Tr. pp. 423-24, 515. A conviction for conspiracy to provide material support simply cannot be obtained unless the government proves the offense "involved the provision of funds or other material support or resources." U.S.S.G.§2M5.3(b)(1)(E). Thus, the base offense level under § 2M5.3(a) necessarily incorporates the basis for the requested enhancement pursuant to § 2M5.3(b)(1)(E). As a result, the two-points enhancement results in impermissible double counting.

### b. Mr. Schimenti objects to the 12-point enhancement under § 3A1.4

The government and probation suggest that a twelve-point enhancement is appropriate in this case pursuant to U.S.S.G. § 3A1.4. PSI, p. 7, ¶ 24; Govt. Sent. Memo, p. 14. The position of probation and the government in supporting the Terrorism Enhancement (which includes an automatic adjustment to Criminal History Category VI) is without support or merit.

### i. There is no proven basis to apply the "Terrorism Enhancement"

The Terrorism Enhancement in U.S.S.G. § 3A1.4 applies as follows:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

     (b) In each such case, the defendant's criminal history category from Chapter Four
        (Criminal History and Criminal Livelihood) shall be Category VI.

*Id*. Relevant to subsection (a), "Federal Crime of Terrorism" has a two-part definition. *See*

U.S.S.G. § 3A1.4, Application Notes; 18 U.S.C. § 2332b(g)(5). "[A] [f]ederal crime of terrorism

[is] an offense that is (1) calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government conduct, *and* (2) listed in 18 U.S.C. §

2332b(g)(5)(B)(i)." *United States v. Parr*, 545 F.3d 491, 504 (7th Cir. 2008) (internal quotations

omitted; emphasis in original). "The definition is stated in the conjunctive, so both requirements

must be met." *Id*.

     The Fourth Circuit Court in *United States v. Chandia*, encountered a situation in which

the parties disputed at sentencing whether the government had proven the first element of the

two-part test. 395 Fed. App'x 53 (No. 08-4529, 4th Cir. 2010). The court offered a concise

explanation of the intent aspect:

> Although it may seem at first blush that a terrorism-related conviction like [the
> defendant's] is naturally a 'federal crime of terrorism,' Congress chose a more narrow,
> motivation-based definition. A "federal crime of terrorism" is a violation of one of many
> statutorily enumerated offenses *and* is "calculated to influence or affect the conduct of
> government by intimidation or coercion, or to retaliate against government conduct." 18
> U.S.C. § 2332b(g)(5). The "calculated to influence or affect" element of the definition
> imposes a specific intent requirement that a sentencing court must find before applying
> the enhancement.

*Id*. at 54, citing *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008); *United States v.*

*Stewart*, 590 F.3d 93, 137-39 (2d. Cir. 2009). Simply concluding that the enhancement applies,

without more, does not satisfy the government's burden.

     It is accurate that Mr. Schimenti's conviction for violating § 2339B is "a felony that

involved … a federal crime of terrorism as defined at 18 U.S.C. § 2332b(g)(5)." PSR, p. 7, ¶ 24.

But demonstrating that the offense for which Mr. Schimenti was convicted falls within a list of

terrorism related offenses is only half the task. This Court must also find that the government

has proven, by a preponderance of the evidence, that Mr. Schimenti had the intent to "influence

or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct…." No such evidence was presented at trial, nor has any been developed

and presented since. Indeed, neither the government nor probation provide any explanation as to

why § 3A1.4 applies; rather, both simply conclude that it *does* apply without offering any proof

that Mr. Schimenti had the intent to influence or affect the conduct of the government or to

retaliate against such conduct. Application of this enhancement should be denied.

### ii. The automatic increase to Criminal History Category VI should not be applied here

Mr. Schimenti generally objects to the application of the automatic increase in Criminal

History Category to VI which accompanies use of the Terrorism Enhancement. Mr. Schimenti's

objections are listed in Section II(B)(i) and his accompanying request for a Criminal History

Departure pursuant to U.S.S.G. § 4A1.3 are further explained in Section III, *infra*.

### c. Mr. Schimenti Objects to the Adjusted and Total Offense Levels

Mr. Schimenti objects to probation's and the government's calculation of the adjusted

and total offense levels of 42. PSR, p. 8, ¶¶ 27, 30; Govt. Sent. Memo., p. 14. The appropriate

adjusted and total offense levels should be 28 once the requested enhancements pursuant to

U.S.S.G. §§ 2M5.3(b)(1)(E) and 3A1.4 are denied. Combined with the other arguments herein

listed, the resulting total offense level is 28 with a Criminal History Category of III. Mr.

Schimenti's Guideline Range is 97-121 months' imprisonment.

### d. Discretionary Conditions of Release, p. 30, ¶ 16

Discretionary condition of supervised release number 16 provides: "you shall permit a

probation officer to visit you at any reasonable time or" at home, at work, at school, at a

community service location, or "other reasonable location specified by a probation officer." PSR, p. 30, ¶ 16. Mr. Schimenti specifically objects to the discretionary condition which allows a probation officer to visit him at work.

Regardless of the length of incarceration which this Court orders, this Court will also sentence Mr. Schimenti to a term of mandatory supervised release ("MSR"). Whether by nature of his criminal history or this conviction, Mr. Schimenti is a convicted felon. As this Court knows, obtaining employment having previously been convicted of a felony can prove intensely difficult. Even once employment is secured, Mr. Schimenti anticipates that he will face additional scrutiny as an employee.

Assuming Mr. Schimenti finds employment and is otherwise doing well, he hopes that a probation officer's unannounced visit to his job would not impede his ability to keep that employment. Visits from a probation officer at Mr. Schimenti's home, his school, a community service location, or other reasonable location will not have the same potential to negatively impact Mr. Schimenti's success on MSR as will visitation at work. From that perspective, Mr. Schimenti respectfully requests that this Court sustain his objection to the discretionary condition listed in paragraph 16 of the PSI, specific only to visitation at work.

### III. DOWNWARD DEPARTURE

From a technical perspective, downward departures and variances are obsolete after *Booker*. 543 U.S. at 233-34. The arguments made herein for downward departures may be construed as mitigating factors to be considered as part of this Court's § 3553(a) analysis. *United States v. Maxfield*, 812 F.3d 1127, 1129-30 (7th Cir. 2016) ("Courts may now use aggravating and mitigating factors that, in applying the factors in 18 U.S.C. § 3553(a), may lead to a sentence below, or above the guidelines range,"); citing *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013). "District courts can be guided by the departure provisions and apply them by way of analogy when assessing the § 3553(a) factors." *Maxfield*, 812 F.3d at 1130. Thus, while the below arguments are properly presented as mitigation to be considered pursuant to § 3553(a), Mr. Schimenti presents them separately due to the guiding nature of the applicable Guideline provisions.

#### a. Mr. Schimenti should receive a downward departure from Criminal History Category VI

Should this Court apply the Terrorism Enhancement to Mr. Schimenti, his criminal history category will move from III (five points) to VI. PSR, p. 14, ¶ 49. Mr. Schimenti requests a downward departure pursuant to U.S.S.G. § 4A1.3: Departures Based on Inadequacy of Criminal History Category. Section 4A1.3 provides: "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3(b)(1). Mr. Schimenti submits that a criminal History Category VI over-represents Mr. Schimenti's criminal history as well as the likelihood that he will commit other crimes.

Prior to this case, Mr. Schimenti's criminal history consisted largely of traffic offenses, with convictions for only one prior felony (possession of cocaine thirteen years ago), and a misdemeanor possession of cannabis charge from 2010.  PSR, p. 13, ¶¶ 46, 47.  Mr. Schimenti's criminal history is almost entirely devoid of any allegations of violence[1], and nothing remotely close to the conviction in this case.  Without the automatic increase in criminal history included in the Terrorism Enhancement, Mr. Schimenti has only five criminal history points, with the most recent point stemming from a 2012 misdemeanor theft conviction.  Mr. Schimenti requests a downward departure because the Terrorism Enhancement, if applied, drastically increases his Criminal History Category without considering him as an individual – which this Court must do.

The Terrorism Enhancement was created in 1994 by the Sentencing Commission pursuant to direction from Congress.  *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022.  At the time of its creation, there was no base offense level for many "federal crimes of terrorism, but when Congress passed the USA PATRIOT Act … in the wake of September 11, the Sentencing Commission created those Guidelines."  James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4:  Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51 (2010) (available at http://scholarship.law.umn.edu/lawineq/vol28/iss1/2), *citing*, U.S. Sentencing Guidelines Manual App. C, amend. 637 (2002); USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272.  Material support of Terrorism under § 2339B was one of the offenses for which the U.S.S.C. created a new base offense Guideline.  As a result, any prison term imposed under the newly created Guidelines was also subject to the

---

[1] Mr. Schimenti's adult record includes charges for domestic battery in 2001 (PSI, p. 18, ¶ 65) and misdemeanor battery in 2006 (PSI, p. 19, ¶ 73).  Both of those charges were dismissed.

8

previously drafted Terrorism Enhancement. This is the exact situation in which Mr. Schimenti currently stands.

The Terrorism Enhancement's redundant punishment is problematic for several reasons.

Mr. McLoughlin (*Deconstructing USSG Section 3A1.4*) concisely explains two of the issues:

> First, the Guideline increases a defendant's Criminal History Category to a level VI – the most culpable. The shift to Criminal History Category VI ensures that a defendant will be sentenced as if he or she were a career criminal, with no empirical evidence that this is true or fair (under the considerations contemplated in 18 U.S.C. § 3553). Second, the Guideline automatically and uniformly increases a defendant's offense level, ensuring a defendant will be sentenced as if his or her offenses are among the most serious offenses addressed by the Sentencing Guidelines, regardless of where the offense level fits on the spectrum of "material support."

*Id.* at 57-58. Thus, a defendant receives the same enhancement under U.S.S.G. § 3A1.4, regardless of whether they have simply provided money or other goods (like broken cell phones) on one end of the spectrum, or they have provided weapons of mass destruction directly to ISIS, representing the other end of the spectrum. This sweeping application of the twelve-point enhancement and automatic Criminal History Category VI is problematic because it fails to evaluate each defendant appearing before the court as an individual. This point is apparent here where the government candidly recognizes "that at the time of the government's engagement with [the defendants], as much as they desired to support ISIS, they were not actively plotting to either travel to join ISIS, looking to facilitate travel for others, or to commit a terrorist attack in the United States." Govt. Sent. Memo., p. 2. But the Terrorism Enhancement does not allow for this Court to view Mr. Schimenti's crimes on a spectrum. If this Court applies § 3A1.4, Mr. Schimenti automatically receives a twelve-point enhancement and a Criminal History Category VI regardless of the severity of his actions.

The Terrorism Enhancement removes the spectrum of conduct entirely, and simply takes any individual labeled a "terrorist" and makes his or her crimes equal to that of any other

similarly labeled "terrorist." "Gradation of offenses" is an important value in criminal law." George D. Brown, *Notes on a Terrorism Trial – Preventative Prosecution, "Material Support" and the Role of the Judge After United States v. Mehanna*, 4 Harv. Nat'l Sec. J. 1, 54 (2012). "We do not treat a purse-snatcher like a rapist, [yet] the Enhancement reflects a different view: terrorist is a terrorist." *Id*. But this lack of consideration of Mr. Schimenti's actual criminal history is not the only basis for granting the instant request for a downward departure.

Pursuant to § 4A1.3(b)(1), this Court may also grant the requested departure based on "the likelihood that the defendant will commit other crimes …." Evaluating the potential of recidivism is at the forefront of this Court's task when crafting a sentence for Mr. Schimenti. It is not a stretch to say that is also one of the main concerns of the government in requesting lifelong MSR. Gov't. Sent. Memo., pp. 2,21 ("…there is no reason to believe that, if given the opportunity again, the defendants would not provide material support to ISIS or some other terrorist organization with a similar ideology,"). But the generalized fears of recidivism for "terrorists" are without empirical support and tend to lump all defendants into a single "terrorist" category.

In a now public report authored by the National Counterterrorism Center ("NCTC") in January, 2017, the NCTC declared: "[w]e assess that at least some of the more than 90 homegrown violent extremists (HVEs)[2] incarcerated in the US who are due to be released in the next five years will probably reengage in terrorist activity, possibly including attack plotting, because they either remain radicalized or are susceptible to re-radicalization as has already been demonstrated overseas." *See* NCTC Current, *US Homegrown Violent Extremist Recidivism*

---

[2] NCTC defines an HVE "as an individual inspired by a foreign terrorist organization of any citizenship who lives or operates primarily in the US, was radicalized primarily in the US, and who incites, conducts, or facilitates ideologically influenced terrorist activities while acting independently of any direction from a foreign terrorist organization." NCTC Current, p. 1.

*Likely*, January 24, 2017 (available at http://assets.documentcloud.org/documents/3873025/ NCTC-Report.pdf).[3] What is the basis for such a bold proclamation? The NCTC believes the "high rates of recidivism among those who were incarcerated for non-terrorism" crimes suggest that the "likelihood of violent extremist recidivism" is also remarkably high. In other words, the NCTC compared those convicted of terrorism related activity with run-of-the-mill criminal activity and viewed them as equal when predicting recidivism rates. In the same breath, however, the NCTC argues the inequality of terrorism related crimes by suggesting higher sentences and longer terms of MSR. The NCTC's own numbers do not support either its conclusion or suggestion.

In its report, the NCTC used various other studies to examine recidivism rates for federal offenders. NCTC Report, p. 1, *citing* Bureau of Justice Statistics Special Report, *Recidivism of Prisoners Released from 30 States in 2005: Patterns from 2005 to 2010* (April 2014); The National Institute for Justice, *National Statistics on Recidivism*, (February 2008). The Report found that from 2005 to 2010, 56 percent of those released were rearrested within one year, 68 percent were rearrested within three years, and 77 percent were rearrested within five years. Specific to violent offenders, "39 percent were rearrested within one year, 62 percent within three years, and 71 percent within five years…." *Id.* Similar statistics are not available for terrorism-centric convictions because many people falling into that category have yet to be

---

[3] Although the article is marked "For Official Use Only/ Law Enforcement Sensitive/ Not for Public Release," the document has been quoted, cited, and linked to in major publications such as The New York Times and The Atlantic, and is otherwise widely available online. The New York Times initially discussed the Report in May 2019. *See*, The New York Times, *John Walker Lindh, known as the 'American Taliban,' Is Set to Leave Federal Prison this Week*, available at https://www.nytimes.com/2019/05/21/us/politics/American-taliban-john-walker-lindh.html (last accessed March 25, 2020).

released from prison. Considering this the NCTC looked outside the United States to assess available data.

Examining data from BBC News and the Washington D.C. based think tank, Brookings, the NCTC found that "[a]s of January 2016, 47 out of 300 terrorists released from Indonesian prison reengaged with terrorism within the first two years of release …." NCTC Report, p. 1. Thus, in a focused examination of incarcerated people whom the government labels "terrorists," only 16 percent reengaged in terrorism within the first two years of release from prison. Compared with the 68 percent and 62 percent who were rearrested within three years per the Bureau of Justice and National Institute for Justice studies, respectively, the recidivism rate specific to terrorists and terrorist activities is significantly lower. Thus, removing from the sentencing equation, the baseless argument that those convicted of domestic terror crimes are more likely to re-offend and are, therefore, deserving of higher sentences or longer terms of MSR. In other words, the empirical data provided by the NCTC directly undermines the government's argument that "there is no reason to believe that, if given the opportunity again, the defendant's would not provide material support to ISIS or some other terrorist organization with a similar ideology." Govt. Sent. Memo., p. 21.

This Court should reject the government's argument on this point, should find that the fear of recidivism based on the nature of the conviction alone is without merit. This Court should further find that Mr. Schimenti's conviction over-represents the likelihood that he will commit other crimes, and a Criminal History Category VI over-represents his actual criminal history. Mr. Schimenti respectfully requests that this Court grant a downward departure of his criminal history on these two bases.

### b. Mr. Schimenti should be granted a downward departure based on the Imperfect Entrapment Doctrine and U.S.S.G. § 5K2.12

Mr. Schimenti asserted the affirmative defense of entrapment at trial. Despite that defense, the jury convicted Mr. Schimenti of both counts of the indictment. Thus, Mr. Schimenti's assertion that he was entrapped by the government was not proven at trial; however, he may assert "imperfect entrapment" here as mitigation regarding future dangerousness and the need to impose a sentence under § 3553(a)(2)(C) that protects the public. *See United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005) (recognizing that the defendants lawyer properly presented "a pattern of entrapment not as a defense but as a mitigating factor not reflected in the guidelines" citing §§ 3553(a)(2)(D) and (a)(3)).

The doctrine of "imperfect" entrapment is a legitimate basis for a sentencing variance and is entirely applicable based on the facts of this case. Because the doctrine is not frequently cited, some background is appropriate. Before the Supreme Court decided *Booker*, courts recognized imperfect entrapment as a basis for departing under the then-mandatory guidelines. *See United States v. Bala*, 236 F.3d 87 (2d Cir. 2000); *United States v. Giles*, 768 F.Supp. 101, 103-04 (S.D.N.Y. 1991); *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1999); *United States v. McClelland*, 72 F.3d 717, 726 (9th Cir.1995) (affirming downward departure based on imperfect entrapment, discussing scope of imperfect entrapment defense, in that it can apply when the defendant first proposes the offense (for if the defendant did not and the defendant was not predisposed, then it would be grounds for acquittal); *United States v. Taylor*, 696 F.3d 628, 633-34 (6th Cir. 2012) (recognizing the doctrine of imperfect entrapment," and "the notion that undue government encouragement to commit an offense can mitigate punishment even if it cannot wholly defeat criminal liability," but affirming the sentence finding that the court considered arguments even though it did not directly discuss imperfect entrapment); *United States v.*

13

*Osborne*, 935 F.2d 32, 35 n.3 (4th Cir. 1991); *United States v. Way*, 103 F.App'x 716, 718 (4th Cir. 2004) (recognizing the district court has authority to consider imperfect entrapment argument and affirming court's decision to reject the theory). Mr. Schimenti recognizes that the Fifth Circuit has declined to recognize imperfect entrapment as a basis for a sentencing variance, and further notes that although the Seventh Circuit has recognized imperfect entrapment, it has yet to be applied in this Circuit. *See Cunningham*, 429 F.3d at 678; *United States v. Lewis*, 162 F.App'x 647, 652 (7th Cir. 2006); *United States v. Sokoya*, 2007 WL 4198244, *6 (N.D. IL, 05 CR 41, 2007) (acknowledging application of "imperfect entrapment" departure in conjunction with U.S.S.G. § 5K2.12, citing *United States v. Bala*, *supra*, but nevertheless denying that basis for appeal because the defendant "alleged no such conduct,").

As the court in *Sokoya* did, the above pre-*Booker* cases typically viewed the imperfect entrapment argument through the lens of U.S.S.G. § 5K2.12, entitled "Coercion and Duress (Policy Statement)." *See Bala*, 236 F.3d at 91-92 ("Some circuits have determined that 'imperfect entrapment,' described as 'aggressive encouragement of wrongdoing, although not amounting to a complete defense,' is a proper ground for a downward departure at sentencing pursuant to U.S.S.G. § 5K2.12"); *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993) ("The district court in the present case was faced with a similar situation. Agent Murillo did not threaten the defendants, but it was he who initially proposed the illegal activity and persistently contacted [the defendant] by telephone and in person over several months until the scheme was completed. This sort of aggressive encouragement of wrongdoing although not amounting to a complete defense, may be used as a basis for a departure under section 5K2.12,").

*United States v. Martinez-Villegas*, 993 F.Supp. 766, 777 (C.D. Cal. 1998) illustrates the application of the imperfect entrapment defense. There, the district court recognized that a

14

downward departure under U.S.S.G. § 5K2.12 was appropriate "if a defendant committed the offense due to serious coercion, blackmail, or duress under circumstances not amounting to a complete defense of entrapment." It further held that such a departure was appropriate because "the government's conduct, although not rising to the level of entrapment, is sufficient to constitute 'aggressive encouragement' to support a finding of imperfect entrapment." *Id*. at 777. That conduct involved the government first proposing the illegal activity, initiating contact through a confidential informant, and then introducing an undercover agent who posed as "a Latin American drug lord." *Id*. This doctrine may be applied even if the defendant is the one who initially proposes the illegal conduct if the government actors apply enough pressure.

The Ninth Circuit, which has apparently had the most occasion to consider the doctrine, affirmed a departure even when a defendant was the first to propose an illegal scheme. *See McClelland*, 72 F.3d at 725-26. In *McClelland*, the court held that

> A district court could properly determine that a defendant who first proposed an illegal scheme, but who later expressed serious reservations and acted only after strong and repeated inducements by the government is less morally blameworthy and less likely to commit crimes in the future than a defendant who eagerly participated in an illegal scheme with no inducement other than the initial suggestion by a government agent. Thus, if a district court departs downward on the ground of imperfect entrapment in a case in which the defendant first approached the government, the departure may still be completely consistent with at least two important factors relevant to sentencing – protection of the public, and characteristics particular to the defendant's culpability.

*Id*. Thus, the doctrine is properly applied even if a defendant is found to be predisposed to commit a crime. Here, we have the exact situation contemplated by the imperfect entrapment doctrine.

As is thoroughly discussed throughout this sentencing submission, the various pleadings of the defendants, and from this Court observing the trial of this case, Mr. Schimenti was surrounding by government agents for nearly two years. At all times, these government actors

tried their best to get Mr. Schimenti to take some overt action. Before Mr. Schimenti met with undercover agents Bilal and Omar, or confidential human sources Milton and Muhammed, he was very vocal and supportive of ISIS propaganda in online forums. At that point, the FBI targeted online covert employees to interact with Mr. Schimenti to develop their investigation. This online targeting evolved into in person meetings with Bilal and Omar, which Mr. Schimenti cut short when the undercover agents suggested pledging allegiance to ISIS. Bilal continued to pursue Mr. Schimenti via text message. These messages were not promoted by Mr. Schimenti, nor were they reciprocated to any large degree.

As of May 2016, six months passed since Mr. Schimenti rebuffed advances by Omar and Bilal, and during which Bilal continued to pursue Mr. Schimenti. At this point, there was a "pause" in the investigation for agents to assess "where exactly they were in the investigation." Tr., p. 2009. The agents devised a new scenario to surround Mr. Schimenti with government agents, in the hopes that the FBI's new efforts would "lure" Mr. Schimenti into committing overt acts. Tr., p. 2014. It is important to note that while testifying in open court, Special Agent Thad Boertje testified he "regrettably used" the term "lure" in internal FBI communications discussing the FBI's revised scenario. When no one was watching in 2016, the FBI was attempting to lure Mr. Schimenti to commit overt acts. The FBI then threw more resources at Mr. Schimenti, surrounding him with CHS Milton and CHS Muhammed. The FBI ensured Mr. Schimenti was constantly involved in the false reality it created for him, at work, at the gym, and online at home. Through its substantial efforts, the FBI exerted immense pressure on Mr. Schimenti, and while the jury did not believe this pressure rose to the level of entrapment, these actions certainly support the mitigating factor of imperfect entrapment.

### c. Mr. Schimenti should receive a downward departure based on the investigators' sentencing manipulation

Mr. Schimenti acknowledges at the outset that this Circuit does not recognize sentencing manipulation. *See United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009) ("…our circuit does not recognize the sentencing manipulation doctrine," while acknowledging that other circuits do recognize the doctrine), *citing United States v. Ciszkowkis*, 492 F.3d 1264, 1270 (11th Cir. 2007) (recognizing sentencing manipulation as "a viable defense"); *United States v. Rizzo*, 121 F.3d 794, 801 & n. 11 (1st Cir. 1997). This Court does, however, have significant discretion in the sentence of imprisonment to which it orders Mr. Schimenti. As a result, should this Court reject his argument related to sentencing manipulation, Mr. Schimenti urges this Court to consider his arguments as part of the § 3553(a) factors.

Mr. Schimenti was arrested and formally interviewed by multiple law enforcement officers as part of the post-arrest procedures on April 12, 2017. Tr. at 1802-03. Among the law enforcement officers participating in the post-arrest interview of Mr. Schimenti was FBI Special Agent Boertje. *Id*. t 1803. According to Agent Boertje, "[t]he post-arrest interview is a routine practice for the FBI. We actually put quite a bit of thought and preparation into a post-arrest interview because it provides a time, oftentimes the first time, to interact directly with the subject to the investigation." *Id*. Agent Boertje's position might be accurate in other cases, but it was not in this matter. Numerous law enforcement personnel interacted directly with Mr. Schimenti prior to the post-arrest interview, including multiple confidential human sources, multiple undercover agents, and multiple online covert employees whom occupied every aspect of his life.

During the post-arrest interview, the government made it a point to ask Mr. Schimenti questions to which they already knew the answers. This is a common and accepted tactic in post-arrest interviews so law enforcement can determine if someone is generally telling the truth. In

Mr. Schimenti's situation, however, the agents *only* asked questions to which they already knew the answers. This was so because the FBI and those working for it had completely surrounded Mr. Schimenti's life – at home, at the gym, at work, and on the computer. This is exemplified by the following testimony of Agent Boertje:

> Q:  Agent Boertje, in this clip we just watched, how did Schimenti answer your questions about why Muhamed would have all these phones?
>
> A:  He responded that he didn't really know the purpose of those cell phones.
>
> Q:  Agent Boertje, why did you ask Schimenti repeatedly, repeatedly about the cell phones?
>
> A:  Because during the investigation, evidence had been collected where Muhamed had explained the purpose of those multiple cell phones.

Tr. at 1816.  And so went nearly the entire interview. The agents specifically asked questions to which they already had the answers in a situation where their investigation was complete. This is at odds with the requirement of a prosecution for violating 18 U.S.C. § 1001(a)(2) (Count Two), which requires that the false representation be material in nature. Here, none of the representations could have been material to the investigation because it was complete, and the answers to all questions were known when asked. The only possible goal of the agents was to increase the potential maximum sentence for Mr. Schimenti. As such, we ask this Court to grant Mr. Schimenti a downward departure based on the sentencing manipulation of the investigating agents in this matter.

## IV.    SENTENCING MEMORANDUM

Post *Booker*, a district court has significantly more freedom to fashion a sentence which is appropriate for the individual defendant before the court.  *See United States v. Baker*, 445 F.3d 987, 991 (7th Cir. 2006), citing *Booker*, 543 U.S. 220.  The United States Sentencing Guidelines are merely advisory, and sentencing courts are required to consider all factors listed in 18 U.S.C. § 3553(a) in imposing a sentence.  *Booker*, 543 U.S. at 245.  Where the defense raises § 3553(a) factors in requesting a below-guidelines sentence, the court must conduct a meaningful analysis of how those factors apply to the facts and explain why its sentence is appropriate under § 3553(a).

Under 18 U.S.C. § 3582, the imposition of a term of imprisonment is subject to the following limitation:  in determining whether and to what extent imprisonment is appropriate based on the § 3553(a) factors, the judge is required to recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation."  The primary directive in § 3553(a) is that the court must impose a sentence that is "sufficient but not greater than necessary" to comply with the purposes of sentencing.  When considering an appropriate sentence, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

Our jurisprudence makes clear that one of the main goals of using the sentencing factors is to consider each defendant appearing before the court as an individual.  As the Supreme Court explained in *Koon v. United States*, 518 U.S. 81, 113 (1996), "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify the crime and punishment to ensue." The basis of this tradition is the notion that the "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949); *see also Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("for the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender,"). With those considerations in mind, Mr. Schimenti implores this Court to look not only at the offense conduct and its context, but also at the unique circumstances of Mr. Schimenti when crafting an appropriate sentence for him.

### a. The Nature and Circumstances of the Offense

Mr. Schimenti appeared on the FBI's radar as a marginalized member of society, enthralled with the propaganda of radical Islam. As Professor Jaffer explained, ISIS and those that follow its views believe the Western powers as "crusader armies" engaging in a "religious war against the Muslims…." Tr. 89. Although many find Mr. Schimenti's fascination with radical Islam and his related speech distasteful, it is protected speech. At the time that the FBI began following and interacting with Mr. Schimenti through its Online Covert Employees ("OCEs"), Mr. Schimenti had *done* nothing. His days consisted of going to work, exercising at the gym, and returning home. Beyond simply monitoring Mr. Schimenti, the FBI made significant efforts to interact with him by introducing the first of several undercover agents and confidential sources.

The FBI created a plan to catch Mr. Schimenti committing acts rather than using words. To accomplish this, the FBI introduced Mr. Schimenti to an undercover FBI Agent known as Bilal. Along with his colleague "Omar 1", Bilal met with Mr. Schimenti and Mr. Jones in

December 2015.  In the December 2015 meeting, Bilal and Omar 1 posed as Islamic extremists and tried to get Mr. Schimenti and Mr. Jones to pledge allegiance to ISIS ("bay'at").  Mr. Schimenti rejected this ploy and left the meeting.  Unsatisfied that Mr. Schimenti was not a threat, the FBI continued to pursue him.

During the late Spring and Summer of 2016, Bilal contacted Mr. Schimenti several times by text message and attempt to re-engage him.  Mr. Schimenti largely rejected Bilal's attempts and invitations.  After more than six months of trying to get Mr. Schimenti to do more than talk – without success - the FBI was still unsatisfied that he was not a threat.  The FBI again ramped up its efforts to goad Mr. Schimenti into action.

The government describes the FBI's next steps well:

Although the FBI was engaging with Jones, Schimenti was still a concern.  In November 2016, the FBI directed CHS [confidential human source] to get a job at Schimenti's place of employment in order to interact with Schimenti.  The CHS was hired and became friendly with Schimenti to the point where they socialized after work.

Govt. Sent. Memo., p. 9.  Mr. Schimenti's daily routine consisted of work, gym, and home.  The FBI monitored Mr. Schimenti's online activity at home and the CHS, known as Muhammed, could monitor him at work.  But there remained a gap in the FBI's efforts.

Concerned by lack of FBI "coverage" for every aspect of Mr. Schimenti's life, the FBI introduced a second CHS, "Milton," near the time it introduced Muhammed.  Tr., pp. 403-04.  The FBI introduced Milton to Mr. Schimenti at the gym to complete the fictional universe created around Mr. Schimenti.  Thus, after more than a year of inaction on the part of Mr. Schimenti, the FBI had now infiltrated every part of his life.  Over time the CHS convinced Mr. Schimenti they were friends and they would spend time together outside of work.  On the rare occasions that Muhammed would invite Mr. Schimenti to a meal or social gathering, Muhammed

continued to apply pressure by employing a narrative which the FBI concocted. Milton also applied pressure, but Ed rejected his advances.

On one occasion when Ed went to Milton's house and discussed travel to Pakistan to meet his bride, Milton suggested to Ed that he travel across the border to meet his brothers in ISIS. Ed responded to the effect that he was not interested, and just wanted to bring his bride back to the United States. When Ed thought nobody was listening, when he thought Milton had been a real person and confronted with the choice to join ISIS in Syria, Ed declined. Despite nine in-person meetings and further communication through text messages, Milton was unsuccessful in the eyes of the FBI. The relationship between Milton and Mr. Schimenti never "turn[ed] the corner" and Mr. Schimenti never talked with Milton about ISIS. Tr., p. 405.

Ultimately Mr. Schimenti succumbed to the continued pressure and purchased a phone charger and five broken phones which he gave to Muhammed for the purpose of sending to ISIS fighters. These actions largely made up the basis for prosecution and conviction in this case. At no time did Mr. Schimenti argue that he did not purchase the phones and charger and provide them to Muhammed; rather, the defense at trial focused on entrapment. While Mr. Schimenti respects the jury's verdict, he submits that the facts of this case warrant consideration and the requested below-Guidelines sentence.

**b. The History and Characteristics of Mr. Schimenti**

As Ms. Johnson stated in her letter, "Eddies home life was a good one during his younger years as his father always provided well for his family. His father Edward B. Schimenti would take his family on vacations at least once a year." Ex. A. Sadly, Ed's mother became addicted to cocaine. As a young boy it must have been frightening and upsetting to Ed to see the one person

who could turn to for comfort become addicted. This addiction ultimately did not only affect herself. It trickled down to her husband ultimately her only son.

Because of his mother's addiction, Ed's father found himself embroiled in her downfall. Both of Ed's parents became hooked on drugs. A young boy needs parents for guidance, compassion and most of all a sense of protection. Ed lost that when he lost his parents to their addictions. As Ms. Johnson saw firsthand, "it destroyed all homelife normalcy for Eddie." Ex. A.

Seeing his parents struggle with addiction, Ed turned to religion. As a thirteen-year-old, he found Islam. To Ed, the strict rules related to abstinence of alcohol and drugs appealed to him. He thought if he could get his parents to join him, they would no longer suffer from their addictions. He could in effect, take that away from them. Ed found comfort and solace in Islam's teachings and prayer. He stopped his association with gang members and tried to go down a different path.

However, like any extremist wing of any religion, Ed became consumed with extremist Islam. He immersed himself in the teachings, lectures and online propaganda of ISIS. To Ed, this was the strict religious sect he desired. He found Sharia law acceptable to himself, and even went so far as to seek a bride from Pakistan. The deeper Ed got into the religion, the more vocal he became. The court saw his social media posts and rants.

It is important to note at this point a statement from the government's expert, Jamil Jaffar. Mr. Jaffar stated that ISIS operatives reach out to individuals they think can help them. These ISIS members initially start off by asking the target for small or menial tasks, like sending a phone card, or wiring money. These requests graduate to clothes, medical supplied and eventually asking the target to travel overseas to join ISIS. Nothing remotely similar happened here. Despite all the flags Ed put out, all the social media posts professing a love for ISIS or

sharing of grotesque videos, nobody from any terrorist group ever took Ed seriously. The FBI

had monitored Ed's social media activity for two years. There is not one single post, reply,

message or note from a terrorist group asking Ed to commit any acts to provide material support.

This is a significant mitigating factor in favor of Ed. It shows his unwillingness to act, and more

his desire to spread his extremist views online only.

The government also views Ed's statements about Great Lakes Naval Station as

significant and serious desire to commit violence. Plainly put, Ed never posed any serious or

realistic threat to commit harm to anyone. This statement made to Ms. Turnipseed should be

viewed in the same vain as Ed' statement that he wanted to "see the ISIS flag atop the White

House." It is extremist and merely offhand rhetoric. While the statements themselves are

disturbing they are in no way indicative of Ed's intent to blow up the Naval Station. Indeed, the

government never took this statement as a credible threat either. The government learned of Ed's

statement when agents interviewed Mr. Turnipseed in December 2016. They did not arrest Ed

until April 2017. This coupled with the government's around the clock surveillance of Ed's

social media gave the government no reason to view this as anything but talk. It strains credulity

that the government believed that Ed would commit an act of violence.

### c. The Kinds of Sentences Available and the Sentencing Range Calculated under the Sentencing Guidelines

The statutory provisions related to Mr. Schimenti's conviction for violating 18 U.S.C. §

2339B(a)(1) (Count One) provide a maximum possible sentence of 20 years' in custody.  The

statutory maximum sentence for Mr. Schimenti's violation of 18 U.S.C. § 1001(a)(2) (Count

Two) is eight years.  PSI, p. 27.  As discussed in the Objections, above, the disputed Guideline

range for a term of custody is 360 months to life, with an adjusted range of 336 months.  *Id*. at ¶

113.  The PSI lists 360 months to life adjusted down to 336 months as the Guideline range for

Mr. Schimenti based upon a Total Offense Level of 42 and a criminal history category VI. Mr. Schimenti submits that the appropriate Total Offense Level is 28 with a criminal history category III. This correct calculation by Mr. Schimenti results in a Guideline range of 97 to 121 months' imprisonment.

Although probation is available to Mr. Schimenti pursuant to the statutes, probation is not an option for Mr. Schimenti pursuant to the Guidelines. *Compare* 18 U.S.C. § 3561(c)(1), USSG § 5B1.1, comment (n.2). Any term of probation for the two counts of conviction shall run concurrently. PSR, p. 34, ¶ 119; 18 U.S.C. § 3564(b).

Restitution is not an issue in this case. PSR, p. 35, ¶¶ 127, 128. The Guideline range for fines for Counts One and Two is $50,000 to $250,000, with a statutory maximum fine of $250,000. PSR, p. 34, ¶¶ 121, 123; 18 U.S.C. § 3571(b); USSG § 5E1.2(c)(3). A special assessment of $100 per count must be ordered by this Court. 18 U.S.C § 3013.

Lastly, this Court must consider imposing a term of MSR. The government suggests a lifetime term, to which Mr. Schimenti objects. Any term of MSR for Counts One and Two shall be served concurrently. *Id*. at ¶ 116.

### d. Pertinent Policy Statements Set Forth Pursuant to the Guidelines

This Court may consider certain policy statements promulgated by the United States Sentencing Commission before imposing a sentence for Mr. Schimenti. Among the policy considerations which this Court may consider are the following:

> (1) age; (2) education; (3) vocational skills; (4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability; (5) physical condition, including drug dependence; (6) previous employment record; (7) family ties and responsibilities … (9) role in the offense; (10) criminal history; and (11) degree of dependence upon criminal activity for a livelihood.

28 U.S.C. § 994(d). These factors are all relevant here and all weigh heavily in favor of this Court imposing a below-guidelines sentence of 60 months' incarceration.

### i. Age

Increased age bears a strong correlation with lower rates of recidivism. Per Sentencing Commission data, "[r]ecidivism rates decline relatively consistently as age increases," from 35.5 percent under age 21, to a mere 9.5% over the age of 50. United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, p. 12 (May 2004). The United States Parole Commission has long included age as part of its Salient Risk Factor Score because it is a validated predictor of recidivism risk. United States Sentencing Commission, *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score*, pp. 1, 8, n. 29 (January 2005). Although the Commission has not modified the Guidelines to incorporate this data, this Court is free to rely on this information to depart from the Guidelines when the defendant's age predicts a reduced likelihood or recidivism.[4]

If this Court sentences Mr. Schimenti to a term of imprisonment within his suggested Guideline range, he will be nearly 50 when he is released from prison. Statistically, Mr. Schimenti will be an exceptionally low risk of recidivism. Mr. Schimenti has also demonstrated during his time at the MCC that he wishes to use his time constructively by participating in the

---

[4] Courts have cited similar data when imposing below-Guideline sentences. See*, e.g., United States v. Johnson*, 685 F.3d 660, 661 (7th Cir. 2012) ("The propensity to engage in criminal activity declines with age, and is, on average, sharply lower for persons over 70 – although persons 65 and older are 13 percent of the population, they account for only seven tenths of one percent of arrests,"), *citing* Federal Bureau of Investigation, *Crime in the United States: Arrests by Age, 2010*, available at https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s.-2010/tables/10tbl38.xls; see also *United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006) ("[i]n other words, if the defendant is elderly and infirm, he may be harmless, and this bears on the sentencing goal of preventing him … from committing crimes by incarcerating him. In still other words, the older, weaker, etc., the defendant is, the less likely he is to recidivate, and this argues for a shorter sentence,").

programs offered. PSI, p. 25, ¶ 103. There is no reason to think any time he spends in more permanent custody would not be used similarly. It is likely that Mr. Schimenti will work hard while incarcerated and emerge a man unlikely to re-offend.

### e. The Need to Avoid Unwarranted Sentencing Disparities

A within – Guidelines sentence "implicitly incorporates the United States Sentencing Commission's concerns regarding avoiding unwarranted disparities among similarly situated defendants." *United States v. Prado*, 743 F.3d 248, 252 (7th Cir. 2014). Despite that, sentencing Mr. Schimenti within the Guidelines or even sentencing in accordance with the suggestion of the government (20 years' imprisonment), would likely create a sentence that is inconsistent with other defendants convicted of violations of 18 U.S.C. § 2339B.

In its Sentencing Memorandum, the government cites several cases which it believes support a sentence of 20 years' imprisonment for Mr. Schimenti. Govt. Sent. Memo, pp. 21-23. Notably, in only one of the cited cases did a defendant receive a sentence close to 20 years. In *United States v. Robert Hester*, (W.D. Mo., March 4, 2020, 17 CR 64), the government charged Mr. Hester with one count each of violating 18 U.S.C. §§ 2339A and B. Ultimately, Mr. Hester pleaded guilty to one count of violating § 2339B by way of a Plea Agreement and was sentenced to 19 years and 2 months' imprisonment. Dkt. No. 49. The significant difference between Mr. Schimenti and Mr. Hester is that Mr. Hester agreed to the imposition of a 2-level enhancement pursuant to U.S.S.G. § 2M5.3(b)(1)(E), agreed to the 12-level Terrorism Enhancement, agreed that his criminal history would be at Category VI, and further agreed not to seek a sentence less than 15 years' imprisonment. *Id*. at 6. Mr. Hester's sentencing range pursuant to his Agreement was between 180 and 240 months. Mr. Schimenti has actively opposed the enhancements to which Mr. Hester agreed.

Mr. Schimenti created a table of cases involving convictions pursuant to § 2339B, and has attached it hereto as Exhibit B.  Although some of the cases involve convictions in addition to the conviction for § 2339B, it provides a survey of similarly situated defendants from 2003 through the present.   Specifically, some of these cases demonstrate that factual scenarios similar to Mr. Schimenti's have yielded sentences significantly lower than that called for by the USSG or suggested by the government.[5]  Although the attached list is non-exhaustive, Mr. Schimenti submits that the review of these cases support Mr. Schimenti's requested sentence.

In *United States v. Adel Daoud*, Case Nos. 12 CR 723, 13 CR 703, and 15 CR 487 (N.D. IL), the court sentenced the defendant to 192 months incarceration.[6]  As framed by the government, "[t]he initial charge was the defendant attempted to detonate a 1,000 pound car bomb that he believed was going to kill hundreds of people who were enjoying a warm evening

---

[5] *See* Ex. B, p. 1 (*United States v. Warsame*, No. 04 CR 29 (D. Minn.) (Defendant travelled to Afghanistan to participate in an Al Qaeda training camp, completed the training, then attended another taught by Osama Bin Laden.  The defendant provided security and English language services while overseas, and wired money to "the brothers" once he returned to the United States.  The defendant received 92 months' imprisonment for his conviction for violating § 2339B); Ex. B., pp. 1-2 (*United States v. Augustin, et al*., No. 06 CR 20373 (S.D. FL) (Defendants Burson Augustine, Rothschild Augustine, and Patrick Abraham were accused of plotting to blow up buildings in Miami and Chicago after swearing an oath to al Qaeda.  After a jury trial the defendants were all convicted of violations of § 2339B, among other counts.  The trial court sentenced the defendants to terms of imprisonment of 72 months, 84 months, and 112.5 months, respectively); Ex. B, p. 3 (*United States v. Tobias-Rodriguez*, No. 10 CR 20094 (S.D. FL) (Defendant worked with others to assist al Qaeda in the transportation and smuggling of aliens and weapons into the United States from Peru, and pleaded guilty to violations of 18 U.S.C. §§ 2339B and 960.  The court sentenced the defendant to 90 months' imprisonment); Ex. B, pp. 3-4 (*United States v. Hassan*, No. 10 CR 187 (D. Minn.) (Defendant was found guilty after a jury trial of three counts of violating § 1001, and one count of violating § 2339B.  Defendant assisted in raising $2,100 for al-Shabbab and encouraged others to pledge allegiance to the group.  The defendant was sentenced to 120 months' imprisonment.  By comparison, Hassan's co-defendant, Amina Ali received a sentence of 240 months' imprisonment after being convicted of 13 violations of § 2339B); Ex. B, p. 4 (*United States v. Hor Akl, et al*., No. 3:10 CR 251 (N.D. OH) (Defendant Hor Akl, and co-defendant Amera Akl pleaded guilty to violating § 2339B for their planned concealment of $500,000 meant for Hezbollah.  The court sentenced Hor Akl to 75 months' imprisonment, and Amera Akl to 40 months' imprisonment).

[6] The court sentenced Mr. Daoud to 192 months' incarceration for Counts One and Two, concurrent for case 12 CR 723.  The court also sentenced Mr. Daoud to 140 months' incarceration in 13 CR 703- and 120-months' incarceration in 15 CR 487, all to run concurrently.  Dkt. 342, p. 14.

at the Cactus Bar & Grill. Prior to that evening, the defendant had been preaching for violent Jihad." Dkt. 342, p. 4. In case 13 CR 703, the defendant solicited the murder of an undercover agent, and in 15 CR 487, he attacked another inmate while being held at the MCC. *Daoud* was undoubtedly a complex case, however, at the center of it was a young man who was approached by law enforcement and goaded into trying to detonate a 1,000-pound bomb in downtown Chicago. For this, he received a sentence of 192, while here, the government is requesting a sentence of 240 months. Although Mr. Schimenti's convictions are undoubtedly serious, his actions in this case are magnitudes less jarring and violent than the three separate offenses in *Daoud*.

In *United States v. Aws Mohammed Younis al-Jayab*, Case Nos. 16 CR 181 and 18 CR 721 (N.D. IL), the defendant was charged with material support of terrorism in violation of 18 U.S.C. § 2339B and providing a materially false statement to federal agents in violation of 18 U.S.C. § 1001. Dkt. No. 129 (16 CR 181). The defendant pleaded guilty to those offenses pursuant to a plea agreement. Specifically, the defendant admitted to "planning to travel to Syria to support Ansar Al-Islam, identified Turkey as a probable transit point, and sought to arrange the finances and logistics for his travel." *Id*. at 3. The defendant not only planned but succeeded in traveling to traveling to Turkey in November 2013. *Id*. at 4. From there, he traveled to Syria where the defendant "joined and fought with Ansar Al-Sham and Ansar Al-Islam, knowing that Ansar Al-Islam was a designated foreign terrorist organization. *Id*. Upon his return to the United States, the defendant lied to immigration officials about his travel. *Id*. at 5. Pursuant to his plea agreement, the defendant's total offense level was 37 which resulted in a guideline range of 276 months' imprisonment. For all of this, the government sought a sentence of imprisonment of only 180 months' incarceration. Dkt. No. 26 (18 CR 721), and the court

sentenced the defendant to 60 months' imprisonment (concurrent with case 18 CR 721), with a 20-year term of supervised release. Sixty months' imprisonment for a defendant who not only planned travel and raised money but ventured to Syria and *fought* with foreign terrorist organizations. Based on the above and the cases referenced in Exhibit B, any sentence of imprisonment over 60 months would create an unwarranted sentencing disparity.

## V. CONCLUSION

Wherefore, Mr. Schimenti respectfully requests that this Court sentence him to a below Guidelines term of imprisonment of 60 months, and a term of Mandatory Supervised Release of three years.

Respectfully submitted this 2nd day of April 2021.


| /s/ Joshua B. Adams | /s/ Stephen F. Hall |
|---|---|
| Joshua B. Adams | Stephen F. Hall |
| Counsel for Mr. Edward Schimenti | Counsel for Mr. Edward Schimenti |


Joshua B. Adams
**Law Offices of Joshua B. Adams, P.C.**
53 W. Jackson Blvd., Suite 1615
Chicago, Illinois 60604
312.566.9173
Josh@Adamsdefenselaw.com

Stephen F. Hall
**Law Office of Stephen F. Hall**
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
312.858.4400
Stephen@sfhall.com